**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

ENID BONILLA,
Plaintiff

v. C.A. No. 07-331S

ELECTROLIZING, INC.,
ALAN GODIN, *alias*,
DAVE RICHARDS, *alias*, and
any and all defendants,
Defendants

**PLAINTIFF'S REPLY MEMORANDUM TO DEFENDANTS' OPPOSITION TO MOTION FOR LEAVE TO AMEND COMPLAINT**

Pursuant to Rule 7 of the Local Rules of the United States District Court for the District of Rhode Island, Plaintiff Enid Bonilla hereby submits this memorandum in response to Defendants' Memorandum in Opposition to Motion for Leave to Amend Complaint filed on April 7, 2008.

For the reasons discussed below, Plaintiff's Motion for Leave to Amend Complaint should be granted.

## I. Defendants' Claim of Potential Prejudice Is Completely Without Merit.

Defendants' claim of un-timeliness and potential prejudice is just a clever smoke-screen designed to derail Plaintiff's case from gaining steam.

### A. Defendants Cannot Argue in Good Faith to Be Prejudiced or Surprised by the Assertion of a Claim Under the R.I. Fair Employment Practices Act, R.I. Gen. Laws § 28-5-1 *et seq.* (2007) ("FEPA") Because They Were Put on Notice Twice of Potential FEPA Violations Two Years Prior to the Filing of This Lawsuit Via a Demand From Plaintiff and a Charge of Discrimination in the Rhode Island Commission For Human Rights ("RICHR").

On or about June 29, 2006, Ms. Bonilla, through her attorney, submitted a demand to Defendant Electrolizing alleging, *inter alia*, violations of FEPA and offering to settle her potential claims for a discounted sum ("Plaintiff's June 29, 2006 Demand"), a copy of which is attached hereto as Exhibit "A." Plaintiff's June 29, 2006 Demand stated unambiguously that Defendants' conduct in this matter was a potential violation of FEPA.

When Defendant Electrolizing failed to make any meaningful counter-offer to Plaintiff's Demand, Plaintiff filed a Charge with RICHR on December 6, 2006, a copy of which is attached as Exhibit "B."[1] Ms. Bonilla's final step in seeking relief for her grievances was the filing of this lawsuit on August 31, 2007.

This idea that Ms. Bonilla picked a FEPA claim out of the "clear, blue sky" is pure fiction. Put simply, Ms. Bonilla has been threatening to seek relief under FEPA for almost two years and now is following through on her promises. As such, Defendants should have known that a potential FEPA claim was looming on the horizon and cannot claim now to be shocked by this turn of events.

---

[1] Ms. Bonilla's RICHR Charge states, in pertinent part:

> I believe that Electrolizing's decision to terminate me for missing work constitutes disparate treatment based on my sex in violation of the Fair Employment Practices Act, R.I. Gen. Laws § 28-5-1 *et. seq.* and the Civil Rights Act of 1964, Title VII, 42 U.S.C. § 2000e *et. seq.*

(Affidavit of Enid Bonilla in Support of Claimant's Charge of Discrimination at ¶ 31).

> I believe that Mr. Godin subjected me to a hostile work environment, that my supervisor, Mr. Richards, was aware of Mr. Godin's unlawful conduct, and that Electrolizing failed to take any remedial action regarding Mr. Godin's unlawful conduct in violation of the Fair Employment Practices Act, R.I. Gen. Laws § 28-5-1 *et. seq.* and the Civil Rights Act of 1964, Title VII, 42 U.S.C. § 2000e *et. seq.*

(*Id.* at ¶ 32).

> I believe that Mr. Richards terminated my employment in retaliation for my filing complaints against Mr. Godin with the company, which violates the Fair Employment Practices Act, R.I. Gen. Laws § 28-5-1 *et. seq.* and the Civil Rights Act of 1964, Title VII, 42 U.S.C. § 2000e *et. seq.*

(*Id.* at ¶ 33).

**B. Defendants Cannot in Good Faith Argue That They Will Suffer Any Additional Burdens Should This Court Allow These Additional Claims to Enter at This Stage of the Litigation.**

**1. Plaintiff's additional discrimination claims under FEPA and 42 U.S.C. § 1981 ("Section 1981") pose no new legal theories of relief and, therefore, it will be unnecessary for defendants to assert any new defense theories.**

In short, the legal analysis for a claim under a Title VII is the same for a FEPA claim,[2] and a Section 1981 claim.[3] The only substantive differences among these claims applicable to this matter are differing lengths in statutes of limitations and differing amounts of compensatory and punitive damages. Moreover, Plaintiff's additional claims arise from the same set of facts as does her Title VII claim.

In the present matter, Defendants have already asserted the following defenses in response to Plaintiff's existing claims:

- Some or all of Plaintiff's claims are time-barred;

---

[2] *Marley v. United Parcel Service, Inc.*, 665 F.Supp. 119, 128 (D.R.I. 1987), citing *Newport Shipyard, Inc. v. Rhode Island Comm'n for Human Rights*, 484 A.2d 893, 897-98 (R.I. 1984); *Narragansett Elec. Co. v. Rhode Island Comm'n for Human Rights*, 374 A.2d 1022, 1023 (R.I. 1977) ("Because the Rhode Island Fair Employment Practices Act is nearly identical in its remedial provision to its federal analog, Title VII, the Rhode Island Supreme Court has applied the analytical framework developed in federal Title VII cases to actions brought pursuant to the Rhode Island statute.)

[3] *See Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431 (4th Cir. 2000) (same standard for Title VII and § 1981 claims based on intentional discrimination).

- Defendant had a legitimate business reason for terminating Plaintiff, an inability to meet the company's attendance policy;
- Plaintiff failed to complain to her supervisors about the alleged harassment by a co-worker;
- The company employs fewer than fifty (50) people and, therefore, it does not fall under the prevue of the Family and Medical Leave Act; and
- Plaintiff is entitled to limited or no compensatory damages

Since the additional discrimination claims pose no new legal theories for relief, all defenses previously asserted can be applied straightforwardly to the new claims.

### 2. **Defendants Have Already Deposed the Plaintiff and Have Asked All the Relevant Questions in Support of All Possible Defenses.**

On March 14, 2008, Defendants took Ms. Bonilla's deposition, a copy of which is attached hereto as Exhibit "C." During the deposition, opposing counsel probed thoroughly and effectively the following topics, purportedly for the purpose of asserting the aforementioned defenses:

- Whether Plaintiff complained to a supervisor regarding the alleged harassment (i.e., to argue that her employer did not have actual knowledge of the harassment and, therefore, it is not liable) (Depos. of Enid Bonilla of March 14, 2008 at ¶ 43: 16);

- The date Plaintiff first complained to a supervisor regarding the alleged harassment (i.e., to argue that the statute of limitations for some or all of her claims has lapsed) (*Id.* at ¶ 45:19);

- Why Plaintiff believes Electrolizing employs fifty or more people (i.e., to argue that the FMLA does not apply to the Defendant) (*Id.* at ¶ 52:3);

- How her termination has impacted her life (i.e., to argue that Plaintiff is entitled to limited or no compensatory damages) (*Id.* at ¶ 64:10);

- Whether Plaintiff has sought medical treatment in connection with her termination (i.e., to argue that Plaintiff is entitled to limited or no compensatory damages) (*Id.* at ¶ 65:16);

- The manner in which Dave Richard fired Ms. Bonilla (i.e., to argue that Ms. Richard did not retaliate against Plaintiff for taking FMLA leave, but that he was attempting to accommodate her familial needs) (*Id.* at ¶ 59:6);

Indeed, if Plaintiff had asserted a FEPA claim, a Section 1981 claim, and a FMLA retaliation claim in her original complaint, Ms. Bonilla's deposition would have consisted undeniably of all the same questions and responses. At the present time, Defendants are in possession of all the information they need from Ms. Bonilla to defend the proposed discrimination claims and there exists no compelling reason to re-depose Ms. Bonilla. Nonetheless, to the extent that Defendants feel it essential or necessary to re-examine Ms. Bonilla, Plaintiff's counsel will make her available to them at their convenience.

## II. The Cases to Which Defendant Cite in Support of Their Legal Arguments Are Clearly Distinguishable From the Case at Hand.

Defendants place great weight on the courts' rulings in *Acosta-Mestre v. Hilton Int'l of Puerto Rico, Inc.*, 156 F.3d 49 (1st Cir. 1998) and *Tiernan v. Blyth, Eastman, Dillon & Co. et al.*, 719 F.2d 1 (1st Cir. 1983) to support their argument that Plaintiff's Motion for Leave to Amend Complaint should be denied on the grounds of un-timeliness and prejudice to the Defendants. However, the factual scenarios in *Acosta-Mestre* and *Tiernan* are "worlds apart" from the case at hand.

### A. Ms. Bonilla's Motion for Leave to Amend Seeks to Add Additional Claims, Not Additional Defendants.

In *Acosta-Mestre v. Hilton Int'l of Puerto Rico, Inc.*, 156 F.3d 49 (1st Cir. 1998), Plaintiff sought leave to amend the complaint to add an additional <u>defendant</u> fifteen months after filing the original complaint. Moreover, at the time Plaintiff sought leave to amend the complaint, the court had already granted three extensions of time to complete discovery as well as a first amended complaint. In this case, Ms. Bonilla only seeks leave to add additional claims that assert the same legal theories arising out of the same set of facts and circumstance. Furthermore, Ms. Bonilla's complaint was filed only seven months

after her original complaint and, to date, the court has granted only one extension of time to complete discovery.[4] Indeed, common sense dictates that adding a defendant to a lawsuit fifteen months after it inception - a manufacturer in a complicated products liability case no less - places a much greater burden than one who is faced merely with defending new claims that are substantially similar to previous claims asserted. As such, Defendants cannot reasonably compare the current situation to the scenario faced by their brother in *Acosta-Mestre*.

Moreover, in its decision, the *Acosta-Mestre* held that: "the prejudice to [defendant] resulting from a reopening of discovery with additional costs, a significant postponement of trial, and a likely major alteration in trial strategy and tactics due the presence of [the defendant] . . . fully support the district court's ruling." *Id.* at 52. In the present matter, since a trial date has yet to be set and since discovery is still open, Defendants cannot possibly have a trial strategy or trial tactics that need to be "altered" should the new claims enter.

---

[4] Contrary to Defendants' assertion, the first extension of time granted in this matter occurred pursuant to a joint motion.

Similarly, *Tiernan v. Blyth, Eastman, Dillon & Co. et al.*, 719 F.2d 1 (1st Cir. 1983) represents a clearly distinguishable set of circumstances from the case at hand. In *Tiernan*, Plaintiff's Motion for Leave to Amend came one month after the date the court had originally targeted to begin trial and only one and one-half months before the actual start of trial. *Id.* at 4. As previously stated, no trial date has been set in this matter and, therefore, plenty of time exists for Defendants to defend these additional claims with suffering any prejudice whatsoever.

**CONCLUSION**

For the forgoing reasons, Ms. Bonilla requests this honorable Court to grant her Motion for Leave to Amend Complaint.

Enid Bonilla
By Her Attorney,

/s/Mark P. Gagliardi (#6819)
111 Wayland Avenue
Providence, RI 02906
(401) 277-2030
(401) 277-2021 (fax)
e-mail: mark@gagliardilaw.net

**CERTIFICATION**

I hereby certify that on this **14**th day of **April**, 20**08**, I filed electronically this Memorandum with the Clerk of the U.S. District Court for the District of Rhode Island. The following counsels of record have received notice electronically:

Brandon S. Bell, Esq.
120 Wayland Avenue
Providence, RI 02906
bbellesq@aol.com

Geoffrey W. Millsom, Esq.
ADLER POLLOCK & SHEEHAN, P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345
gmillsom@apslaw.com

Adam M. Ramos, Esq.
ADLER POLLOCK & SHEEHAN, P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345
aramos@apslaw.com

Jaime J. LaPorte, Esq.
ADLER POLLOCK & SHEEHAN, P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345
jlaporte@asplaw.com

Richard R. Beretta, Esq.
ADLER POLLOCK & SHEEHAN, P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345
rberetta@apslaw.com

/s/Mark P. Gagliardi

# Exhibit "A"

***** For Settlement Purposes Only *****

June 29, 2006

Mr. Christopher Bejbl
President m
20 Houghton Street
Providence, RI 02904-1014

**Re: Enid Bonilla**

Dear Mr. Bejbl:

This firm represents Enid Bonilla, a former Electrolizing, Inc. ("Electrolizing") employee, as it pertains to her employment termination. Please direct any further communication regarding this matter to my attention. In the event your company maintains insurance coverage for unlawful employment practice claims, kindly forward a copy of this letter to your insurance carrier.[1]

On February 10, 2006, Electrolizing terminated Ms. Bonilla's employment abruptly and without just cause. I have reviewed the circumstances surrounding Ms. Bonilla's dismissal, and I have a compelling reason to believe that her employment was unlawfully terminated. The purpose of this letter is to inform you that unless a satisfactory settlement agreement is reached, Ms. Bonilla will pursue claims for damages against Electrolizing in the appropriate legal forums.

## I. FACTUAL BACKGROUND

Ms. Bonilla is a Hispanic woman – a native of Puerto Rico – and a mother of two children, ages six and three. On March 30, 2004, Ms. Bonilla began working as a "Receiver" and "Backup Shipper" in Electrolizing's Shipping and Receiving Department. Ms. Bonilla's primary job duties consisted of packing and sealing boxes in preparation for shipping the company's products.

---

[1] Please be advised that a failure to notify your insurance carrier timely of this claim could result in a denial of coverage.

Ms. Bonilla worked in the Shipping Department with a Caucasian, male worker named Alan Godin. During the course of Ms. Bonilla's employment, Mr. Godin subjected her repeatedly to sexist and racist comments – often in front of her supervisor, Dave Richards.

- When Mr. Godin thought Ms. Bonilla was working too slowly, he said to her: "I told [Electrolizing] not to hire women . . . you shouldn't be working here . . . all you women do is talk . . . I don't know why they keep sending me women . . ."

- On many other occasions, Mr. Godin made derogatory remarks about Ms. Bonilla's race and national origin, stating: "You people come [to the United States] and get all the benefits . . . If I had my way, none of you people would be here . . . you should all go back to your country!"

- Mr. Godin routinely disparaged Latin "Salsa" music in front of Ms. Bonilla, stating: "I'm sick of <u>you</u> people and <u>your</u> music!"

Throughout Ms. Bonilla's employment, Ms. Godin treated Ms. Bonilla rudely and with open hostility, despite the fact that she was a competent and friendly co-worker. For example, Ms. Godin yelled at Ms. Bonilla several times in front of her co-worker, Anilsa Soriano, for making minor, harmless errors. Also, Mr. Godin "nit-picked" Ms. Bonilla's packing techniques continually, claiming that her methods were improper or inefficient when, in truth, she always finished her work timely with few mistakes. Nonetheless, Mr. Godin bullied Ms. Bonilla into adopting his packing techniques even though he had no supervisory authority over her.

Mr. Godin's above conduct leads to the reasonable inference that he had a discriminatory motive towards Ms. Bonilla and that his animus towards her was based on her gender, her race, and/or her national origin. Indeed, Mr. Godin berated Ms. Bonilla for talking with co-workers during work hours, <u>but only when she spoke Spanish with Hispanic co-workers and not when she spoke English with Caucasian co-workers</u>. Furthermore, Mr. Godin <u>never</u> criticized any Caucasian co-workers for conversing during work hours.

### A. Ms. Bonilla's First Complaints of Sex and Race/National Origin Discrimination

Ms. Bonilla grew tired of Mr. Godin's racist and sexist comments so she complained to Electrolizing's Plant Manager, Dave Richards, about Mr. Godin at least ten different times. Mr. Richards either ignored or dismissed out of hand each of Ms. Bonilla's complaints. Mr. Richards even made the outrageous statement: "You haven't been here long enough to have the right to complain about anything!" Mr. Richards made light of Ms. Bonilla's complaints by showing her a picture from his office of a dog and stated: "Think of him the next time you get mad . . . [Mr. Godin] is a dog."

### B. Ms. Bonilla's Second Complaint of Sex and Race/National Origin Discrimination

Not surprisingly, Mr. Godin's discriminatory treatment of Ms. Bonilla continued. Accordingly, in or about October 2005, Ms. Bonilla requested a formal meeting with Mr. Richards to discuss the situation.

At the meeting, an exasperated Ms. Bonilla told Mr. Richards: "I can't take it any longer . . . I don't want to work with [Godin]!" Ms. Bonilla threatened to quit her job unless Mr. Richards relocated her to a different department – away from Mr. Godin. Furthermore, Ms. Bonilla requested that the company conduct a formal investigation of her complaints and that Mr. Richards provide her with a written disposition of the investigation, a requirement under Rhode Island law.

At first, Mr. Richards downplayed Ms. Bonilla's discrimination complaints, calling them "unfair" and stating, "You need to know what you're talking about first [before you accuse someone] . . . ." By the end of the meeting, Mr. Richards seemed to show genuine sympathy for Ms. Bonilla's plight, and he promised to remedy the situation, stating: "Don't quit . . . I'll take care of it."

However, in the end, Mr. Richards and Electrolizing did little more than play lip service to Ms. Bonilla's complaints. Upon information and belief, Electrolizing never conducted an investigation pursuant to Ms. Bonilla's request, nor did it ever reprimand Mr. Godin for his unlawful conduct. In fact, Ms. Bonilla claims that Mr. Godin was named, "Employee of the Month" shortly thereafter.[2]

---

[2] To be fair, Electrolizing did transfer Ms. Bonilla to a different department away from Mr. Godin. However, the transfer was only for the morning shifts, and it occurred only after Ms. Bonilla threatened to quit a second time. Indeed, Electrolizing forced Ms. Bonilla to continue to work with Mr. Godin during the afternoon shifts.

Eventually, Electrolizing replaced Ms. Bonilla with Ms. Soriano for the morning shifts in the Shipping Department. Not surprisingly, upon information and belief, Mr. Godin began harassing Ms. Soriano, a Hispanic woman, within one month, much in the same way he harassed Ms. Bonilla.

**C. Ms. Bonilla's Employment Termination**

In early February 2006, Ms. Bonilla required a small amount of personal time off to tend to family matters: her husband was involved in a serious car accident and her two children became inflicted with Scarlet Fever. Ms. Bonilla claims that Electrolizing's employment policy does not provide for personal days. Rather, Electrolizing employees are required to use vacation days as personal days. At the beginning of February, Ms. Bonilla had five (5) days of unused vacation to apply towards personal time off.[3]

On Friday, February 3, 2006, Ms. Bonilla's husband was involved in a car accident in which his car was totaled. As such, Ms. Bonilla requested permission to leave work at 1:15 PM (approximately three hours early) to pick up her husband at the Rhode Island Hospital Emergency Room. Mr. Richards granted Ms. Bonilla's request, but admonished her that they needed to talk on Monday about her "attendance."

On Monday, February 6, 2006, Mr. Richards threatened to fire Ms. Bonilla if she missed any more time from work ("One more [absence] and that will be it for you"). Ms. Bonilla was shocked to hear that her attendance was an issue with her employer. Indeed, Ms. Bonilla only missed work to tend to vital family matters such as her children's doctors' appointments and her husband's involvement in a car accident. Furthermore, when it was foreseeable, Ms. Bonilla always provided Mr. Richards with advance notice of the requested time off, and she never missed work without Mr. Richard's permission. Moreover, when Ms. Bonilla did take personal time off, <u>she always had unused vacation time available to apply to it</u>.

On Tuesday, February 7, 2006, Mr. Bonilla told Mr. Richards that both of her children had Scarlet Fever, and she provided a doctor's note as proof. The children's faces were severely swollen and their doctor indicated their conditions were very serious. As such, Ms. Bonilla apprised Mr. Richards of her children's medical conditions in case she needed to miss work later in the week to be with her children.

---

[3] For a calculation of Ms. Bonilla's accrued, unused vacation, see *infra* note 3.

On Wednesday, February 8, 2006, Mr. Bonilla's children's conditions worsened, and they were brought to the emergency room for treatment (See Exhibit "A" attached hereto). Mr. Bonilla even had her children's doctor call Mr. Richards directly to verify that a trip to the emergency room was necessary. Accordingly, Ms. Bonilla requested and received permission to leave work at 9:30 AM for the rest of the day to be with her children in the hospital. Ms. Bonilla brought her children home from the hospital later that night.

Ms. Bonilla worked regular hours on Thursday, February 9, 2006 and on Friday, February 10, 2006 even though her children were still severely ill with Scarlet Fever.

At the close of business on Friday, February 10, 2006, Electrolizing terminated Ms. Bonilla's employment for excessive absences. Mr. Richards told Ms. Bonilla in a sarcastic tone: "I'm letting you go . . . so you can go and take care of your kids." Mr. Richards made this disgraceful remark in front of two witnesses: Anilsa Soriano, who he fired along with Ms. Bonilla, and Randy Clifton, a company salesman.

## II. POTENTIAL CLAIMS

Based on the above course of conduct, Ms. Bonilla intends to pursue claims for damages against Electrolizing in the appropriate legal forums. The following is a non-exhaustive list of her claims.

**A. Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.*;**
**B. Violations of the Rhode Island Fair Employment Practices Act, R.I. Gen. Laws § 28-5-1 *et seq.*;**
**C. Violations of the Rhode Island Civil Rights Act of 1990, R.I. Gen. Laws § 42-112-1 *et seq.***

### 1. Sex and Race/National Origin Discrimination

#### a. Unlawful Discharge

In order to establish a prima facie case of discrimination for unlawful discharge, a plaintiff must prove that: (1) she is a member of a protected class; (2) her employer took an adverse employment action against her; (3) she was qualified for the employment she held; and (4) her position remained open or was filled by a person whose qualifications were similar to hers. *Rodriguez-Cuervos v. Wal-Mart Stores, Inc.*, 181 F.3d 15, 19 (1st Cir. 1999) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).

In the present case, all of the above elements are satisfied, allowing Ms. Bonilla to establish a prime facie case of discrimination. First, Ms. Bonilla is an Hispanic woman and a native of Puerto Rico and, therefore, a member of several protected classes. Second, Electrolizing subjected Ms. Bonilla to an adverse employment action when it terminated her employment. Third, Ms. Bonilla was qualified for the employment she held as evidenced by a satisfactory performance evaluation on or about November 2005. Fourth, upon information and belief, Ms. Bonilla's position was filled by Caucasian male, a person whose qualifications were similar to hers.

**b. Hostile Work Environment**

An actionable hostile environment claim requires the plaintiff to prove: (1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability. *See Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754 (1998)).

First, Mr. Godin's racist and sexist comments offended Ms. Bonilla as evidenced by her numerous complaints to Mr. Richards; these comments would have also offended a reasonable person. Second, Mr. Godin's comments pertained to Ms. Bonilla's status as a woman, a Hispanic, and a native of Puerto Rico – all protected classes. Third, Mr. Godin's conduct occurred over a long period of time – his actions were not isolated. Fourth, there is a basis for employer liability because Electrolizing's Plant Manager, Mr. Richards, ignored and/or dismissed Ms. Bonilla's numerous complaints about Mr. Godin. Mr. Richards even witnessed several of Mr. Godin's discriminatory remarks and did nothing to remedy the situation. Furthermore, upon information and belief, other employees have complained about Mr. Godin's racist comments in the past, and Electrolizing has, in fact, disciplined him previously for this behavior.

**c. Disparate Treatment**

Ms. Bonilla claims she was the victim of disparate treatment based on her sex and because she has children. "Sex-plus" discrimination exists when a person is subjected to disparate treatment based not only on her sex, but on her sex considered in conjunction with a second characteristic. *See e.g., Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544 (1971).

Ms. Bonilla claims that if she did not have children to care for and needed personal time for other matters, Electrolizing would have allowed her to apply her unused vacation time without terminating her employment. Indeed, Ms. Bonilla claims that when male workers have requested personal time in the past, Mr. Richards has granted it to them freely. For example, Ms. Bonilla claims that several Electrolizing male employees, who are illegal aliens allegedly and who work in the Plating Department, were granted leaves of absence for months at a time to return to their native countries. Yet Electrolizing allowed these men to return to their positions after their lengthy leaves of absence.

Furthermore, Ms. Bonilla claims that Electrolizing treated Mr. Godin (a Caucasian male) more favorably than it treated her during the course of her employment. For example, when Mr. Godin worked in the Shipping Department without Ms. Bonilla, he received additional help from co-workers, much of it unnecessary and <u>without his request</u>. Yet when Mr. Bonilla worked in the Shipping Department <u>without</u> Mr. Godin – when he was on vacation – she received <u>no additional assistance at all</u> and was forced to fend for herself.

**d. Retaliation**

Ms. Bonilla claims she was the victim of retaliation as a result of her numerous complaints about Mr. Godin, a valued Electrolizing employee with twenty years of seniority.

**(1) Retaliatory Discharge**

Mr. Richards began making comments about Ms. Bonilla's attendance shortly after she formally complained to him about Mr. Godin in October 2005. As previously stated, Ms. Bonilla always had available unused vacation time to apply as personal days. Nonetheless, Mr. Richards fired Ms. Bonilla within three months of her complaint, leading to the inference that Mr. Richards sought an opportunity to get rid of Ms. Bonilla for making waves at the company.

**(2) Retaliation – Failure to Increase Hourly Rate Adequately**

In November 2005, Electrolizing evaluated Ms. Bonilla's work performance, and she received a small raise in her hourly wage, from $11.75 per hour to $12.25 per hour. When Ms. Bonilla asked Mr. Richards why her raise was not higher, Mr. Richards mentioned curiously Ms. Bonilla's "problems" with Alan Godin. Mr. Richard's statement leads to the reasonable inference that Mr. Richard retaliated against Ms.

Bonilla for complaining to him about Mr. Godin's discriminatory behavior by giving her a "token" raise rather than the substantial raise she really deserved.

The above actions establish that Ms. Bonilla was the victim of discrimination based on her race, her national origin, and or her sex. Accordingly, a compelling *prima facie* case of discrimination is established under federal and state law. (*Title VII of The Civil Rights Act of 1964*, 42 U.S.C. § 2000e *et. seq.*; *The Rhode Island Fair Employment Practices Act*, R.I.G.L. 28-5-1, *et. seq*; *Rhode Island Civil Rights Act of 1990*, R.I. Gen. Laws § 42-112-1 *et seq.*).

**e. Failure to Disclose Disposition of an Employee's Internal Complaint – Violation of R.I. Gen. Laws § 28-5-7(1)(v)**

Section 7(1)(v) of Chapter 5, of Title 28 of the Rhode Island General Laws states, in pertinent part, that it is an unlawful employment practice:

> When an employee has presented to the employer an internal complaint alleging harassment in the workplace on the basis of race or color, religion, sex, disability, age, sexual orientation, gender identity or expression, or country of ancestral origin, <u>to refuse to disclose in a timely manner in writing to that employee the disposition of the complaint</u>, including a description of any action taken in resolution of the complaint . . . .

R.I. Gen. Laws § 28-5-7(1)(v)(2004).

When Ms. Bonilla made a formal complaint about Mr. Godin's conduct to Mr. Richards, she requested <u>unambiguously</u> that Mr. Richards provide her with a written disposition of her complaint. Mr. Richards promised Ms. Bonilla he would comply with her request, but in the end, he refused and/or failed to do so, in violation of the above referenced statute.

**D. Violations of the Rhode Island Whistleblowers' Protection Act, R.I. Gen. Laws § 28-50-1 *et seq.;***

The Rhode Island Whistleblowers' Protection Act (the "Rhode Island Whistleblowers' Act") states, in pertinent part, that:

> [a]n employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment:
>
> (4) Because the employee reports verbally or in writing to the employer or to the employee's supervisor a violation, which the employee knows or reasonably believes has occurred or is about to occur, of a law or regulation or rule promulgated under the laws of this state, a political subdivision of this state, or the United States . . . .

R.I. Gen. Laws § 28-50-3 (2004).

In the present case, Ms. Bonilla complained to Mr. Richards on numerous occasions about Mr. Godin's discriminatory conduct. In the end, Ms. Bonilla was terminated because of her complaints.

As such, the timing of Ms. Bonilla's termination and the specious reasoning Electrolizing has provided for it, lead to the undeniable conclusion that Ms. Bonilla was a victim of retaliation by Electrolizing for filing verbal and formal complaints with the company. Each complaint that Ms. Bonilla lodged comprised a protected activity under the Rhode Island Whistleblower's Act.

**E. Violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*;**
**F. Violation of the Rhode Island Parental and Family Medical Leave Act; R.I. Gen. Laws 48-28-2**

When Ms. Bonilla missed work to be with her "seriously ill" children, her job status was protected under both federal and state law. Both the federal and state Family and Medical Leave Acts allow a qualified individual to take time off from work to care for seriously ill family members, *inter alia*, without reprisal from her employer.

In this case, Ms. Bonilla was entitled to take up to thirteen (13) weeks leave from work (twelve weeks under federal law) to care for her seriously ill children, and Electrolizing was required to make her job available to her (or a suitable job if her job was not available) upon her return from family leave. The fact that Ms. Bonilla only missed seven (7) hours of work to care for her children when she was entitled by law to take off more time is indicative of her dedication to her job and her good faith efforts to accommodate her employer during a trying family crisis.

Moreover, the federal FMLA provides for liquidated damages (and interest at the prevailing rate) in an amount equal to actual damages unless the employer can prove that its act or omission in violation of the law was made in good faith.[4] Clearly, Electrolizing's dismissal of Ms. Bonilla without regard to her legally protected rights under the FMLA and Mr. Richard's condescending remarks to Ms. Bonilla about being able to spend more time with her children do not and cannot rise to the level of an act or omission made in good faith. Thus, Electrolizing is liable to Ms. Bonilla for liquidated damages in an amount equal to her actual damages.

**G. Breach of the Employment at-Will Doctrine – The Public Policy Exception**

Rhode Island follows the common law rule of the employment at-will doctrine. In Rhode Island, an at-will employee may be fired for any reason or no reason, as long as the reason for termination is not unlawful or a violation of public policy.

In this case, any argument that Electrolizing's treatment of Ms. Bonilla during her employment was not unlawful will not absolve it from liability. Indeed, a court of law or a jury is likely to conclude that Mr. Richard's purported reason for terminating Ms. Bonilla – because she missed work to bring her children to the hospital – is a violation of public policy and, hence, an exception to the employment at-will doctrine. Therefore, at a minimum, Electrolizing is liable to Ms. Bonilla for damages caused as a result of its breach of the employment at-will doctrine.

---

[4] Section 2617(a) of the FMLA states, in pertinent part:

> Any employer who violates section 2615 of this title shall be liable to any eligible employee affected -
> (A) for damages equal to -
> (i) the amount of -
> (I) any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation;
> (ii) the interest on the amount described in clause (i) calculated at the prevailing rate; and
> (iii) an additional amount as liquidated damages equal to the sum of the amount described in clause (i) and the interest described in clause (ii), except that if an employer who has violated section 2615 of this title proves to the satisfaction of the court that the act or omission which violated section 2615 of this title was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of section 2615 of this title…

29 U.S.C. § 2917 (a) (2006) (emphasis added).

### H. Failure to Pay Accrued Unused Vacation Upon Termination – Violation of R.I. Gen. Laws § 28-14-4(b))

Electrolizing owes Ms. Bonilla $490.00 for accrued, unused vacation[5] pursuant to Title 28, Chapter 14, Section 4(b) of the 1956 Rhode Island General Laws (section 28-14-4(b)).

Section 28-14-4(b) states in pertinent part:

> [w]henever an employee separates or is separated from the payroll of an employer after completing at least one year of service, any vacation pay accrued or awarded by collective bargaining, written or verbal company policy, or any other written or verbal agreement between employer and employee shall become wages and payable in full or on a prorated basis with all other due wages on the next regular payday for the employee.

1956 R.I. Gen. Laws § 28-14-4(b) (2004) (emphases added).

Electrolizing violated the aforementioned statute when it failed to include Ms. Bonilla's accrued, unused vacation in her last pay check.

## III. DAMAGES

Currently, Ms. Bonilla is unemployed due to Electrolizing's unlawful termination. As a result, Ms. Bonilla has suffered substantial damages.

Ms. Bonilla's economic damages are estimated as follows:

**A. Lost Wages:**

1. Front Pay – Termination Date to Commencement of New Job
   (2/11/06 to 9/5/06)
   [$490.00/wk * 28 weeks][6] $13,720.00

---

[5] Ms. Bonilla was entitled to two weeks or eighty (80) hours of vacation for the 2006 fiscal year; she had used five (5) days or 40 hours in November and December 2005. Therefore, at the time of her termination, Ms. Bonilla had five (5) accrued, unused vacation days (40 hours) or $490.00 ($12.25/hr * 40 hrs).

[6] Ms. Bonilla anticipates it will take her until about September 6, 2006 (Labor Day) to find suitable employment.

2. 5 Year Pay Differential – Old Job and New Job (9/6/06 - 3/16/11)
   [$80.00/weekly pay differential @ 5% annual increases][7]

3. Liquidated Damages

4. Back Pay – Retaliation
   [$1.00 /hr * 40 hrs/wk * 46 weeks]

5. Accrued, Unused Vacation

**Total economic damages suffered by Ms. Bonilla**

Thus, Ms. Bonilla's total economic damages are not less than and likely will continue to accrue beyond the five-year period used for the instant settlement proposal.

In addition to the above monetary losses, Ms. Bonilla has suffered emotional harm and damage to her reputation, which along with attorneys' fees, and costs would be compensable in a lawsuit against your company.

Furthermore, any judgment obtained against your company is likely to include prejudgment interest at twelve (12) percent per annum and <u>punitive damages</u>, which are awarded at the court's sole discretion and could range anywhere from $25,000 to $100,000 <u>for each law violated</u>.

In this case, it is obvious that Electrolizing was well aware of Mr. Godin's proclivity for making sexist and racist remarks. Indeed, this is not Mr. Godin's first infraction for creating a hostile work environment while employed at Electrolizing. Upon information and belief, Electrolizing has disciplined Mr. Godin in the past for discriminatory behavior. Sadly, Electrolizing chose to callously and recklessly ignore this ticking "time bomb." In fact, not only did Electrolizing ignore Mr. Godin's egregious conduct, it actually named him "Employee of the Month!"

---

[7] But for Electrolizing's unlawful conduct, Ms. Bonilla would have continued to be employed for an additional five years. The pay differential equals Ms. Bonilla's weekly compensation had she not been terminated, less her hourly compensation at a new job estimated at $10.25 per hour.

However, recognizing the desirability of a speedy resolution of this matter, short of litigation, Ms. Bonilla is willing to settle her claims for a discounted amount. **To this end, Ms. Bonilla will provide Electrolizing with a release of all claims for a lump sum payment in the amount** [redacted] This discounted demand is contingent upon the rapid settlement of Ms. Bonilla's claims without resort to administrative proceedings and/or litigation.

Please inform us of your position as soon as possible, but in any event, no later than **July 10, 2006**.

Very truly yours,

Mark P. Gagliardi

MPG/jrg
cc: Enid Bonilla

# Exhibit "B"

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
COMMISSION FOR HUMAN RIGHTS

In the matter of:

| | | |
|---|---|---|
| ENID BONILLA,<br>Complainant | : | RECEIVED |
| v. | : | RICHR No. DEC 06 2006 |
| | : | EEOC No. RICHR |
| ELECTROLIZING, INC.,<br>ALAN GODIN, DAVE RICHARDS,<br>and any and all defendants,<br>Defendants | : | |

**AFFIDAVIT OF ENID BONILLA IN SUPPORT OF COMPLAINANT'S CHARGE OF DISCRIMINATION**

I, Enid Bonilla, hereby attest to the following facts:

1. I am an Hispanic woman and a native of Puerto Rico.

2. I worked for Electrolizing, Inc. ("Electrolizing") in the Shipping Department as a "Receiver" and "Backup Shipper" from on or about March 30, 2004 to on or about February 10, 2006.

3. During my employment at Electrolizing, I was responsible for packing and sealing boxes in preparation for shipping the company's products.

4. I worked in the Shipping Department with a Caucasian, male worker named Alan Godin.

5. During the course of my employment, Mr. Godin subjected me repeatedly to sexist and racist comments - often in front of my supervisor, Dave Richards.

6. When Mr. Godin thought I was working too slowly, he said to me: "I told [Electrolizing] not to hire women . . . you shouldn't be working here . . . all you women do is talk . . . I don't know why they keep sending me women . . ."

7. On many other occasions, Mr. Godin made derogatory remarks to me about my race, color, and national origin, stating: "You people come [to the United States] and get all the benefits . . . If I had my way, none of you people would be here . . . you should all go back to your country!"

8. Mr. Godin routinely disparaged Latin "Salsa" music in front of me, stating: "I'm sick of you people and your music!"

9. Ms. Godin yelled at me several times in front of my co-worker, Anilsa Soriano, for making minor, harmless errors.

10. Mr. Godin berated me for talking with co-workers during work hours, but only when I spoke Spanish with Hispanic co-workers and not when I spoke English with Caucasian co-workers.

11. Mr. Godin never criticized any Caucasian or male co-workers for conversing during work hours.

12. I grew tired of Mr. Godin's racist and sexist comments so I complained to my supervisor, Dave Richards, about Mr. Godin on many occasions.

13. Mr. Richards either ignored or dismissed all of my complaints.

14. In fact Mr. Richards once stated to me: "You haven't been here long enough to have the right to complain about anything!"

15. Finally, in October 2005, I requested a formal meeting with Mr. Richards to discuss Mr. Godin's conduct (the "H.R. Meeting").

16. At the H.R. meeting, I told Mr. Richards that I no longer wanted to work with Mr. Godin and that I would quit my job unless I was relocated to a different department away from Mr. Godin.

17. I also requested that the company conduct a formal investigation of my complaints and that Mr. Richards provide me with a written disposition of the investigation, a requirement under Rhode Island law.

18. Mr. Richards promised to remedy the situation, stating: "Don't quit . . . I'll take care of it."

19. However, to the best of my knowledge, Electrolizing never conducted an investigation pursuant to my request, nor did it ever reprimand Mr. Godin for his unlawful conduct.

20. In early February 2006, I required a small amount of personal time off to tend to family matters: My husband was involved in a serious car accident and my two children became afflicted with Scarlet Fever.

21. Electrolizing's employment policy requires the use vacation days as personal days.

22. At the beginning of February 2006, I had five (5) days of unused vacation to apply towards personal time off.

23. On Friday, February 3, 2006, my husband was involved in a car accident in which his car was totaled.

24. I requested and received permission to leave work three hours early to pick up my husband at the Rhode Island Hospital Emergency Room.

25. On Wednesday, February 8, 2006, my children became afflicted with Scarlet Fever and were brought to the emergency room for treatment.

26. I requested and received permission to leave work six and one half hours early to be with my children in the hospital.

27. I worked regular hours on Thursday, February 9, 2006 and on Friday, February 10, 2006 even though my children were still severely ill with Scarlet Fever.

28. At the close of business on Friday, February 10, 2006, Electrolizing terminated my employment for excessive absences.

29. Mr. Richards told me: "I'm letting you go . . . so you can go and take care of your kids."

30. However, upon information and belief, Mr. Richards allowed several of my male co-workers to be excused from work for longer periods than me, yet these workers were not terminated for excessive absences.

31. I believe that Electrolizing's decision to terminate me for missing work constitutes disparate treatment based on my sex in violation of the Fair Employment Practices Act, R.I. Gen. Laws § 28-5-1 *et. seq.* and the Civil Rights Act of 1964, Title VII, 42 U.S.C. § 2000e *et. seq.*

32. I believe that Mr. Godin subjected me to a hostile work environment, that my supervisor, Mr. Richards, was aware of Mr. Godin's unlawful conduct, and that Electrolizing failed to take any remedial action regarding Mr. Godin's unlawful conduct in violation of the Fair Employment Practices Act, R.I. Gen. Laws § 28-5-1 *et. seq.* and the Civil Rights Act of 1964, Title VII, 42 U.S.C. § 2000e *et. seq.*

33. I believe that Mr. Richards terminated my employment in retaliation for my filing complaints against Mr. Godin with the company, which violates the Fair Employment Practices Act, R.I. Gen. Laws § 28-5-1 *et. seq.* and the Civil Rights Act of 1964, Title VII, 42 U.S.C. § 2000e *et. seq.*

34. As a result of the above-referenced unlawful conduct, I have suffered from severe emotional distress, I have incurred a substantial loss of wages and benefits, and I have incurred other economic damages.

Signed and sworn this 6th day of ~~November~~ December 2006.

[signature]
ENID BONILLA

*State of Rhode Island*
*County of Providence*

On the 6th day of ~~November~~ December 2006, before me personally appeared Enid Bonilla, to me known and known by me to be the person executing the foregoing instrument, and she acknowledged said instrument, by her so executed, to be her free act and deed.

[signature]
Notary Public
Mark ~~P.~~ Gagliardi
My commission expires: 7/9/08