UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ENID BONILLA
Plaintiff,

v. C.A. NO.: 07-331S

ELECTROLIZING, INC., ALAN GODIN,
and DAVID RICHARDS
Defendants.

DEPOSITION OF ENID BONILLA, in the above-entitled cause, taken on behalf of the Defendants, pursuant to notice, before Jane F. Cormier, CSR, a Notary Public in and for the State of Rhode Island, at the offices of Adler Pollock & Sheehan, P.C., One Citizens Plaza, Providence, Rhode Island, on Friday, March 14, 2008, convening at 9:30 a.m.

PRESENT:

FOR THE PLAINTIFF...... LAW OFFICE OF MARK P. GAGLIARDI
BY: MARK P. GAGLIARDI, ESQUIRE

FOR THE DEFENDANTS..... ADLER POLLOCK & SHEEHAN P.C.
BY: GEOFFREY MILLSOM, ESQUIRE

ALSO PRESENT: MATTHEW BEJBL

# I N D E X



| WITNESS | PAGE |
|---|---|
| ENID BONILLA | |
| Examination by Mr. Millsom | 3 |



## E X H I B I T S



| DEFENDANTS' | DESCRIPTION | PAGE |
|---|---|---|
| A | Review sheet | 35 |
| B | Plaintiff's Responses and Objections to Defendants' First Set of Interrogatories Directed to Plaintiff | 87 |
| C | Affidavit of Enid Bonilla in Support of the Complainant's Continuing Charge of Discrimination | 91 |
| D | Complaint | 99 |



(EXHIBITS WERE RETAINED BY COUNSEL)

(Proceedings commenced at 9:40 a.m.)

ENID BONILLA

Being duly sworn, deposes and testifies as follows:

EXAMINATION BY MR. MILLSOM

Q. Ms. Bonilla, can we start by having you state your full name and address for the record.

A. Okay. Enid D. Bonilla, 44 Argol Street, Providence, Rhode Island.

Q. Have you ever had your deposition taken before?

A. No.

Q. It's a little strange, because we have a court reporter here, and what she's doing, and you've probably figured this out, is she's typing up in shorthand my questions and your answers. And that makes for an unusual dynamic, because she cannot type if both of us talk at the same time, or if one of us doesn't talk. So, you have to keep in mind two things: one is, you need to speak your answers. Right now you're nodding your head.

THE WITNESS: I'm sorry.

Q. In normal conversation, that's fine, because that's the way we communicate, verbally and nonverbally. But for this, its especially important that when I ask you a question, you say yes or no or maybe, or otherwise talk, instead of just nod or shake your

head. It's also important that we don't both talk at the same time, because she's a really fast typist, but she's not that fast. And she also needs to be able to hear clearly what each of us say in order to get it down?

A. Okay.

Q. I'm not here today to confuse or trick you, so if I ask you a question, and you don't understand it or you don't think it's fair, or you think it's just wrong because I got the facts wrong, tell me.

A. Okay.

Q. And what I'll do is I'll work with you to ask you a question that you think is fair or you think you can answer?

A. Okay.

Q. The court reporter is the most important person in the room, but you're a very close second. You control the deposition in many ways. If you need to take a break, or you want to talk to Mark, or you want to get a drink of water, or you want to go make a phone call, just let me know, I'll certainly accommodate you?

A. Okay.

Q. Can you tell me, did you do anything to prepare for your deposition today?

A. I went over, we went over the questions, and I signed off on it. I'm not sure what it's called.
Q. I'm not sure what you mean when you say you went over the questions?
A. Well, we got the deposition ready, then I have to sign off on it, that those are my words on this piece of paper.
Q. I think what you're probably referring to is something we call interrogatories?
A. Oh, okay.
Q. Does that sound familiar?
A. Yes.
Q. So, you read those?
A. Yes.
Q. And you answered them?
A. Yes.
Q. And signed off on them?
A. Yes.
Q. Now, you took an oath when we started, you raised your right hand and swore to tell the truth?
A. Yes.
Q. And do you understand the significance of that?
A. Yes.
Q. And what I mean by that is, do you understand whether anything happens if you don't tell the

truth?

A. Yes.

Q. And what do you understand is the significance of the oath?

A. Well, it will have other consequences, mainly against me, if I was to lie.

Q. And do you have any sense of what those consequences would be?

MR. GAGLIARDI: Objection.

A. No.

Q. Are you familiar with the term perjury?

A. No.

Q. Now, let me ask you something, when you signed those interrogatories --

A. Yes.

Q. -- did you understand that you were making the same oath you've made today?

A. Yes.

Q. And you understand that, generally speaking, bad things can happen if you don't tell the truth; right?

A. Yes.

Q. And you also signed something called an affidavit when you were first bringing the case in front of the Rhode Island Commission of Human Rights; right?

A. Yes.
Q. And did you understand that signing the affidavit subjected you to the same oath that you just took today, and that you made when you signed the interrogatories?
A. Yes.
Q. Before you came here today, after you signed the interrogatories, did you look at any documents to get ready to have your deposition taken?
A. Well, I looked at them again this morning.
Q. So, between the time you signed the interrogatories and today, you looked at documents this morning, and that was it?
A. Yes.
Q. Or had you done other work?
A. No.
Q. And between the time you signed your interrogatories and today when we started, did you talk with anybody other than Mr. Gagliardi --
A. No.
Q. -- about the case?
A. No.
Q. What about your husband; he was deposed in this case?
A. Yes.

MR. GAGLIARDI: Objection.

Q. Have you and he discussed the case at all?

A. I asked him how it went.

Q. Did he tell you anything about his testimony?

MR. GAGLIARDI: Objection. Marital privilege doctrine. Go ahead, you can answer.

A. We didn't really talk in specifics, I just basically asked him how it went, he explained to me that he was a little very nervous at the beginning, and that was that.

MR. MILLSOM: Yeah. One thing I should say, from time to time Mark may object, and that's his job, but it's more for the lawyer stuff. He will tell you when he doesn't want you to answer. And during the course of the deposition, I may have occasion to ask you about your husband, but I don't want you to tell me what you and he talked about, because you don't have to. And I don't want you to inadvertently do that. So, just know that up front, and I'm sorry I didn't explain that before I started asking you the question.

THE WITNESS: Okay.

Q. So, do you remember what documents you looked at this morning before the deposition?

A. What I signed off on. We didn't really go, I

didn't really look at every question. I had a question, basically, on one of --

Q. I'm sorry, I think what you're probably about to tell me is something you and Mark talked about; right?

A. Well, I had a question on something that was written on the answers.

Q. I don't want to cut you off, but I also, just like I don't want you to tell me what you and your husband talked about, I don't want you to tell me what you and Mark talked about, just because that's privileged, and I would not be being fair to you if I let you talk about that. So, you saw some documents?

A. Yes.

Q. And do you remember about how many there were?

A. Just that particular one.

Q. Just the one document you signed off on?

A. Yes.

Q. Was it the interrogatories?

A. One question, yes.

MR. GAGLIARDI: Jeff, for clarity purposes, would you object to me showing Ms. Bonilla some documents that would refresh her memory as to what she reviewed?

MR. MILLSOM: You know, I just don't think it's necessary. I appreciate the offer, but.

MR. GAGLIARDI: I don't think that she understands what the documents are called.

MR. MILLSOM: That's fine. You know what, it's just not a big deal.

Q. Have you talked with anybody other than your husband about the lawsuit?

A. Pedro is aware of the lawsuit.

Q. That's Pedro Roman?

A. Pedro Roman.

Q. And who is he?

A. He's my sister's boyfriend.

Q. And what conversations have you had with him about the lawsuit?

MR. GAGLIARDI: Objection.

A. He received a letter saying that he has to come in, and he just asked me what it was for, and I explained to him what was going on.

Q. What did you tell him?

A. That there was a lawsuit that I was going through, and just to say the truth, just to answer whatever they were going to ask him.

Q. Did you tell him about any of the things you said in your lawsuit?

A. No. No.
Q. Did you two talk at all about Al Godin?
A. No. I didn't talk to him about anything.
Q. Is there anybody else you've discussed the lawsuit with?
A. Anilsa Soriano.
Q. Who's she?
A. She was a coworker.
Q. Is she related to you at all?
A. No.
Q. She worked pretty closely with you; right?
A. Yes.
Q. Side by side?
A. Yes.
Q. And how many times have you discussed the lawsuit with her?
A. She called me when she received the same things, telling me that she was going to be coming in, and I said okay, great, that's it.
Q. You didn't discuss the allegations or the lawsuit in any detail?
A. No. Because I really didn't know, anyway.
Q. Anyone else?
A. Carmen Bonilla.
Q. Who's that?

A. She is my husband's brother's wife, and she also worked at Electrolizing.
Q. Did she work there while you were there?
A. Yes.
Q. Was she working close to you, or in another part of the --
A. In another part. But we also did work pretty close, because I would come over and also work with her.
Q. What did she do?
A. She was a plater.
Q. And did you, how many times did you talk about the lawsuit with her, approximately?
MR. GAGLIARDI: Objection.
A. None. She knew that it was going on, but we never went into detail as to what was going on, exactly.
Q. Anyone else?
A. No.
Q. How about your sister?
A. She knew what was going on, but I never went into details on anything.
Q. Have you ever been involved before in a lawsuit?
MR. GAGLIARDI: Objection.
A. No.

Q. No?
A. No.
Q. So, no car accident cases, nothing like that?
A. I was in a car accident once.
Q. Did you bring a lawsuit?
A. There was a lawsuit, yes.
Q. So, you want to change your answer from no to yes?
A. No. There was a lawsuit, yes.
Q. And were you involved in it?
A. Yes.
Q. Were you a plaintiff?
A. Yes.
Q. So, when I asked you if you were ever involved in a lawsuit, you answered no.
A. Oh, I'm sorry.
Q. And I just said, you now want to change your answer now to yes; right?
A. Yes.
Q. So, yes, you were in a lawsuit?
A. Yes. I was in a lawsuit.
Q. And do you remember whether you were the plaintiff in the lawsuit, like you're the plaintiff in this lawsuit? Does that word mean anything to you, plaintiff?
A. Yes.

Q. So, you were the plaintiff?
A. Yes.
Q. And do you remember who the defendant was, the person who was sued?
A. No.
Q. Was it a person, or was it a company?
A. A person.
Q. Do you remember about when this lawsuit occurred?
MR. GAGLIARDI: Objection.
A. No.
Q. Was it more than a year ago?
A. Yes.
Q. Was it more than five years ago?
A. No.
Q. Do you remember who your lawyer was?
A. Yes.
MR. GAGLIARDI: Objection.
Q. Who was your lawyer?
A. Anthony Cordeiro.
Q. And is he a lawyer here in Rhode Island?
A. He passed away, but, yes.
Q. Other than that car accident, were there any other lawsuits that you were involved in, either as somebody who sued or somebody who was sued?
MR. GAGLIARDI: Objection.

A. No.

Q. I'm going to ask you a couple of background questions. What was your date of birth? I don't need exact date, just year?

A. 1981.

Q. And what is your present marital status?

A. Married.

Q. And do you have children?

A. Yes.

Q. How many?

A. Two.

Q. And two boys, two girls, one of each?

A. One of each.

Q. How long have you been married?

A. Three years.

Q. Is this your first marriage?

A. Yes.

Q. And only; correct?

A. Yes.

Q. Are you originally from Rhode Island?

A. I'm from Puerto Rico.

Q. And how old were you when you moved to Rhode Island?

A. Ten.

Q. Did you go to high school here?

A. Yes.

Q. Did you pursue any education after high school?
A. My GED.
Q. And when did you attain your GED?
A. 2006.
Q. How old were you when you first started working full time?
THE WITNESS: Full time in Electrolizing?
MR. MILLSOM: Just anywhere.
A. Eighteen.
Q. And where was your first job?
MR. GAGLIARDI: Objection. Relevance.
A. I don't remember.
Q. Okay. That's fine. Why don't we do this this way. To the extent you can remember, can you sort of list for me all the places you worked, starting with as far back as you can remember, and taking me up to Electrolizing, please?
MR. GAGLIARDI: Objection. Relevance.
A. Mainly agencies, staffing agencies.
THE WITNESS: Do you want names of the companies?
MR. MILLSOM: If you can remember them. I'd like both.
A. Okay. I worked for Texas Instruments through an agency, I just don't remember the name. I worked

for Mosquito Magnet through an agency called Pro Staff.
Q. Do you remember anywhere else?
A. K and M.
Q. Was that through an agency?
A. No. That was a company.
Q. Is there anywhere else you remember working?
A. Zerava Yepes Insurance Agency, with a V.
Q. What was the second word?
A. Yepes, Y-E-P-E-S.
Q. Was that through a staffing agency?
A. No.
Q. Anywhere else?
A. And Electrolizing.
Q. And is that more or less in order? Was Texas Instruments before Mosquito Magnet, which was before K and M?
A. On the first two, I don't know which one was first.
Q. Do you remember what you did at Texas Instruments?
A. Assembly line, running a machine.
Q. Did you get involved in shipping and receiving at all?
A. Packaging.
Q. And what did that entail?

A. Getting the pieces out of the assembly line and packaging them in special boxes, and putting them in skids.

Q. Do you remember about how long you were with that position?

A. About nine months.

Q. Do you remember why you left?

MR. GAGLIARDI: Objection. Relevance.

A. It was too far.

Q. Too far away from home?

A. Yes.

Q. What about Mosquito Magnet, what did you do for them?

A. A tester. That was the title.

Q. What did that involve?

A. Testing the machines, making sure that they were going to work when they sold them.

Q. How did you do that, just turn them on and operate them?

A. A monitor, yeah. Different, measuring the oxygen beads, different type of things.

Q. But you didn't have to stand next to them in a room full of mosquitoes?

A. No.

Q. And do you remember how long you were there?

A. About a year.
Q. Do you remember why you left?
MR. GAGLIARDI: Objection. Relevance.
A. They lost a lot of their, how can I say this, well, it wasn't in demand as much, so they decided to do a big layoff.
Q. What did you do at K and M Associates?
A. Pack confirm.
Q. What does that mean?
A. Check that the order was picked correctly.
Q. What does K and M do?
A. They sort out different kinds of jewelry for, like, Wal-Mart, K-Mart, stuff like that. So, they would pick them there, package them, and then they would ship them out to the different stores.
Q. So, was that part of their shipping department, or were there departments, or were they not distinguished?
A. It wasn't really distinguished.
Q. Do you remember how long you were there?
A. Eight months.
Q. And do you remember why you left?
A. Layoff.
Q. Have you ever been terminated from a job for absenteeism?

MR. GAGLIARDI: Objection. Relevance.
Q. For taking too much time, stuff like that?
A. No.
MR. GAGLIARDI: Objection.
Q. Have you ever been terminated from a job before Electrolizing?
A. No.
Q. Oh, I'm sorry, we didn't talk about the insurance agency. What did you do at Zerada Yepes?
A. I took care of mailing their correspondence, and taking payments, answering the phones, filing.
Q. And how long were you there?
A. About a year.
Q. Do you remember why you left?
MR. GAGLIARDI: Objection.
A. I wasn't making enough.
Q. How did you come to work at Electrolizing?
A. I was looking for a job. I went to pay a bill at Cox Communications, because it's right next to it. And I was actually with my mother-in-law, and my brother-in-law had worked there many years ago. And she said, stop by and see if they're hiring. And I did. And I asked for an application, and I filled it out, and I was called.
Q. Now, you said you left Zerava Yepes for more money?

A. Um-hmm.
Q. Were you offered more money at Electrolizing?
A. Yes.
Q. Do you remember initially, when you were hired at Electrolizing, what your compensation was?
A. Nine dollars.
Q. And how did that compare to what you were making at Zarava Yepes?
A. I was making $7.00.
Q. And I assume $7.00 per hour; right?
A. Yes.
Q. And what was your compensation at K and M, to the best you recall?
A. 8.50.
Q. Do you remember Mosquito Magnet?
A. Eight dollars.
Q. And what about Texas Instruments?
A. No.
Q. Do you have any sense of the dates of any of these jobs, I mean, the timing of layoffs, anything that causes you to remember when or about you started or left one of these employers?
A. K and M, I left right after my daughter was -- well, they did the layoff right after my daughter was born, so that must have been in 2003.

Q. When was your daughter born in '03?
A. May.
Q. So, was it sometime that spring, in the summer, or?
A. Yes.
Q. In any of these jobs were you ever counseled because of attendance issues, or spoken to by your supervisor because of taking too much time?
MR. GAGLIARDI: Objection.
A. No.
Q. Did you have any disciplinary issues with any of your former employers?
MR. GAGLIARDI: Objection.
A. No.
Q. Did you ever have occasion to bring a claim against any of your former employers, either in the Rhode Island Commission for Human Rights, or courts?
MR. GAGLIARDI: Objection.
A. No.
Q. Do you remember when you started at Electrolizing?
A. I believe in March.
Q. March of 2004; right?
A. Yes.
Q. And do you recall what your position was?
A. I was hired as a part time, working with helping in shipping and receiving.

Q. So, right when you started, you were working part time, if I understand you correctly?

A. Yes.

Q. Do you remember how part time it was, how much time you worked?

A. From 11:00 to whenever shipping was done, I believe. I'm not sure of the time.

Q. Well, okay. That's fine. And what did you mean by, whenever shipping was done?

A. Well, there wasn't really an ending time for shipping. Basically it was whenever we were done shipping, that's the end of the day for me. That would have been the end of the day for me.

Q. Do you have any sense of why they ran it that way, why didn't they ship what they can until 5:00, and then leave the rest for the next day?

A. Because most of those jobs were rush jobs. They needed to go out on that day. And all jobs were differently, and they could have come out exactly at 4:00 and needed to be packaged, because it really did need to go out the door.

Q. And did you understand when you were hired that there were going to be some days when you couldn't depend on when your day ended because of the need to rush and get it out the door that day?

A. Yes.
Q. Do you remember how many days a week you were doing this?
A. Five days a week.
Q. And when you first started, were you just doing shipping?
A. Shipping, and helping in receiving also.
Q. There was never a time when you were just doing one and not the other?
A. Some days if shipping was very hectic, then I would just stay in shipping.
Q. Can you describe for me exactly what you would do in a typical day, from the moment you showed up at work until the end?
A. Go straight into shipping, check if there was anything to be packaged, if not, I would go to my supervisor, he would direct me on what else needed to be, or where I can help.
Q. Okay. So, if there was something for you to do in shipping, you would need to package it?
A. I would come in, look at whatever we had on the table, grab a job, find out how it needed to be wrapped, because all packages needed to be wrapped differently. If I would pick a job, I would try to, depending on what the job was and what the

requirement was, I would package it, and prepare all the labeling and all the paperwork that would go with it.

Q. And you mentioned if there was no shipping to be done you would go to your supervisor?

A. Yes.

Q. Who was that?

A. David Richards.

Q. Was he your supervisor the entire time you were employed at Electrolizing?

A. Yes.

Q. Did you have any other supervisors?

A. At the beginning, Alan Godin was my supervisor, because that's the area that was introduced to first.

Q. So, how did you come to understand that he was your supervisor?

A. Because that's who I was working with at first, and he was my, training me, he was supervising what I was doing in the shipping area.

Q. Was he telling you what to do?

A. Yes. At the beginning.

Q. And if you needed to help out in another part of the plant, would he send you there?

A. David Richards would.

Q. So, I understand that he was sort of showing you the ropes, but I need to understand whether or not he was training you, or he was really your supervisor; do you appreciate the distinction?
A. Yes.
Q. Was this a guy that could hire or fire you, Alan Godin?
A. No.
Q. Could he tell you what to do, if he wanted you to go to another part of the plant, help out?
A. When there was nothing there to do, he would just tell me to leave the area and go to Dave Richards.
Q. Did he show you how to do your job?
A. Yes.
Q. Did he ever give you a performance review?
A. No.
Q. Did he ever discuss the terms of your compensation or employment with you?
A. No.
Q. If you needed to take a vacation day or sick day, would you talk to him about it?
A. No.
Q. If you had a problem with either the work or one of your employees, would you ever go to Alan Godin?

A. No.
Q. Did anybody ever tell you that you should go to Alan Godin with supervisory issues?
A. No.
Q. So, is it fair of me to say that the extent of his supervision over you was basically showing you how to do the job and being the guy who directed the work that you did?
MR. GAGLIARDI: Objection.
A. No.
Q. How is that not fair? What other supervisory responsibilities did Alan Godin have with respect to you?
A. When I was in his area, I was being supervised by him on the things that I had to do.
Q. What does that mean?
A. If I needed to leave his area for any reason, I would have to tell him and let him know.
Q. Could he say no? Could he say no, you have to stay here?
A. He would tell me when to stay and when not to stay.
Q. He would?
A. Yes.
Q. Could he fire you?

A. No.
Q. Why not?
MR. GAGLIARDI: Objection. Speculative.
MR. MILLSOM: She answered, Mark.
THE WITNESS: Well, can I take that answer back? I wasn't really thinking when I answered you. Maybe I answered too fast.
MR. MILLSOM: Okay.
A. To my knowledge, from my understanding, I didn't think he had any of that kind of -- how should I say this -- that kind of position for him to be able to fire me. But the way, like I said at the beginning, the way everything was handled, it seemed that way.
Q. I gotcha. So, nobody from Electrolizing, neither Dave, nor Chris Bejbl, or anybody else, ever told you, this is a guy who can hire and fire you, this is the guy you report to?
A. To report to, yes.
Q. Well, what did that mean?
A. Well, the first thing I needed to do when I came in was to report to shipping, to Alan, who would instruct me on what I was going to be doing to day.
Q. He was the head shipper; right? Is that fair to

say?

A. Yes.

Q. But nobody ever said that you need to go to him to request days off or sick time or with problems?

A. No.

Q. Electrolizing never told you that he was the guy that was going to review your performance, did he?

A. No.

Q. At a certain point in time, did you stop being part time?

A. Yes.

Q. And do you remember when that was?

A. No.

Q. Was it days, weeks, months?

A. Months after.

Q. After you started. And when you switched from part time to full time, did you have a set schedule, a set hours you had to work?

A. No.

Q. How did you know you were full time?

A. After thirty-two hours, I believe, you're considered full time. Basically because if I was to come in, let's say at 9:00, mainly at 9:00, before receiving would start, I didn't have an end time. I could have left one day at 5:00. Like, I could have

left one day at 3:30. If there was anything -- because shipping, sometimes it had a lot of stuff that needed to go out that day, and everything was rush, rush, rush, and it could take up until 5:00 o'clock. Or sometimes if it was slow that day, everything was done by 3:30, and everyone got to go home in the shipping department.

Q. At a certain point in time, did somebody ask you to start coming in earlier than 11:00?

A. Yes.

Q. And is that what you think of in your mind as when you switched from part time to full time?

A. Yes.

Q. And who asked you to start coming in before 11:00.

A. Dave Richards.

Q. And did your job change at all when you -- and -- let me restate that question. Did what you were doing change at all when you started on a full-time basis?

A. In the mornings I was in the receiving department.

Q. And before you came in at 9:00, you didn't do receiving?

A. Well, if there was nothing in shipping, they would ask me to go into the receiving department so

I could be trained.
Q. But when you started at 9:00, you were fully trained and you were, that was just your responsibility?
A. Yes.
Q. Did anybody else work in receiving?
A. Norma, I believe her name was.
Q. And that was when you started; right?
A. Yes.
Q. Was she there the whole time?
THE WITNESS: Until my termination.
MR. MILLSOM: Yes.
A. No. She retired.
Q. Were you sort of supposed to be her replacement?
A. Yes.
Q. Did she have any assistants, anybody else working with her in receiving?
A. No.
Q. While you were there, did you have anybody helping you in receiving?
A. At the beginning, no. Then they hired Anilsa Soriano.
Q. And what did Anilsa do?
A. She was to learn receiving, but mainly to work with Alan in shipping.
Q. Did you ever receive any warning or any kind of

discipline while you were at Electrolizing, prior to your termination?

A. No.

Q. Did you ever --

THE WITNESS: I'm sorry.

MR. MILLSOM: I'm sorry. Please continue. I shouldn't have interrupted.

A. On the Monday of February 6, he did ask me to see him, and he spoke to me about my attendance that one time.

Q. Who's he?

A. Dave Richards.

Q. So, Dave Richards called you in on the morning?

A. On the Monday, February 6.

Q. Was that the day of your termination?

A. No. On Friday. On the 10th.

Q. Before that, had he ever discussed your attendance with you?

A. No.

Q. Did anybody ever speak to you, anybody in a supervisor advisory role at Electrolizing, ever speak to you about talking too much on the job?

A. He mentioned it when they did the review. He said there was one particular coworker that was giving this complaint about me talking too much.

Q. Now, when you say he, again, you mean David Richards?
A. Yes. David Richards.
Q. Let me just back up a minute. You had a review during your time there?
A. Um-hmm.
Q. A performance review?
A. Yes.
Q. Just one, or more than one?
A. More than one.
Q. Do you remember how many you had?
A. I believe two.
Q. And how would these things work?
A. They go by your attendance, ability to work with others, how much you've learned on each department, and how clean you would keep your area.
Q. Let me ask it another way. When you had your performance review, would you get called off the floor into a room to meet with somebody?
A. Yes. Dave Richards.
Q. Just David?
A. Yes.
Q. And would they give you a document, would they show you a written review?
A. Yes.

Q. And would they talk to you about it?
A. Yes.
Q. Anything else that they would do with the performance review?
A. No.
Q. So, they would just tell you how you were doing since the last review or since you started?
A. Yes.
Q. And about how long would it last?
A. I don't remember.
Q. So, you remember having a couple performance reviews while you were there?
A. Yes.
Q. Both with David Richards?
A. Yes.
Q. Was Alan Godin ever at your performance review?
A. No.
Q. Was Chris Bejbl ever at your performance review?
A. No.
Q. And you recall the subject of your talking came up at a performance review?
A. Yes.
Q. But not attendance; right?
A. No.
Q. You said Dave Richards said that a coworker

complained about your talking too much?
A. Yes.
Q. Did he indicate who?
A. No.
Q. Did you find out who through other means?
A. No.
Q. Did you have reason to suspect who it might have been?
A. No.
Q. The thought never crossed your mind?
A. No.
MR. MILLSOM: Can we have this marked, please.
(Defendants' Exhibit A Marked For Identification)
Q. Ms. Bonilla, I've placed before you a document that's been marked for the purpose of this deposition as Exhibit A, and my first question for you is whether or not you recognize this document?
A. Yes.
Q. What is it?
A. It's when they do the review sheet.
Q. Have you seen this document before?
A. Yes.
Q. Do you remember when you saw it?
A. No.
Q. Do you remember whether it was your first review or

your second review that is reflected on this document?

A. By talk too much, it's my second.

Q. Second?

A. Um-hmm.

Q. So, you do recognize this?

A. Yes.

Q. So, this was your second review?

A. Yes.

Q. Do you remember about how long before you were terminated that your second review took place?

A. No.

Q. Can you read the handwritten notation at the top of the page, just to the right of the section designated one, company policies, twenty points?

A. Exceeded allowable days.

Q. And do you see the section that is underlined next to that?

A. Yes.

Q. What does it say?

A. In on time, work full days.

Q. Was that underlining, and was that handwritten notation on the document, when you were shown it in your review?

A. No.

Q. So, you've never seen this before?
A. The exceeded allowable days, no.
Q. Going down to section two, do you see the handwritten notation to the right?
A. Um-hmm.
Q. Can you read that?
A. Stays late.
Q. And the number next to it?
A. Eight.
Q. Do you see an S on the end of the word stay?
A. Yes. Not clearly, no.
Q. So, you think that says stays late?
A. Stay late. It would make sense to say stays late.
Q. Did you talk to Dave Richards at all about this subject during the course of your review?
A. What he focused on the most was the talking too much.
Q. You don't recall, and I'll tell you, my question is, it's not clear from the document whether or not this related to the fact that you do stay late, and it was a point in your favor, or the fact that he wanted you to stay late. Do you remember that subject coming up at all in the review, so that you could shed any light on it?

A. No.
Q. Can you read what it says next to three, quantity of work?
A. Talks, and I don't know what the word next to it says. I don't know what it says.
Q. And can you read the number?
A. Seven.
Q. And that's seven out of ten points; right?
A. Yes.
Q. And was talks a positive, as you recall it being presented to you in your review?
A. No.
Q. And under five, or across from five, can you read what it says?
A. Talking too much noted by coworkers or coworker.
Q. Do you remember Dave Richards specifically discussing this with you, this aspect, talking too much, during the review?
A. Yes.
Q. And seeing this document, I know you've testified about it, you've testified clearly, is there anything else that you recall talking to him about during this review about the talking too much?
THE WITNESS: I'm sorry, say that again.

MR. MILLSOM: It's a terrible question. I certainly will.

Q. What exactly do you remember him saying and you saying during your review about talking on the job?

A. I remember him focusing mainly on the talking, that I was talking a lot, that he got a couple of complaints about me talking a lot. He said that's where I was failing on, basically, was the talking.

Q. And he said you got more than one complaint, he said you got a couple?

A. Yes. A couple.

Q. Is there anything else you remember about the review that's reflected on this Exhibit A?

A. Nope. Just the talk.

Q. Do you see the number forty-five in the right-hand corner?

A. Yes.

Q. Does that have any significance to you?

A. Yes.

Q. What is it?

A. That's how many points I got on the review.

Q. And the review is out of sixty points; correct?

A. Sixty points.

Q. Did you have any sense of whether forty-five out of sixty was good, bad, or normal, or did it have any

meaning for you?
A. Well, I know I did better on the first review. That was the only meaning.
Q. You did better?
A. Yes. On my first review.
Q. And is that something you and Dave talked about?
A. No.
Q. You just, you remember seeing a higher number on the first review?
A. Yes.
Q. Did you ask him any questions about why the number was going down, and whether or not there was any problem, in his mind, with your performance?
A. Well, I asked him how many people were giving these complaints, because it's not very clear on what he wrote, whether coworker or coworkers. So, I did ask him if it was more than one coworker, and his answer was yes.
Q. It was yes?
A. Yes.
Q. Were you ever counseled or spoken to by anybody at Electrolizing about taking too much time at lunch?
A. No.
Q. Was there ever a period of time when you were taking your sister-in-law to work at lunch?

THE WITNESS: My sister.
MR. MILLSOM: Your sister.
A. Yes.
Q. What happened?
A. She had just come down from -- you want the whole story?
Q. No. I just want to know --
A. With Dave Richards. I came to speak with Dave Richards one day, and I said, my sister Rena, doesn't have a ride, can I get permission to drive her to work, and he said yes.
Q. So, did you drive her from then on?
A. And then he asked me to stop.
Q. Why did he ask you to stop; did he say?
A. Because it was just taking too long, and he wanted it to stop.
Q. So, did he talk about, at that point, taking too much time at lunch?
A. No.
Q. No?
A. No. It had nothing to do with the lunch. It was just, it was taking me too much time to drive her to her job, and he wanted it to stop. And when he asked for it to stop, it stopped.
Q. When would you typically drive her? What was the

time of the day?
A. Noontime.
Q. Okay. I think we're probably saying the same thing with different words. How long would it take you to leave and come back when you were taking her to work?
A. About forty-five minutes, from what I recall.
Q. And how long did you get for a break, at or about noon?
A. Thirty minutes, I think.
Q. The car accident you talked briefly about before, did that happen while you were at Electrolizing?
A. Yes.
Q. And do you remember about when?
A. It was shortly after I became a full-time employee.
Q. Did you take time out of work in connection with that?
A. Once.
Q. Well, how much time did you take? Did you just take a day?
A. No. I left early.
Q. And that was to see a doctor?
A. Yes.
Q. Did you ever take time off to meet with your lawyer

to prepare for the case?
A. No.
Q. Did Mr. Richards ever tell you that he didn't think you were getting all your work done?
A. On February 6.
Q. That was the first time?
A. That was the first time.
Q. Did Mr. Godin ever tell you he didn't think you were getting all your work done?
THE WITNESS: Alan Godin?
MR. MILLSOM: Yes.
A. No.
Q. Did Alan Godin ever tell you he was upset because he had to do your work, or your share of the work?
A. No.
Q. Did you ever complain about Alan Godin?
A. Yes.
Q. To whom did you complain?
A. Dave Richards.
Q. Do you remember when?
A. No.
Q. Do you remember whether it was just once or more than once?
A. More than once.
Q. How many times did you go to Dave Richards about

Alan Godin?

A. It was many times. I don't know exactly how many times.

Q. Do you remember what exactly you complained about?

A. Yes.

Q. What was it? What did you complain about?

THE WITNESS: Do you want to know about at the beginning of my complaints or at the end of my complaints?

MR. MILLSOM: Yeah. And --

THE WITNESS: Summarize.

Q. I don't want to know a whole lot about it. I just want to know the subject areas, you know, when you first went to him, what was it, and how did you complaints evolve over time? What were you talking to him about?

A. At first I was complaining about the hostility in the area, how everything I did bothered him, how he would throw things around and swear and yell, and how that it made me feel very uncomfortable and threatened by his actions.

Q. And what do you remember Dave Richards' response to those complaints?

A. That he would talk to Alan about it.

Q. Did you ever see him talk to Alan about that?

A. No.
Q. And over time, did you stop complaining about that?
A. No.
Q. So, that was a complaint you had throughout?
A. Yes.
Q. Did you ever go to Mr. Richards with complaints about anything else?
A. Yes. One day, it was at the end of my shift, or shortly, I'm sorry, shortly before the end of my shift, I was in the shipping department, cleaning the area. And David and I, we were just talking about work, and I said to him, well, I've noticed that you really haven't done anything to make -- I haven't really seen you talk to Alan about anything, and there's other things going on than just him yelling and swearing and throwing things, he's also making a lot of racial comments, racist comments, derogatory comments, and sexist comments.
Q. Do you remember when it was that you first spoke with Dave Richards about that?
A. No.
Q. And did you have additional conversations after that first one with Dave Richards about that?
A. Yes.
Q. When was the last time?

A. I believe in December, sometime in December.
Q. Why do you think it was December?
A. Because it was right after Carmen Bonilla had quit her job.
Q. And tell me about your conversation at that time; what do you remember about it?
A. I was very upset, because I didn't see any change in Alan's actions, and so, I decided to have, like, a meeting with David. And I said to him, I was very honest with him, and I said, I don't think you have even talked to him, because nothing has changed. I really want to quit this job because of this. I have given you many, many complaints. When I confronted you about the racial and sexist comments, you said that, you haven't been here long enough to know what you're talking about. These are very serious accusations. And he just left it that way when I first tried to confront him or let him know what was going on. So.
So, on this meeting I said, I need you to give me something in writing that shows me that you're really working with this person, trying to change the whole -- I didn't want to keep working in a hostile environment, I wanted to be able to go into work without having to worry about having to listen

to all these things every single day. And he promised that me he would take care of it.

Q. Why did you ask for something in writing?

A. Because I had given so many complaints before, and nothing had ever been done, nothing had ever changed on Alan's behavior. So, I said, this is the only way you can prove to me that you are going to do some type of investigation about the whole situation. That would prove to me that you are really working on this, and not just blowing me off, and just saying, yeah, I will, and not do anything.

Q. Did you think it was appropriate to request something in writing from your employer?

A. Yes.

Q. Why?

A. Because, like I said, nothing was changing. Nothing ever changed. The guy just kept doing the same racial comments, sexist comments, derogatory comments, the swearing, and his behavior wasn't changing at all.

Q. And you understood it was Dave Richards' obligation to do an investigation and give you a written report; right?

A. When I asked for the report, he said that when he did the investigation, he couldn't provide Alan's

version of it, but that he can give me something in writing saying, this is what you've come to me with, and this is what I will do.

Q. And that writing was important to you?

A. Yes.

Q. Did you ever complain to Dave Richards in writing?

A. No.

Q. You never put your complaints in writing; right?

A. Right.

Q. Why not?

A. He never asked me to.

Q. But you understood the significance of a writing --

MR. GAGLIARDI: Objection.

Q. -- right?

A. For me, yes.

Q. But you didn't think it would be important for him?

A. No. No.

Q. Were you aware of any policies or procedures at Electrolizing pertaining to complaints about harassment or other conduct in the workplace?

A. No.

Q. So, you think you had this conversation with him in about December?

A. Yes.

Q. And after that, did you notice anything change?

A. No.

Q. After your meeting with Dave Richards, did Godin continue to make comments that you deemed either racist or sexist?

A. Yes.

Q. When was the -- and was that true the whole time you were there?

THE WITNESS: I'm sorry, what was true?

Q. When was the last time you remember him making a racist or sexist comment?

A. He would do it almost every day. It was something that was constant. I can't pinpoint a certain day, or the last time or -- I really can't.

Q. Do you remember him doing it the week you were terminated?

A. The week that I was terminated, I worked with him a couple of hours at the end of the day, and there wasn't really much time for me to even, or him, for us to have any type of conversations of any kind.

Q. Was that consistent with the amount of work you would do -- strike that. So, you didn't work a whole lot with him the week you were terminated, directly with him?

A. Yes.

Q. Were you working a whole lot with him in the weeks leading up to that?
A. Yes.
Q. Or were you working less and less with him as time passed?
A. I was trying to work as little as possible with him. I even mentioned that to David on that meeting that I had. Because our agreement was that I would go into the shipping department after Alan would leave at 3:30. He would still be there. So, I said to David, if he's in the shipping department, there's no need for me to be there, because Alan is there. So, I was trying to use that more so that I wouldn't have to be in the shipping department for that many hours, or for too long.
Q. So, that was already happening before your meeting in December, that you were going to shipping starting at 3:30?
A. No. That was the agreement, not something that was going -- it didn't work that way. Because I was being sent, because he needed the extra help.
Q. So, even after the December meeting you were spending more time in shipping than you talked to Dave Richards about?
A. Yes.

Q. And even after the meeting, he would make sexist and racist comments to you or in your presence?

THE WITNESS: That week? On that week?

MR. MILLSOM: No. I mean after the meeting in December.

A. Oh, after the meeting, yes, yes.

Q. Did you ever threaten to quit if you were not relocated or put in another job?

A. I threatened to quit if the agreement that we had wasn't followed, and if I didn't get -- I threatened to quit if he wouldn't be able to do something about the situation. And I also requested him or asked him to please to try to limitate (sic) the hours that I would work with him.

Q. But you didn't quit?

A. No. Because he promised to -- he asked me not to quit, that he would handle the situation and he would do something about it.

Q. So, you threatened to quit?

A. Um-hmm.

Q. He promised to handle the situation?

A. Yes.

Q. And do something about it?

A. Yes.

Q. But you're saying he didn't do anything about it, it

didn't change, and you didn't quit; is that right?
A. That's right.
Q. In this you claim that Electrolizing employs more than fifty people; right?
A. Yes.
Q. Why do you say that?
A. There's people that work from home. I know this because there was a conversation between Alma, I don't remember her last name, and Louie, he worked in the QC Department. He was just starting to do, like, meetings outside of work, and it was only for the employees. So, she wanted her daughter to go to those meetings. And he said, well, she can't go because she's not an employee. And she said yes, she is, because she works from home, and she does get paid for taking the work home. And he's, like, well, I don't believe that. And that's how I started finding out about these other people working at home.
Q. What was Alma's daughter's name?
A. Alahandra.
Q. Alahandra?
A. I don't remember the last name.
Q. And so, you think some people worked from home; right?

A. I know.
MR. MILLSOM: Okay. And I'm not, please don't -- sometimes I'm not very good at this, asking questions, so you're just going to have to bear with me.
Q. So, people worked from home, but my question was, why did you think there were more than fifty people told?
A. Because -- why did I think that? Well, because when I first saw, met with Mark, he asked me how many employees were employed. And I just did a head count in my head of how many people actually worked with the different departments. I came up with forty-seven employees, and that wasn't even counting the people that worked from home. So, that made me think that, obviously made me think that there were a lot more than fifty employees.
Q. So, you just thought back and thought of people you could remember working with during the whole time you were there?
A. Um-hmm.
Q. And you came up with forty-seven?
A. Yes.
Q. Do you have any idea how many people worked from home at any given time?

A. No.

Q. So, you were just imagining, and I don't mean that the way it sounds. You were just assuming that it was probably at least this many people at any given time that were working from home?

A. Yes.

Q. This person you discussed named Alahandra, I think you identify her in your interrogatories as Alahandra Carrasco?

A. Um-hmm.

Q. Is it possible that her name is Alahandra Caballeros?

A. I don't know her last name.

Q. You never knew the last name?

A. No.

Q. Your kids got sick in February, 2006; right?

A. Yes.

Q. Tell me about that, please?

A. They were sick for the weekend on that 4th and 5th. My husband decided to take the day off to take them to the doctor, because they weren't getting any better. My daughter was diagnosed with scarlet fever and strep throat. My son was diagnosed with an ear infection, strep throat and something else. I can't really remember. They were on a lot of

medication. On that meeting, because I also had that meeting with David, where he was telling me about how I wasn't meeting the attendance, or whatever it was. And I said to him, well, my kids are sick, and my husband took them to the doctor, but I'm not really sure what's going to happen. And I requested that I might, I said to him, I might be able to take some time off, because it's pretty serious what they have. And he said it was fine.

I still went to work on Tuesday and Wednesday. On Wednesday the condition just got worse. I went in to work, because one, the office opened at 10:00, and I didn't want to just run off to the emergency room without them knowing, without my job knowing what was going on. So, I decided to just drop them off at my mother-in-law, and I called into work, and I explained the situation to David Richards. I said to him, can I please call the doctor from here, because we weren't allowed to use the phones, we had to ask for permission. And he said that it was okay. So, I called the doctor, and I explained to her all the symptoms that my kids were having. And she said, you're going to have to take them to the emergency room, because with the strep throat and the scarlet fever, it can affect the long-term