**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| ENID BONILLA<br>Plaintiff | . CIVIL ACTION NO. 07-00331-S-DLM<br>. |
| | . |
| V. | . PROVIDENCE, RHODE ISLAND<br>. APRIL 28, 2008 |
| ELECTROLIZING, INC., et al<br>Defendants | .<br>. |

. . . . . . . . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE DAVID L. MARTIN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the plaintiff: Mark P. Gagliardi, Esquire
Law Office of Mark P. Gagliardi
111 Wayland Avenue
Providence, RI 02906
401-277-2030
mark@gagliardilaw.net

Brandon S. Bell, Esquire
McOsker-Bell Law Office, LLP
120 Wayland Avenue
Suite 5
Providence, RI 02906-4318
bbellesq@aol.com

For the defendant: Geoffrey W. Millsom, Esquire
Adler Pollock & Sheehan, PC
One Citizens Plaza
8th Floor
Providence, RI 02903
401-274-7200
gmillsom@apslaw.com

Court Reporter:

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

***MARYANN V. YOUNG***
**Certified Court Transcriber**
**Wrentham, MA 02093**
**(508) 384-2003**

**I N D E X**

Proceedings 3

**P R O C E E D I N G S**

COURT CALLED INTO SESSION

THE CLERK: The Honorable David L. Martin, United States Magistrate Judge presiding. You may be seated.

THE COURT: Good morning.

COUNSEL: Good morning, Your Honor.

THE COURT: This is the matter of Bonilla v. Electrolizing Inc., Civil Action No. 07-331-S. There are two motions before the Court this morning, actually three, plaintiff's motion for leave to amend complaint. That's Document No. 16 in clerk's file. Plaintiff's motion to compel further responses to interrogatories. That's Document No. 17. And plaintiff's motion to compel responses to requests for production of documents.

The attorneys will identify themselves, please.

MR. GAGLIARDI: Good morning, Judge, Mark Gagliardi on behalf of Enid Bonilla.

MR. BELL: Brandon Bell on behalf of Enid Bonilla, Your Honor.

THE COURT: Thank you.

MR. MILLSOM: Jeff Millsom, Your Honor, on behalf of defendants, Electrolizing Inc., Alan Godin and Dave Richard. If I may, Your Honor, I believe there's an additional motion pending this morning.

THE COURT: Which motion is that?

MR. MILLSOM: A motion to extend the discovery deadline as well.

THE COURT: I do recall seeing reference to that. Ms. Saucier, is that included in the notice?

THE CLERK: (Inaudible - #10:26:26).

THE COURT: All right. Thank you, counsel. Can you identify that document number for me please?

THE CLERK: (Inaudible - #10:26:41).

THE COURT: Okay.

PAUSE

THE COURT: Yes, I have that motion. That's also plaintiff's motion to extend discovery deadline and other dates set forth in pretrial order dated January 11, 2008. The Court recognizes that these motions are interrelated. I think we'll take up first the motion for leave to file an amended complaint. I'll hear counsel from the plaintiff on that motion.

MR. GAGLIARDI: Good morning, Your Honor, Mark Gagliardi on behalf of plaintiff, Enid Bonilla. Your Honor, if I may, I may give a brief overview of the travel of the case.

THE COURT: Please.

MR. GAGLIARDI: Thank you, Your Honor. My client, Ms. Bonilla, worked for the defendant Electrolizing for approximately two years. She was a good employee, well liked by her coworkers, did her job. Unfortunately, during her

employment she was subjected to a hostile work environment by another employee, a fellow by the name of Alan Godin, on the basis of her gender and her national origin, race. Without getting into too much detail, he would make comments to her to the effect of I told the company not to send me women, this is a man's job, you, you know, you people come to this country and get all the benefits, very negative disparaging comments. And for a while my client tolerated it.

Eventually, she grew tired of these comments, reported this conduct to her supervisor. At first it was just, hey listen, can you talk to this guy and ask him not to give me such a hard time. And then the complaints were, listen he's making sexist and racist comments and I'd like you to do something about it. Unfortunately, these complaints fell on deaf ears. My client, right before her termination, had some family; some of her family members had medical problems. Her kids were severely ill, had to be taken to the emergency room with Scarlet Fever. She requested permission from her employer to be with her kids in the hospital. She was given permission. Two days later she was terminated. Her supervisor told her now you can go take care of your kids.

We filed a charge of discrimination in the Rhode Island Commission for Human Rights timely, which was simultaneously filed in the EEOC, and then we filed suit in this Honorable court August 31st `07. Your Honor, the reason

we're asking the Court to amend the complaint, we're not looking to add any new facts, really any new causes of action. All we're looking to do is seek relief under different statutes. This amendment doesn't pose any new theories of relief. It's all the same, hostile work environment claim, retaliation, violation of the FMLA. There's really nothing new. And based on the liberal philosophy of Rule 15 we ask that the Court, this is a circumstances where the Court should really give, really grant the motion because justice so requires.

Now, Judge, the reason I'm asking the Court and the reason we filed this motion at this stage of the litigation was because like most cases once you start really getting into the nitty gritty and you start uncovering facts and you start reassessing your case, I feel that it was a duty to my client to give her the best chance to prevail on the merits of this case. And once we started conducting or trading discovery, conducting depositions, I started to realize that maybe the best way to proceed on behalf of my client wasn't solely on a Title 7 claim but to add a parallel state claim. The analysis is all exactly the same. It just gives my client a better chance to recover for the harm that she suffered.

THE COURT: Why does it give your client a better chance to recover?

MR. GAGLIARDI: Well the statute of limitations under

FEPA, as you know, is one year versus 300 days. Once again, when my client was deposed and we started really getting into the facts of this case, we started to realize that some of that conduct may fall outside of the 300 days. My client didn't document, I think it's important for the Court to understand that my client didn't really document her complaint so it was hard for her to convey when exactly she complained about this harassment.

This is a manufacturing facility and a lot of the production workers are on a first name basis. It's not like an office job where everybody knows everybody. It was difficult for her to pinpoint witnesses in this matter until she started to review payroll records that were produced, started to pinpoint witnesses and really we were able to put our claim together really strongly in the last month or so and really kind of assess where we are. And of course, Judge, there's a statute, there's no cap on damages under FEPA. And once again once we started to realize how strong her claim is, that's when we decided to file the motion to amend.

And also, Judge, quite frankly I thought we were going to settle this case a little bit earlier and as it's progressed it looks like that's kind of a long shot unfortunately. So we're gearing up towards a trial and we really just need to do what's best, you know, do what's best for our client.

THE COURT: Thank you.

MR. GAGLIARDI: You're welcome. Judge, may I add one more thing?

THE COURT: Yes.

MR. GAGLIARDI: This amendment would not result in any prejudice on the defendants. They've already deposed my client. They've asked all the relevant questions. They've probed all the areas. They asked her when she first complained. They asked her to whom she complained. They asked her how this termination has affected her life. They've asked really, they've done, quite frankly, they've done an excellent job in probing all the possible defenses and to the extent that they are prejudiced now that they have to engage in duplicate discovery, I don't agree with that position.

The First Circuit has ruled on the standard for what prejudice, what constitutes prejudice in granting a leave to amend. In *Wolfe v. Reliance Standard Life Insurance Company*, the Court stated that the prejudice occurs when the amendment substantially changes the theory on which the case has been proceeding and the amendment is proposed late enough so that the opponent would be required to engage in significant new preparation. I don't see any of those two scenarios being present here, Judge.

Once again, and then one other issue I would like to just reiterate which is in my reply memorandum, we did send a

demand letter out after my client retained me alleging FEPA violations. We filed a charge of discrimination in the Rhode Island Commission for Human Rights. And in the original complaint, paragraph six and paragraph 26 we make reference to my client's charge in the Rhode Island Commission for Human Rights so that clearly defendants were on notice that this claim was out there and looming on the horizon. Judge, I have a copy of that case if you'd like one.

THE COURT: Was it cited in your memorandum, Mr. Gagliardi?

MR. GAGLIARDI: No, it's not.

THE COURT: All right. Have you provided opposing counsel with a copy of the case?

MR. GAGLIARDI: No, I haven't, Judge. I have one--

THE COURT: Why don't you just give me the citation then for the case?

MR. GAGLIARDI: Sure. It is 71F.3d 44 at page 450 First Circuit 1995, *Wolfe v. Reliance Standard Life Insurance Company.*

THE COURT: You do have a copy for opposing counsel is that right?

MR. GAGLIARDI: Yes.

THE COURT: Oh, then you may submit it to me.

MR. GAGLIARDI: Judge--

THE COURT: Yes.

MR. GAGLIARDI: --sorry, one more thing.

PAUSE

MR. GAGLIARDI: I do have one more case I would like cite. This is a case called *Baker v. John Morrell & Company* 266 F.Supp.2d 909. That's a case from the District Court of Northern District of Iowa 2003. This is a case that's very much on point with the present matter in which the plaintiff brought a Title 7 claim for sexual harassment. And actually, Judge, after a trial, after the plaintiff succeeded on a trial, the plaintiff filed a motion to amend to add identical state claims and the Court granted it.

PAUSE

MR. GAGLIARDI: One more, Judge, *Roy v. Russell County Ambulance Service* 809 F.Supp. 517 Western District of Kentucky 1992. This is a Title 7 case for gender discrimination. After one year, the plaintiff sought to amend the complaint to add a claim for pregnancy discrimination and retaliation. The Court granted the motion. Only initial discovery had been conducted and therefore the Court decided that no prejudice would result in the defendant. So I think that's in line with what's going on here, although in this case quite frankly there's a little bit more discovery, but one year had passed and they sought state claims, parallel state claims.

THE COURT: Do you have a copy for opposing counsel?

MR. GAGLIARDI: I don't have that one, Judge.

THE COURT: All right. Give me the citation again.

MR. GAGLIARDI: 809 F.Supp 517 Western District of Kentucky 1992.

THE COURT: Have you completed, Mr. Gagliardi?

MR. GAGLIARDI: Yes, Your Honor.

THE COURT: All right. Mr. Millsom?

MR. MILLSOM: Thank you, Your Honor. Your Honor, I will not do a counter statement of the facts. Suffice it to say we deny most, if not all, of plaintiff's allegations. It's not very often we oppose a motion to amend a complaint candidly because we don't see much success in doing that. It's a very high, very liberal standard but there is a standard. Ever since *Fomen v. Davis* was decided in I think it was the 20's and the rules were amended to reflect that it's been the same, motions to amend shall be freely granted when justice so requires. It's a lay up but it's not a jump ball and you have to have a good reason.

The First Circuit has been pretty clear that it's not, you know, Rule 15 does not automatically excuse a plaintiff for her lack of diligence. You have to come forward and show some good cause, some cause. And what we've heard in the two motions is basically oops, I forgot. Today at argument we heard, I think this helps me so therefore I have cause to amend. And, you know, that's not the way it works, Your Honor. You don't just get a do over. There is First Circuit law that

we cited in our brief, the *Acosta Mestra* (ph) case and the *Tiernan (ph)* case and both of those cases deal with motions to amend that were denied. And it shows that where the Court does see that plaintiff is putting the defendant in an awkward position, whether or not the new claims require new discovery, whether or not there is severe crushing prejudice on the defendants, where there's no good cause, when justice would otherwise require, they will not automatically grant the motion to amend. And this is just such a case.

You know, he's - Ms. Bonilla seeks to do a couple of things. There are basically four things she seeks to do in the amended complaint. The first is to bring a FEPA claim as a compliment to her Title 7 claim. And FEPA is the state court equivalent of Title 7. It is uncapped as to damages. As Mr. Gagliardi pointed out, this was a cause of action or a claim Ms. Bonilla identified from the get go before the Rhode Island Human Rights Commission and even before that in her initial demand letter to Electrolizing, but she chose for strategy reasons or otherwise not to bring that claim, and that changed the case in a significant way.

Ms. Bonilla was an hourly employee who earned approximately $12.75 an hour. Her back pay damages for the time it took her to find new work come to just under 13,000. Front pay I don't, you know, to the extent there's any rational calculation it's similarly minimal, well under the $50,000 cap.

As a result defendant's defense was premised upon that at least initially. Now she seeks no limit and if, you know, the Court is perhaps under the impression that that doesn't change the complexion of the case or defense strategies, I'm here to tell you it does. We do treat an unlimited claim very different than a claim where everything, you know, compensatories, punitive damages, attorneys' fees, everything is capped at 50 grand. That's a very significant change and it is prejudicial, particularly when it happens now at the close of discovery.

She seeks to add a 1981 claim. Candidly, Your Honor, I don't know what that's all about. I've done a fair bit of this, but we typically don't see a lot of discrimination claims brought under 1981. It seems to me to be repetitive and unnecessary. I can't claim prejudice because it's the same theory, the same burdens of proof, the same everything as the other claims but, you know, again it's changing the playing field here at the end of the fourth quarter.

She seeks to change her FMLA claim from a violation claim to a retaliation claim. And I guess that makes sense. She initially claimed she was fired, she wasn't allowed to take leave and the evidence kind of turned out that in fact she thinks she was fired after she took leave to be with her sick children. But, you know, that's really of no - and fourth, she seeks to add an allegation that he coworker, the gentleman Mr.

Gagliardi described as allegedly making inappropriate comments to her, was her supervisor. And this, this claim candidly is problematic because there's zero evidence that that in fact was the case. He wasn't a supervisor. He's another hourly employee. He had been there 26 years and perhaps was a bit senior to her, had to show her how to work in his department, but he was, I mean, she acknowledged in her deposition she didn't go to him with problems. He didn't review her. He didn't have the power to hire or fire her. He wasn't a supervisor. He's, you know, the org. chart, to the extent there is one, makes clear he's just a lateral level employee.

Another I think interesting point that shows up the prejudice and one of the reasons why we're here arguing against a motion to amend, a motion to extend the deadlines is sort of the way this case has been conducted. Plaintiff has filed two briefs in this case, the initial brief and a reply brief, and yet counsel stood up in his argument and presented you with three cases that he hasn't cited. Oops. You know, here we are at the 11th hour, two briefs, new cases. And the entire case has been like that. Plaintiff is, you know, not giving us a clear picture of what's she's thinking, what the claims are, what's going on. And all these things combine to our detriment, and that is why in this case we are arguing against a motion to amend where normally we don't because normally they're not successfully. Thank you, Your Honor.

MR. GAGLIARDI: Your Honor, may I have a brief rebuttal?

THE COURT: Yes, briefly Mr. Gagliardi.

MR. GAGLIARDI: Yes, thank you. Judge, regarding the changing of strategy now that a FEPA claim has been advanced, so far the settlement discussions have involved offers from the defendants of $5,000 and $6,000. My brother has indicated that they generally settle these claims for lost wages. If he had made a settlement offer of the cap on damages, he would have a strong argument but that hasn't happened.

THE COURT: He'd have a strong argument in what regard?

MR. GAGLIARDI: That it's changing how they're viewing this case. If this case was, and what I'm inferring from what he said is that this case prior to introducing a FEPA claim didn't have value and now it has a lot of value. Well there haven't been any meaningful settlement discussions either way. I don't see how that changes things. They have insurance coverage of a million dollars. This is not going to subject them to, the company to any additional hardships.

Regarding the Section 1981 claim, Judge, Your Honor, as you know in the *Hill* decision in the Rhode Island Supreme Court, the Rhode Island Supreme Court--

THE COURT: Is the *Hill* case mentioned in either of your memos?

MR. GAGLIARDI: No. It's regarding--

THE COURT: Can you identify the case more than just saying the Hill case?

MR. GAGLIARDI: Is it *Horn* or *Hill*? Am I saying it wrong? It's *Horn*. I'm sorry, it's *Horn*.

THE COURT: *Horn*?

MR. GAGLIARDI: Yeah, it's the case where Rhode Island Supreme Court set, decided that the statute of limitations under the claim for the Rhode Island Civil Rights Act of 1990 is only one year. So that wasn't available to my client when she filed claim, when she filed her lawsuit. If we had filed the claim under that statute that would be time barred. And the statute of limitations under Section 1981 is three years.

And just very briefly, Your Honor, last the FMLA claim, it's really just cleaning up a little bit of language. It probably could have just stayed the way it was but I'm just being a little overly prudent. All the language is there stay the retaliation claim.

THE COURT: All right.

MR. GAGLIARDI: Thank you.

THE COURT: Thank you. All right, I'll take this motion under advisement. I'll issue a written order.

Let's take up next the motion to extend the discovery deadlines and other dates set fourth in the pretrial order

dated January 11, 2008. I'll hear you on this, Mr. Gagliardi.

MR. GAGLIARDI: Thank you, Your Honor. Your Honor, I think one of the biggest areas of disagreement that I have with my brother is their characterization of this case as straightforward. I will concede that in terms of legal theories it is straightforward. This is not a medical malpractice case, a products liability case, a patent infringement case. Either he harassed or he didn't, I agree. But, Your Honor, factually this is a difficult case as all discrimination cases are. It's a difficult case to prove. A lot of the players in this matter are either defendants or employees of the defendants.

As I stated previously, my client was just on a first name basis with a lot of her fellow coworkers. She wasn't able to identify, hey Joe Smith heard me say that Alan Godin harassed me. Everything was on a first name basis and we weren't able to really put the case together until we started getting documents. I'm sure we're going to be talking about the motion to compel in a few minutes but had the defendants produced all those documents that we had asked for, we probably could have been a little more ahead in this case then we are right now.

Every week that this case endures, Your Honor, new witnesses pop up. Every deposition that is taken somebody else pops up. Last Friday I learned that the former bookkeeper, I

finally got a hold of her, Michelle Carocchio (ph), finally spoke with her. She just provided a complete treasure trove of information on this company, Your Honor, and I just need a little bit more time to put this all together. Similarly, another witness that has surfaced is Diana Bonilla. She's actually a potential, another potential FMLA plaintiff. We didn't know the circumstances under which she was terminated because once again the defendant--

THE COURT: Is she related to the plaintiff?

MR. GAGLIARDI: She is. She is her sister-in-law I believe. But, Your Honor--

THE COURT: And when you saw she surfaced, how did she surface?

MR. GAGLIARDI: The, my client of course knew that she worked there but did not know that she had important information on this case. I'm trying to think exactly how I came into contact with her. It was, I was--

THE COURT: Well, I guess my question Mr. Gagliardi is that if she is so closely related to the plaintiff, the fact that only recently you learned that she had information that you think is relevant to the plaintiff's case, it seems to be somewhat surprising. I mean the plaintiff obviously knows who she is. The plaintiff obviously knew I assume that she worked for the defendant and the fact that only just now recently the plaintiff has become aware that this relative has information

surprises me and I'm asking you to explain why that is.

MR. GAGLIARDI: Your Honor, if you think you're surprised how do you think I felt when I found out? They don't have, I don't want to say they're estranged but they don't have a relationship really. And, once again, I contacted Diana Bonilla to try to obtain Michelle Carocchio's phone number. Michelle Carocchio was the former bookkeeper. So my client said why don't you call my sister-in-law. I don't talk to her, here's her phone number. I asked Diana Bonilla if she could give me Michelle Carocchio's phone number. I got to talking with her and low and behold she claims she overheard, she witnessed my client complaining of the unlawful conduct and crying and threatening to quit. That was the first time I ever heard that, Your Honor. That is a great witness. If we had known that from the beginning she would have been number one of the list. But once again I think because they're not, they don't have a relationship, either my client didn't think she knew the information or perhaps didn't think she would cooperate, I'm not sure, but she told me about this last week. And we've filed supplemental responses to interrogatories, although they haven't been signed yet but we've provided the defendants with notice of these witnesses.

So, but Your Honor I just want to impress upon the Court that these people just keep popping up. They just keep popping up left and right, and I just need a little bit more

time to piece this all together. The defendant has been forthcoming with some information but, quite frankly, it's information that doesn't hurt their position and doesn't help us. But when it comes to really relevant information that can help us prove our claim, for example, a list of all the employees they terminated in the last five years, they refuse to produce to produce it. Had they produced that information and Michelle Carocchio was on that list, then I could have called her, but we have no way of knowing who was terminated, who's still working there. We're at their mercy because they produced what they feel is relevant.

THE COURT: Have you completed, Mr. Gagliardi? I don't want to cut you off.

MR. GAGLIARDI: Judge, I just want to state that the standard for allowing an extension of time under Rule 16 is a showing of good cause and that we believe that this is a good cause for extending the deadline.

THE COURT: All right. Thank you.

MR. GAGLIARDI: Thank you, Your Honor.

THE COURT: Mr. Millsom?

MR. MILLSOM: Thank you, Your Honor. Actually, the First Circuit has spoken on motions to extend and stated in the *Pilgrim*, case which is cited in our brief, that if there's little fruitful prospect to be expected from a motion to amend it should be denied. And notably that failure to perform

discovery is no excuse for a motion to amend in the *Sayer* case.

Plaintiff has recently disclosed that her attorney spent 191 hours on the case as of the beginning of April in discovery. That's a lot of time doing discovery. Plaintiff has all relevant documents. She has deposed most of the relevant witnesses. She hasn't, has elected not to depose Dave Richards who was the supervisor who she claims she complained to and who was the one who terminated her. She really can't articulate with any specificity the discovery she requires. And the excuses and stories she tells quite candidly beg credibility or lie along the borders of credibility. For example, in her brief she indicates that there was a witness deposed named Pedro Roman and Pedro Roman disclosed four employees who had relevant - well some, I don't believe the plaintiff says in her brief four, some employees who had knowledge of defendant's conduct one way or the other. And we went back and we looked at Pedro Roman's testimony. He disclosed four other employees. They were Carmen Bonilla, Arison Carasco, Angel Ruiz and Miguel Matos. Three of the four, Ms. Bonilla, Mr. Carasco, Mr. Ruiz, were disclosed in plaintiff's interrogatory responses which were filed on March 3rd, eight days before Mr. Roman was deposed on March 11th. One more, Miguel Matos was not – he was newly disclosed in the Pedro Roman deposition.

Plaintiff noticed their depositions. Two of them, well, I'm sorry, one of them took place Friday and two of the other three were scheduled to take place, or I'm not sure if it's Angel Ruiz or Angel Martinez, tomorrow. So by plaintiff's own account she took this deposition on March 11th, learned of these new witnesses and noticed their depositions for March 29th and 26th. There's no explanation for that one and a half month delay. What we have here is a case where there is--

THE COURT: Mr. Millsom, did you – either I, you said March and then you referred to a month and a half delay and it's not computing to me because it sounds as if there was disclosure in like the first or second week of March and then depositions were noticed for the end of March which would be a half month.

MR. MILLSOM: No, Your Honor, the end of April. They were to take place tomorrow and last Friday.

THE COURT: All right. Thank you.

MR. MILLSOM: So, you know, a month and a half just I guess preparing the deposition notices.

THE COURT: Thank you.

MR. MILLSOM: The – this is a case where the plaintiffs, plaintiffs have been struggling to get their proof together and they shouldn't. This is a case that is very finite. There is not unlimited relevant witnesses and documents and materials. This is a case where the plaintiff

is increasingly going down very suspect and I would argue irrelevant, and I'm sure we will argue in the motion to compel rabbit holes in search of something that might bolster their case. And, you know, the new kick is they're seeking to depose and learn of employees, other employees who granted, who were granted or who took leave for medical or personal reasons and not fired. You know, that does not pertain to plaintiff. The plaintiff was fired because she could not consistently work 40 hours a week in a job that required 40 hours a week plus overtime. This wasn't a case where she came to her employer and said I need two weeks to deal with a sick child and was denied. This was a case where day after day, week after week, month after month, she was losing half a day here, she was late there, she was leaving early, she was taking too long a lunch and she just wasn't getting the time in. There were a few incidents in a row and they were unfortunate. She was excused, they were good reasons to leave, but it doesn't change the fact that she couldn't put in the time. And now plaintiff has this theory that she should have been granted leave under a federal statute that doesn't apply. So she wants to discover any other employee that ever took or requested leave from the company. In other words, employees that are not similarly situated to her, employees that were not fired or disciplined or counseled for their inability to work 40 hours a week. And this is the type of discovery she seeks extra time for, and I just don't

believe it's warranted.

This is a case that plaintiff has already devoted an exorbitant amount of time to and if the pace continues will continue to devote an exorbitant amount of time to. It is now unsettleable as plaintiff has indicted because the legal fee component of her damages has got to be astronomical. This is a $12 employee demanding well over $100,000 to settle her claim because her lawyers have already spent so much time. She has all the relevant documents. She has a list of every employee that worked during the time she worked. And now she claims she couldn't even, you know, that she couldn't even figure out that her sister-in-law had relevant information. This is a case that needs to go to summary judgment and trial. Thank you, Your Honor.

THE COURT: All right, thank you. I'll take the motion to extend under advisement.

MR. GAGLIARDI: Your Honor, may I have a brief rebuttal?

THE COURT: All right, briefly, Mr. Gagliardi.

MR. GAGLIARDI: Okay. Judge, regarding Pedro Roman, I had spoken with him prior. My client identified him as a potential witness. I've spoken to him. Once again, Your Honor, he wasn't able to really name specific employees until his deposition, until I showed him payroll records. I had asked opposing counsel several times among those employees that

were named, whom is still employed by the company and either through inadvertence or just because we all have a lot of heavy case load, I was told if you have questions about certain employees, I have the email right here, ask Mr. Bejbl who's the general manager of the company, ask him at his deposition.

It wasn't prudent to submit additional discovery requests for this very narrow bit of information. And I'm not suggesting they were stonewalling, but the truth is that when you discover information you can't put a notice of deposition the next day unless you know if they're still employed by the company. And that's why it took a little bit of time to get this together. And that's why quite frankly, Judge, I hate to sound repetitive, that's why we're asking for additional time because this is very confusing. The witnesses have a hard time remembering people's names and relevant information.

And regarding Mr. Richards, the codefendant, Your Honor, I was told that he's an out-of-state witness and I wasn't told this until my client's deposition on March 14th. His address was not disclosed to us, and I think it's important that the Court understands, his address was not disclosed to us through the initial disclosures and I was under the assumption that he was local. And I didn't find that out until mid-March, so I don't know that it's possible to really depose him right now.

MR. MILLSOM: Two points of rebuttal. First of all,

he was local at the time of the initial disclosures. Second of all, the email he's talking about where he was asking me about or asking actually my associate, Jaime LaPorte, about a bunch of the witnesses and their current employment status was the week my client was to be deposed. And the answer was, ask him yourself. You know, I can call and ask him. You can get the information a day early or you can wait for the deposition. Again, I mention this only because I think credibility of, you know, the position taken is a big issue.

THE COURT: All right. Thank you, Mr. Millsom.

MR. GAGLIARDI: Email right here.

THE COURT: All right, we'll now go to the motions to compel. This is plaintiff's motion to compel responses, requests for production. Let's go first - strike that.

I'm going to take up plaintiff's motion to compel further responses to interrogatories. This is Document No. 17. There are two interrogatories at issue, Interrogatory No. 14 and Interrogatory No. 17. Mr. Gagliardi?

MR. GAGLIARDI: Yes, Your Honor. One minute, Your Honor, I just want to see which interrogatory is first.

PAUSE

MR. GAGLIARDI: Okay. The first interrogatory, Your Honor, sought information a list of employees who were granted family or medical leave during the period 1999 to the present. Once again, Your Honor, on Friday we found out, we deposed

Arison Carasco who's currently employed by the defendant. Low and behold he testified under oath that he in fact was given medical leave - I'm sorry, scratch that. He was given family leave for three weeks to go to the Dominican Republic to be with his family for personal, for family reasons. That was the first time we heard that. Why was that the first time we heard that? Well--

THE COURT: For, excuse me, for family medical reasons?

MR. GAGLIARDI: Family reasons, family. I don't want to characterize it as leave under the FMLA because we're not - he was given leave to be with his family in an effort, my understanding is an effort to bring his family to the United States. He testified under oath that he was given three weeks to take care of this family business and upon his return his job was there for him. This was the first time we had heard of this. Why? Well, because quite frankly the defendants didn't answer the interrogatories; they should have.

THE COURT: How - I'm not following you, Mr. Gagliardi. Interrogatory No. 14 says whether you have ever allowed leave under the FMLA to any current or former employee. How would this leave of this employee to go to the Dominican Republic take care of family problems, are you suggesting something about Immigration, how would that fall within the scope of the interrogatory?

MR. GAGLIARDI: Because the way the defendants answered is when an employee established we've given leave in the past. They were very vague characterizing a leave as to FMLA. They were reluctant to characterizing an answer as to FMLA leave and that's why I don't want to mislead the Court to suggest that that was an FMLA leave. I'll leave that to them.

But this fellow was granted leave to be with his family, and yet my client when she requested leave was terminated. This was the first time we heard this information. Had they produced the list of employees - their answer was in the past we've given leave for good cause. At Mr. Bejbl's deposition I asked him to name somebody who was given leave. The only name he could come up with was Michelle Carocchio and the reason that she was given leave was to have a baby which seems, which is a very good reason. And the inference was we do this very rarely. It's only for good cause. And we found out after the fact that they have given leave to other employees. Mr. Carasco was one.

THE COURT: But medical leave, is it medical leave?

MR. GAGLIARDI: Family and medical leave, I'm characterizing them as the same type of leave for the purposes of FMLA. Why is this information relevant? Why are we seeking this information? Because it goes to motive, Your Honor. And it goes to pretext. They've claimed that the reason they fired my client was for attendance reasons. We say that that's just

not true. They fired her for complaining about unlawful conduct. If we can show evidence that they gave leave to Arison Carasco, for example, he was taking family leave. My client was not seeking medical leave. It was family leave. It was family leave due to the medical problems of her children. Why would they give Arison Carasco, why would they grant him leave to be with his family but not my client? Begs the question, Your Honor, there's only a couple of possible answers really, disparate treatment on the basis of gender or retaliation, retaliating because she filed complaints against the company.

At any rate, Your Honor, this information might not prove to be fruitful but we need to see a list of the people. Michelle Carocchio has indicated that they gave leave regularly. She listed four people that they gave leave to, including herself. She was given leave twice, once to have a baby, another time because of stress and other medical reasons. She listed a few employees that had operations that were given time off, and then Mr. Carasco's testimony. It's all right there, Your Honor. And we need - now, Mr. Bejbl has testified, hey, we only gave leave one time as far as I can remember. I've been there 11 years and it's only once. Now we got all these other people that are contradicting his sworn statement. So this--

THE COURT: Well, let me stop you, Mr. Gagliardi.

When you say you have all these other people contradicting his sworn statement, is that in the record before me?

MR. GAGLIARDI: His deposition was Friday, Your Honor. We have my client, my client claims that they gave leave to other people when she was employed there. She couldn't name specifics. That was the purpose of the discovery request to see if they were telling the truth. They've said--

THE COURT: And the defendant responded by saying at his deposition, an employee of the defendant said at his deposition that he could recall one employee, and he identified her by name, to have a baby. And you're position is that is not a complete response, that they gave other employees medical leave.

MR. GAGLIARDI: We have testimony under oath that says that. Mr. Carasco claims he was given medical, family leave.

THE COURT: Has that testimony been presented to the Court?

MR. GAGLIARDI: Judge, his deposition was taken on Friday.

THE COURT: Is that the only evidence that you have that the testimony of the defendants, you know, executive person who testified that he could only recall one, is that the only evidence you have that that was not a full extent of the medical leave granted?

MR. GAGLIARDI: On the record? Diana Bonilla claims that she was terminated while on medical, well she was on medical leave and she was terminated for extending, for exceeding her medical leave. I found that out about a week ago. Michelle Carocchio, I found out that she had, was given leave twice. My client's own testimony, my client's own statements claim that they gave this leave regularly. She said they allowed foreign workers to go back to their countries, and it was based on that allegation that we made the request, and now we've been proven correct that we were going in the right direction because they have given leave. We have other witnesses that corroborate.

THE COURT: It's not presently in the record, Mr. Gagliardi. What I have before me is your oral argument that the deposition testimony is contradicted. You indicate that one basis for you to support your contention that the deposition testimony is contradicted is a deposition taken last Friday. And I draw from that you're saying it's not possible to have the transcript of that deposition available to the Court on Monday. I'll accept that. But as to these other sources that you say support your position that contradict the testimony, it's not clear to me why this is not available to me, you know, at least by today if you had this information.

MR. GAGLIARDI: Your Honor, it's my client's own testimony. It's in her, I can't pinpoint a page and a

paragraph in her deposition, but it's in her deposition.

THE COURT: All right, I have read her deposition.

MR. GAGLIARDI: Okay.

THE COURT: I have that. I'll look at that. Anything else you want to add in support of your request regarding Interrogatory No. 14?

MR. GAGLIARDI: No, Your Honor.

THE COURT: All right. Thank you. Mr. Millsom, do you want to be heard?

MR. MILLSOM: Thank you, Your Honor. I think the biggest reason why this, well certainly the biggest reason why we objected and haven't provided discovery under this is because employees who were granted leave and not terminated when they came back are differently situated than the plaintiff. The plaintiff was not fired after she took an extended leave. She didn't come to her employer and say I need three weeks and put him in a position where he could plan and schedule her. She was fired because day in and day out she didn't, she was unreliable.

The leave he's talking about was always last minute. My kids are sick, I gotta go. You know, my husband's was in a car accident, I gotta go. Sorry I was late, the sitter didn't show up. It, you know, oh, sorry I had to take an extra half an hour at lunch. I had to drive my sister-in-law to work. And this is a pattern that goes back virtually the entirety of

her employment. She was not fired because she wanted an extended block of time to go visit her family or take care of legal issues somewhere else. She was fired because of excessive tardiness and absenteeism.

This whole leave issue is a complete red herring and these people are not similarly situated. And the suggestion that it is indicative or probative of Electrolizing's pretense is I think defeated by the few examples she gave you. Michelle Carocchio was granted time to take to have a baby. Well, Michelle Carocchio is a woman. Arison Carasco was granted time to take care of Immigration issues back in the Dominican Republic. Well Arison Carasco is a Hispanic gentleman. The work force of Electrolizing is what it is, and to the extent plaintiff seeks to gem up some pretext based on the sexual identities of employees granted leave or their state of origin it actually cuts the other way. It cuts in my favor. These women were granted time, took time and not fired when they came back. So that shows an absence of pretense, an absence of a discriminatory intent. The same with Arison Carasco and any other Hispanic employees who took leave. They weren't fired when they came back. That shows an absence of discriminatory intent. And yet this is evidence he seeks to compel from us of differently situated employees with no probative value and it's one of the reasons why, you know, it's underlying all our position on all of the other motions. We are very far afield

now.

THE COURT: Mr. Millsom, if you argue that the fact that leave was granted to these other employees that it's evidence that you didn't discriminate against the plaintiff--

MR. MILLSOM: I'm not arguing that.

THE COURT: Well, that's what I just heard you say in effect.

MR. MILLSOM: I'm trying to rebut his showing of pretext. That's not going to be an element of our proof. There was, there's no requirement for Electro – strike that.

To be perfectly fair either there is a requirement under the FMLA for Electrolizing to grant leave or there's not and that question turns on a single issue, whether or not Electrolizing employed 50 or more employees in 20 weeks over the course of the year in which Ms. Bonilla was terminated or the preceding year. That's all. If they have the requisite number of employees, Ms. Bonilla is entitled to and they are obligated to provide family medical leave. And then the question is simply did she ask for it, you know, did we violate the statute? We're not talking about that. That's a simple nose counting exercise. That evidence is in. And that evidence is and it's irrefutable, there were not 50 employees for 20 consecutive weeks. There is no obligation; it is our position, under the FMLA to incumbent upon Electrolizing. They don't have the requisite number of employees.

So what we're talking about is a tempest in a teapot. We're looking at employees who are differently situated and hoping or suggesting that we can glean something by some kind of statistical analysis from them in order to prove disparate treatment. Your Honor, it's - well, I think I've been heard on the issue.

THE COURT: All right. Thank you.

MR. MILLSOM: Thank you.

THE COURT: All right, Interrogatory No. 17, Mr. Gagliardi, I'll hear you on that.

MR. GAGLIARDI: Your Honor, this interrogatory seeks a list of employees that the company fired for any reason. Once again, this is a hotly contested issue between myself and my brother. Their position is, hey, we run a tight ship, if you don't show up, you're late too much you're canned. And that's all well and good, but rather than just take the defendant's word for it at a deposition, I want to see examples of people they fired for reasons similar to them firing my client.

They keep saying that my client didn't meet the attendance requirements and that on the surface sounds like a legitimate reason. But when you really look into all the details, Your Honor, you'll find that her attendance problems were relatively minor. Every time she had to leave work early it was always with her supervisor's permission. One time one

of her relatives was in town from Puerto Rico. My client had to bring her to work, had to take a little bit extra lunch. She asked her supervisor. They okayed it. Then when it became a problem, they said listen you can't take the extra lunch and my client said, fine.

At Mr. Bejbl's deposition I asked him, hey, can you give me a list, a name of somebody you fired and why, and the only two people he could come up with in 10 years was a guy they fired because he tested positive for cocaine and somebody who they fired because he was a no call, no show at work, which clearly are more egregious than what they're alleging from my client. If they fire everybody for these minor infractions, why not produce the information? Why not just produce it? Because, Your Honor, I think that – I think the answer's clear, because they don't normally fire people for these kinds of reasons.

And, once again, I hate to introduce evidence from the deposition on Friday, but Mr. Carasco stated that he's been late this year a few times and he never got a verbal warning or nothing. He's been late in the past, never suffered any kind of adverse consequences from it. But yet they fire my client because she can't meet the attendance requirement. I guess it's just a coincidence that she was a person that complained about unlawful conduct. It leads to the inference that they retaliated against her. Nobody runs that tight a ship where

you're getting fired for showing up 10 or 15 minutes late. Every time she left early it was with permission, most of the times it's because they didn't have any work for her. And that's the truth, Your Honor, and so we need to see this information so that we can establish a claim for pretext and also to impeach the defendant's credibility. Mr. Bejbl's been the general manager there for 11 years and he can only pinpoint two times where he fired people. I'm not asking to produce exact names at a deposition. You can't tell me you fired people, more than two people? It's not credible, Your Honor.

THE COURT: All right. Thank you. Mr. Millsom?

MR. MILLSOM: Thank you, Your Honor. Interrogatory No. 17 requests, "From 1999 to the present time please state the name of each and every person you have terminated at the facility and for each terminated person set forth a list." This is not, it's not a narrowly focused request asking for similarly situated employees. The argument was certainly narrowly focused. As an initial matter what happened with other employees is not relevant to what happened with Ms. Bonilla. Her situation is what it is. Either she was fired for cause or not. Either we have a legitimate business reason or not. Either there is evidence of discriminatory intent and animus and motive or there's not. What other employees' situations is irrelevant and you start with the breadth of the request and end with the relevance, we just

don't believe it's a relevant request. We don't habitually disclose other employees' situations, personal files, termination histories or the like in employment cases. The case rise and falls on Ms. Bonilla and her circumstances, not on somebody who was terminated in 1999 because they failed a drug test. Thank you, Your Honor.

THE COURT: Do you know, Mr. Millsom, the two employees that apparently, I'm not remembering the name, the executive who testified he could recall two employees that were terminated. Who testified to that?

MR. MILLSOM: Mr. Bejbl did.

THE COURT: Mr. Bejbl did. Did he indicate when that happened approximately?

MR. MILLSOM: He didn't remember, no. His memory is not - was not clear or sharp on this. He's not the plant manager.

THE COURT: How long has he been with the company?

MR. MILLSOM: Eleven years.

THE COURT: All right. Thank you.

MR. MILLSOM: Thank you.

THE COURT: All right, we'll go to the request for productions. And there are, this is Request No. 1, No. 4 and No. 5 and No. 7. Number 7 pertains to Alan Godin's personnel file so I'll carve that out. Number 4 and 5 pertain to subcontractors. So we'll focus first on request No. 1 which

has to do with payroll records. Mr. Gagliardi?

MR. GAGLIARDI: Your Honor, I hate to sound like a broken record, but I don't understand the confusion regarding this discovery request. It's very basic. It says all the payroll records, and we've been going back and forth over this for a long time. We had a telephone conference my brother and I and another attorney on their side. They said what exactly do you want? I said, all your payroll records, everything. Everything you sent to the payroll company and everything they send back. And all I got were check requests or check registers. These are the checks that were cut. That is clearly inadequate. It does not account for people that were part-time workers that received paychecks intermittently. So if you used their documents which clearly benefit them, it's going to skew the numbers in their favor. We need a list of active employees. This information is all in the payroll documents. They just pick and choose which documents they're going to produce to us.

Your Honor, what's also troubling about this is Mr. Bejbl's paycheck is not in the payroll registers. Yet he testified at his deposition that he gets paid every two weeks just like everybody else and from the same payroll company just like everybody else. But mysteriously his check is not there. Who knows where it comes from? Maybe it comes from somewhere else but that's why we made the request all of your payroll

data from all your employees.

There's also other people that aren't showing up on the check registers and the way we found this out is when defendant's produced a list of employees' start dates and termination dates. For example, Lorenzo Acevedo, on the check registers he's missing for the rest of – he's only on the first 16 check registers for 2005, but yet his termination date was March 3rd `06. I guess he didn't get paid for 16 weeks. Maybe he's independently wealthy. Maybe he was on medical leave. Maybe he was on a family leave. We don't know. That's why we need to see all the documents.

What's troubling about this matter, Your Honor, is the defendants pick and choose which documents they're going to produce based on what we, what they think we need to prove our case and that's not how, that's – my understanding of how discovery works is that's not how it's supposed to work. You're supposed to produce the documents that are requested unless you can maintain an objection under the relevant law. You don't get to pick and choose what you produce and that's what they've done. And quite frankly, Judge, it's somewhat insulting to think that I'm just going to accept these check registers as, hey that's all we have.

THE COURT: All right. Mr. Gagliardi, the defendant in their opposition memo say that you now have the payroll records for the relevant time periods and the hire and fire

dates for the employees. Do you agree with that statement?

MR. GAGLIARDI: No.

THE COURT: Why do you disagree with that statement?

MR. GAGLIARDI: Because Mr. Bejbl's check was not produced in those registers. I can't go to court and try to prove my case on these check registers. They're inconclusive. They don't include everybody that was on the company's payroll. The Court of Federal Regulations is very clear on this. It's not debatable. It says everybody who was on your active payroll. So you could have somebody that doesn't work for two weeks, doesn't get a paycheck. And, Judge, I've mentioned this I think I've detailed this clearly in my reply, in my memorandum where you have according to my calculations seven people, including Mr. Bejbl and part-time workers that have to be added back to those check registers because there's gaps where they received pay. It's a very clever, I have to admit it's a very clever smoke screen, here's your check register. We only had 46 employees. What do you want from us? It's very inconclusive, Judge. And I think if they were forced to produce the payroll, both payroll records it's going to show they had more than 50 active employees. Not, certainly not everybody received a paycheck every week but that's not the analysis. That's not what the Code of Federal Regulations states. And then you have these other four employees that I don't know based on their termination dates they're missing.

Lorenzo Acevedo, Jorge Castillo, Yeroma Hertado (ph), James Knott.

THE COURT: Mr. Gagliardi, is this mentioned in your memo, these four names?

MR. GAGLIARDI: They might not be, Your Honor, because I didn't get this list of termination dates until after I filed my memo. But, Your Honor, that's why I asked for all the payroll records. Presumably there's start dates and termination dates in those payroll records for each employee. We're forced to, you know, to the extent - my brother is correct, sometimes we don't know what we're looking for but that's because they're not cooperating with us. They're not producing the documents we need. So we're forced to just kind of put all these numbers together in kind of a hodge podge way because they haven't produced what we need. If they produce we need, then we can set forth our claim.

THE COURT: All right. Thank you, Mr. Gagliardi. Mr. Millsom?

MR. MILLSOM: Your Honor, this is one where I'm very frustrated because we have cooperated. We've given everything, and I don't know if plaintiff is intentionally taking the position that he doesn't understand what's going on or he legitimately doesn't. But he's right, we have employees that may show up once every four weeks or once a year, but they should be counted and they're on the payroll. And in order to

determine who's on the payroll what you need to find out is during the relevant time period the total list of employees who got checks cause anybody who got a check during the relevant time period is potentially on the payroll. And then what you need to do is take that list and look at the hire and fire dates and figure out for any given week who was on our payroll. And plaintiff has that. They have each and every payroll run for the year--

THE COURT: What about Mr. Bejbl?

MR. MILLSOM: Mr. Bejbl is the owner of the company. What he gets is a draw. As the owner he takes, he draws compensation in the form of the profits of the company or half the profits of the company. And what he gets is a draw against those expected profits and they're not paid on the payroll. Clearly he exists. There is no other person that shows up for work every day at Electrolizing that is not on the payroll and is not Chris Bejbl. Nobody else. They have everybody else's name and they have everybody else's hire and fire dates, and Chris has been there the entire time and they have that information. They have everything they need to count noses. And we've gone out of our way because they haven't always known what they were looking for. They didn't know the relevant dates. They didn't know, they didn't know to ask for hire and fire dates. They made the assumption that payroll records include hire and fire dates. They don't. Payroll records

include the record of who got paid on any given date.

THE COURT: What do you say to Mr. Gagliardi's citation of an employee for whom the check record indicates the last check is I think in the mid 2000 and – I forget the date, but he's not terminated until months later.

MR. MILLSOM: Right.

THE COURT: There's a huge gap between the last check and his termination. What do you say--

MR. MILLSOM: He's on the payroll until his termination date and you got to count him until his termination date.

THE COURT: Okay.

MR. MILLSOM: And that's our position. And that's, I mean it's pretty clear. It's laid out in the code of federal regulations. It's not a big mystery. I mean part-time employees are not, you know, a great puzzling or unique situation. They are what they are and they're counted. They're counted as employees. They're just part time. Thank you.

THE COURT: All right.

MR. GAGLIARDI: Your Honor, a brief rebuttal?

THE COURT: Yes, particularly on the point that Mr. Millsom just made that they agree that a person is an employee until he's terminated, so even though there's a gap where he wasn't paid they agree he's counted all through that

gap.

MR. GIGLIARDI: You're right, Your Honor, that's after we pointed it out to him that we knew this information. The only way we found out was through our own diligent efforts, my 191 hours of work and my client's knowledge that they had people working from their homes. Had we not disclosed that to them, Your Honor, I'm sorry to say they wouldn't be admitting that right now. And in the Rule 16 conference, Judge Smith directed, directed defendants to produce all these payroll records without a formal request. And it took a lot of leg pulling to get it and we still haven't gotten it. Your Honor, the only we were able to determine how many employees they have is through our own diligent efforts and detective work. They weren't going to disclose this information.

THE COURT: Mr. Gagliardi, the defendant has indicated you have the hire and fire dates. And Mr. Millsom that's the termination date, correct? Do I read fire--

MR. MILLSOM: Yes, Your Honor.

THE COURT: --as termination?

MR. MILLSOM: Yes, sir.

THE COURT: So if someone says I found a better job, I'm leaving--

MR. MILLSOM: Yes--

THE COURT: --that date appears in the records?

MR. MILLSOM: That's correct.

THE COURT: All right.

MR. MILLSOM: Even if they retired--

THE COURT: All right.

MR. MILLSOM: --regardless of cause.

THE COURT: So, Mr. Gagliardi, if you have the hire and fire dates and the defendant agrees that if you find one check for that person, that person gets counted as an employee all the way until the date of official termination, what more do you need here?

MR. MILLSOM: I want to verify that information for myself, Your Honor. That's part of the problem is that we're supposed to just take the defendant's word for everything in a deposition. Well, I said I only gave medical to only one person, that should be good enough for you. We need to corroborate this information. Quite frankly, that's not accurate what my brother said about Mr. Bejbl getting profit draws. My colleague, Mr. Bell, is looking for the deposition testimony where Mr. Bejbl admitted he got a salary every two weeks by the same payroll company, not a profit draw. It's in there. It absolutely happened. I understand the difference between a profit draw. He's the general manager of the company. It's incorporated. He's listed on the website as the general manager. He's an employee. He gets a paycheck every two weeks. He's not in those payroll check registers for a reason.

MR. MILLSOM: May I be heard on that, Your Honor?

THE COURT: Briefly, and then we're going to move on.

MR. MILLSOM: Mr. Bejbl does not draw a paycheck from Electrolizing. He is paid from another company. There's no mystery--

MR. GAGLIARDI: That's not what you said. You said profit draw.

MR. MILLSOM: There's no mystery. The company owns Electrolizing.

MR. GAGLIARDI: Your Honor, I have this deposition testimony. May I read it for the record?

THE COURT: How long is the portion you're going to read?

MR. GAGLIARDI: Very short.

THE COURT: All right. Go ahead, Mr. Gagliardi.

MR. GAGLIARDI: "Now, Chris, how do you pay yourself? Do you pay yourself by salary?"

Answer, "Yes."

Question, "How often?"

Answer, "Biweekly."

"Okay, do you use the same payroll company? Is it through the same payroll company that everyone else, everybody else gets paid through?"

"Who is everybody else?"

"All the other employees."

"Where?"

"Electrolizing."

"Yes. Yes it goes through the same payroll service, yes."

"Who do you use?"

"I believe AmeriPay, I believe."

"Did they change their name, Paylocity?"

"Yes."

"How often have you been paying yourself a salary since you started there in 1997?"

"Yes."

It's not a profit draw. It's a salary. He gets paid every two weeks just like everybody else. He's an employee. And, Your Honor, I know we're going to fight about this in a motion for summary judgment at some point, but I need those payroll records to impeach their credibility. I can't take them for their word for it. They employ more than 50 employees and they're making it very difficult for us to prove our claim by not producing these documents.

THE COURT: All right. Let's move on--

MR. MILLSOM: Your Honor, I just – please, I'm sorry. I don't know what payroll records he wants. He has everything. And Mr. Bejbl's testimony was he gets paid by, through the same payroll company not by the same company. I mean it's, again, I don't understand what the misunderstanding is. It's, you know,

an ah-ha moment based on not fully understanding and not asking follow up questions in the deposition. Mr. Bejbl is paid by another company. He's the owner. He's the owner. He may pay himself a salary. He may call it a draw against the profits or a salary, but he's taking what's left over at the end of the year and putting it in his pocket. However you term that, it doesn't go through Electrolizing's payroll.

THE COURT: Thank you. All right, we're going to move on to request No. 4 and 5. This deals with subcontractors. Mr. Gagliardi?

MR. GAGLIARDI: Once again, Your Honor, this was a request to see if the company was misclassifying employees as subcontractors, independent contractors. My brother has fixated on the language of subcontractor that he was confused as to what we were looking for. Mr. Bejbl testified that they used electricians from time to time, people to fix the boilers. If that's true, Your Honor, what I don't understand is if that's true why not just produce the documents? They claim it's overly burdensome, yet they come here and spend all this time and money to argue that it shouldn't be produced. That to me is more burdensome than just producing the documents. How do we know that they don't have a maintenance man that shows up there every day but is paid by a 1099? It's been known to happen in order to restrict the number of employees under 50.

There's also something else that I discovered once

again recently after speaking with Michelle Carocchio that the company employed temporary workers. Now, the magic word please list all the temporary workers on your, that your company utilized was not there, Your Honor. And that's, probably should have been but it said any subcontractors who provide services at your facility. A temporary agency is a subcontractor and they're providing services. That should be produced.

So, once again, we're supposed to rely on the defendant's tacit assurances. We just use electricians and people to fix the boilers. There's nothing else there. Any company, a company as sophisticated as this company must have some kind of accounting software and produce a list of checks that they cut in any given year and to whom and how often. If you're employing an electrician once a quarter, once every month, then sure that's not an employee. But what if they're producing, what if they're paying somebody on a regular basis? The plaintiff has the right to probe that area to see if they're misclassifying subcontractors, independent contractors instead of calling them employees.

THE COURT: All right. Thank you. Mr. Millsom?

MR. MILLSOM: This request I think gives you a good understanding of where we are. Electrolizing's electricians we write a check every month to the electric company. We pay the water company for our water. He wants a list of all our

vendors, all the checks we write. He's fishing. It's not relevant. I've giving him the payroll. There are no temporary workers during the relevant time period. There is nobody who shows up at work every day during the relevant time period other than those employees on the payroll records. There's no reasonable basis to believe that there's any other employees. There's just Mr. Gagliardi saying I want it. That's not good enough. Just because you sue a company they don't have to open their books and records to you if you're not a shareholder. It's not that type of suit. This is an employee who claims she was discriminated against. Why does he get a list of our electricians, the folks who clean our machinery or fix it when it's broken, the people who supply our paper towels or toilet paper in the bathroom. That's what he's looking for and we haven't given it, and I don't think it's relevant and I don't think we should be compelled to give it. Thank you, Your Honor.

THE COURT: All right. The remaining request is the request for Alan Godin's complete personnel file. In the interest of saving time, let me tell counsel how I usually deal with such requests which is to direct the defendants submit it to the Court for an in-camera review and the Court will decide if there's anything in the file that should be produced to the plaintiff. Having told you that's how I would intend to deal with this, I'll give you a chance, Mr. Gagliardi, to say that's

not an adequate way of addressing that.

MR. GAGLIARDI: Your Honor, that's agreeable to me.

THE COURT: Mr. Millsom?

MR. MILLSOM: That's fine.

THE COURT: All right. I'll direct the defendant to submit the file for an in-camera review. Can you do it within 48 hours, Mr. Millsom?

MR. MILLSOM: Absolutely.

THE COURT: All right. All right, I'll take these matters under advisement. I'll issue a written decision addressing all the motions that were heard today. It may be separate decisions. I'll decide that after I consider this matter further. Court will stand in recess.

//
//
//
//
//
//
//
//
//
//
//
//

CERTIFICATION

I, Maryann V. Young, court approved transcriber, certify that the foregoing is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter.

/s/ Maryann V. Young May 13, 2008