UNITED STATES DISTRICT COURT FOR THE DISTRICT (

Enid Bonilla : :

VS. : C.A. NO.: 07-331A

Electrolizing, Inc., :Alan Godin, and David :

Richards :

DEPOSITION OF CHRIS BEJBL, a Witness forthe above-entitl Plaintiff, before Elizabeth Greeley, Notary Public, inand for the Stat Adler Pollock and Sheehan, Citizens Plaza, Providence,Rhode Island, or

PRESENT:

FOR THE PLAINTIFF.........LAW OFFICE OF MARK GAGLIARDI

FOR THE DEFENDANTS........ADLER POLLOCK & SHEEHAN

BY: GEOFFREY MILLSOM, ESQUIRE

ALLIED COURT REPORTERS 115 PHENIX A\

CRANSTON, RI 02920

license for a fee and are given the right to apply the Armoloy coating. They buy, they pay a royalty for that.

Q. How many licensees do you have?

A. Let's see, there are ten.

Q. Okay. Where are they located?

A. There's one in Illinois. There are two in Texas. There's one in Ohio, two in Pennsylvania, one in South Carolina, one in England, and one in Germany. Is that ten?

Q. Hold on. Nine. Rhode Island?

A. Electrolizing is also a licensee, but it's a different process. The ones I've given you are Armoloy company, and we are the only Electrolizing company.

Q. We'll say nine. That's fine. How long have you -- I notice that some of your previous addresses correspond with some of these licensees. How long have you been involved in, with Armoloy?

A. Only since 1997.

Q. '97?

A. The Texas and Illinois addresses have nothing to do with them.

Q. In what capacity did you start out?

A. Sales.

Q. You were in sales?
A. Yes.
Q. What is Armoloy again?
A. It's a chrome coating, chrome plating.
Q. So you were in sales. Tell me a little bit about that; what exactly did you do?
A. I attempted to find customers to sell our service to.
Q. What kind of clients?
A. Aero space, industrial, pharmaceutical, food service, parts that need hardness lubricity, so it's pretty encompassing.
Q. How does this work, the clients would send you the parts and you would coat them and send them back?
A. That is correct.
Q. That's how it works?
A. Yes.
Q. You're a 50 percent shareholder in Armoloy, right?
A. Well, there are more, there are a few -- yes. In the Armoloy Corp, I'm a 50 percent, yes.
Q. So the company just, it has a corporation and it has nine licensees, and that's it?
A. Yes.
Q. How does Electrolizing relate to that?

MR. MILLSOM: I'm not sure he can answer that under oath, Mark. Perhaps you would like to rephrase.

Q. It's a scenario that is foreseeable and likely, and, I'm sure, has happened before. If somebody comes to work -- if you go back to work later today and somebody left work at 10:00, worked for two hours and was violently ill and had five vacation days available, would that person be violating your attendance policy?

MR. MILLSOM: Same objection.

Q. And they had worked every day prior to that, showed up on time?

MR. MILLSOM: Objection.

A. I don't know how to answer that.

Q. This is an attendance policy that has to be quantifiable in some way. That's why I'm asking these questions. I still don't understand what your policy is.

MR. MILLSOM: No question pending.

A. Well, you know, things like this have an interpretive nature to them. While we have a fairly easy, easily definable boundary of what good attendance is and what it isn't, with a human element involved, you know, you have to be flexible with that.

If a single person goes out sick one day, are they violating, no, they're not violating it. We're looking at a pattern of behavior. If you have vacation days, and you are sick and you call in and say, "I'm sick. May I use a vacation day," typically we say yes. If someone goes home early, you know, one time a year, which is the question I believe you asked me, no, they probably would not be considered violating the policy. If someone is constantly coming up short of 8 hours, 40 hours a week for whatever reason, now you're looking at issues that affect our ability to be a viable business.

Q. Why wasn't Ms. Bonilla allowed to use -- strike that. You stated based on your own company document that Ms. Bonilla at the time of her termination had five vacation days available. Why wasn't she allowed to use some of that time on February 10 when she left work to go to the hospital? Why wasn't she allowed to use some of that time as vacation time?

MR. MILLSOM: Objection. Who said she wasn't?

MR. GAGLIARDI: Because she was fired for attendance purposes.

MR. MILLSOM: You're making up facts. You can't ask him questions on facts you determined.

A. It's just a judgment issue.

Q. Well, is it fair to say that a no-call, no-show is more serious than leaving work early and asking your supervisor to leave work early?

A. Like I said, I haven't really put it into a classification system. I don't really have a good answer for you on levels of severity.

Q. Let's talk about Alan Godin. How long has he been employed at your company?

A. I believe it's 25 some years.

Q. How many employees have more seniority than Mr. Godin; where does he rank in terms of seniority among all your employees?

A. I don't really acknowledge seniority in regards to --

Q. Has anybody been there longer than him?

A. Yes.

Q. Who?

A. Louie Sousa, S-O-U-S-A, Randy Clifton, Matt Bejbl, and, perhaps, I think Ralph Peltier has been there longer as well. Maybe also Sunny Souza, with a Z. I think he's been there longer, too.

Q. Do you consider him to be a valuable employee?

A. Well, he does his job well with very few errors. He's reliable.