UNITED STATES DISTRICT COURT FOR THE DISTRICT

ENID BONILLA Plaintiff,

v. C.A. NO.: 07-331S

ELECTROLIZING, INC., ALAN GODIN,

and DAVID RICHARDS Defendants.

DEPOSITION OF ENID BONILLA, in the above-entitled ca of the Defendants, pursuant to notice, before Jane F. Cormier for the State of Rhode Island, at the offices of Adler Polloc Plaza, Providence, Rhode Island, on Friday, March 14, 2008, c

PRESENT:

FOR THE PLAINTIFF...... LAW OFFICE OF MARK P. GAGLIARDI

FOR THE DEFENDANTS..... ADLER POLLOCK & SHEEHAN P.C.

BY: GEOFFREY MILLSOM, ESQUIRE

ALSO PRESENT: MATTHEW BEJBL

Q. When was your daughter born in '03?
A. May.
Q. So, was it sometime that spring, in the summer, or?
A. Yes.
Q. In any of these jobs were you ever counseled because of attendance issues, or spoken to by your supervisor because of taking too much time?
MR. GAGLIARDI: Objection.
A. No.
Q. Did you have any disciplinary issues with any of your former employers?
MR. GAGLIARDI: Objection.
A. No.
Q. Did you ever have occasion to bring a claim against any of your former employers, either in the Rhode Island Commission for Human Rights, or courts?
MR. GAGLIARDI: Objection.
A. No.
Q. Do you remember when you started at Electrolizing?
A. I believe in March.
Q. March of 2004; right?
A. Yes.
Q. And do you recall what your position was?
A. I was hired as a part time, working with helping in shipping and receiving.

Q. So, right when you started, you were working part time, if I understand you correctly?
A. Yes.
Q. Do you remember how part time it was, how much time you worked?
A. From 11:00 to whenever shipping was done, I believe. I'm not sure of the time.
Q. Well, okay. That's fine. And what did you mean by, whenever shipping was done?
A. Well, there wasn't really an ending time for shipping. Basically it was whenever we were done shipping, that's the end of the day for me. That would have been the end of the day for me.
Q. Do you have any sense of why they ran it that way, why didn't they ship what they can until 5:00, and then leave the rest for the next day?
A. Because most of those jobs were rush jobs. They needed to go out on that day. And all jobs were differently, and they could have come out exactly at 4:00 and needed to be packaged, because it really did need to go out the door.
Q. And did you understand when you were hired that there were going to be some days when you couldn't depend on when your day ended because of the need to rush and get it out the door that day?

A. Yes.
Q. Do you remember how many days a week you were doing this?
A. Five days a week.
Q. And when you first started, were you just doing shipping?
A. Shipping, and helping in receiving also.
Q. There was never a time when you were just doing one and not the other?
A. Some days if shipping was very hectic, then I would just stay in shipping.
Q. Can you describe for me exactly what you would do in a typical day, from the moment you showed up at work until the end?
A. Go straight into shipping, check if there was anything to be packaged, if not, I would go to my supervisor, he would direct me on what else needed to be, or where I can help.
Q. Okay. So, if there was something for you to do in shipping, you would need to package it?
A. I would come in, look at whatever we had on the table, grab a job, find out how it needed to be wrapped, because all packages needed to be wrapped differently. If I would pick a job, I would try to, depending on what the job was and what the

Q. So, I understand that he was sort of showing you the ropes, but I need to understand whether or not he was training you, or he was really your supervisor; do you appreciate the distinction?
A. Yes.
Q. Was this a guy that could hire or fire you, Alan Godin?
A. No.
Q. Could he tell you what to do, if he wanted you to go to another part of the plant, help out?
A. When there was nothing there to do, he would just tell me to leave the area and go to Dave Richards.
Q. Did he show you how to do your job?
A. Yes.
Q. Did he ever give you a performance review?
A. No.
Q. Did he ever discuss the terms of your compensation or employment with you?
A. No.
Q. If you needed to take a vacation day or sick day, would you talk to him about it?
A. No.
Q. If you had a problem with either the work or one of your employees, would you ever go to Alan Godin?

A. No.

Q. Did anybody ever tell you that you should go to Alan Godin with supervisory issues?

A. No.

Q. So, is it fair of me to say that the extent of his supervision over you was basically showing you how to do the job and being the guy who directed the work that you did?

MR. GAGLIARDI: Objection.

A. No.

Q. How is that not fair? What other supervisory responsibilities did Alan Godin have with respect to you?

A. When I was in his area, I was being supervised by him on the things that I had to do.

Q. What does that mean?

A. If I needed to leave his area for any reason, I would have to tell him and let him know.

Q. Could he say no? Could he say no, you have to stay here?

A. He would tell me when to stay and when not to stay.

Q. He would?

A. Yes.

Q. Could he fire you?

I could be trained.
Q. But when you started at 9:00, you were fully trained and you were, that was just your responsibility?
A. Yes.
Q. Did anybody else work in receiving?
A. Norma, I believe her name was.
Q. And that was when you started; right?
A. Yes.
Q. Was she there the whole time?
THE WITNESS: Until my termination.
MR. MILLSOM: Yes.
A. No. She retired.
Q. Were you sort of supposed to be her replacement?
A. Yes.
Q. Did she have any assistants, anybody else working with her in receiving?
A. No.
Q. While you were there, did you have anybody helping you in receiving?
A. At the beginning, no. Then they hired Anilsa Soriano.
Q. And what did Anilsa do?
A. She was to learn receiving, but mainly to work with Alan in shipping.
Q. Did you ever receive any warning or any kind of

A. I believe in December, sometime in December.

Q. Why do you think it was December?

A. Because it was right after Carmen Bonilla had quit her job.

Q. And tell me about your conversation at that time; what do you remember about it?

A. I was very upset, because I didn't see any change in Alan's actions, and so, I decided to have, like, a meeting with David. And I said to him, I was very honest with him, and I said, I don't think you have even talked to him, because nothing has changed. I really want to quit this job because of this. I have given you many, many complaints. When I confronted you about the racial and sexist comments, you said that, you haven't been here long enough to know what you're talking about. These are very serious accusations. And he just left it that way when I first tried to confront him or let him know what was going on. So.

So, on this meeting I said, I need you to give me something in writing that shows me that you're really working with this person, trying to change the whole -- I didn't want to keep working in a hostile environment, I wanted to be able to go into work without having to worry about having to listen

to all these things every single day. And he promised that me he would take care of it.

Q. Why did you ask for something in writing?

A. Because I had given so many complaints before, and nothing had ever been done, nothing had ever changed on Alan's behavior. So, I said, this is the only way you can prove to me that you are going to do some type of investigation about the whole situation. That would prove to me that you are really working on this, and not just blowing me off, and just saying, yeah, I will, and not do anything.

Q. Did you think it was appropriate to request something in writing from your employer?

A. Yes.

Q. Why?

A. Because, like I said, nothing was changing. Nothing ever changed. The guy just kept doing the same racial comments, sexist comments, derogatory comments, the swearing, and his behavior wasn't changing at all.

Q. And you understood it was Dave Richards' obligation to do an investigation and give you a written report; right?

A. When I asked for the report, he said that when he did the investigation, he couldn't provide Alan's

version of it, but that he can give me something in writing saying, this is what you've come to me with, and this is what I will do.

Q. And that writing was important to you?

A. Yes.

Q. Did you ever complain to Dave Richards in writing?

A. No.

Q. You never put your complaints in writing; right?

A. Right.

Q. Why not?

A. He never asked me to.

Q. But you understood the significance of a writing --

MR. GAGLIARDI: Objection.

Q. -- right?

A. For me, yes.

Q. But you didn't think it would be important for him?

A. No. No.

Q. Were you aware of any policies or procedures at Electrolizing pertaining to complaints about harassment or other conduct in the workplace?

A. No.

Q. So, you think you had this conversation with him in about December?

A. Yes.

Q. And after that, did you notice anything change?

medication. On that meeting, because I also had that meeting with David, where he was telling me about how I wasn't meeting the attendance, or whatever it was. And I said to him, well, my kids are sick, and my husband took them to the doctor, but I'm not really sure what's going to happen. And I requested that I might, I said to him, I might be able to take some time off, because it's pretty serious what they have. And he said it was fine.

I still went to work on Tuesday and Wednesday. On Wednesday the condition just got worse. I went in to work, because one, the office opened at 10:00, and I didn't want to just run off to the emergency room without them knowing, without my job knowing what was going on. So, I decided to just drop them off at my mother-in-law, and I called into work, and I explained the situation to David Richards. I said to him, can I please call the doctor from here, because we weren't allowed to use the phones, we had to ask for permission. And he said that it was okay. So, I called the doctor, and I explained to her all the symptoms that my kids were having. And she said, you're going to have to take them to the emergency room, because with the strep throat and the scarlet fever, it can affect the long-term

kidney and the heart, so we want to make sure to do certain tests. And I said to her, well, you're going to have to talk to my supervisor, because I didn't think he understands the seriousness of the situation. So, she did. And he said it was fine for me to go, and to try to come back, but I left the hospital almost at 5:00, so it was already too late.
Q. That doctor was Dr. Geraldo?
A. Yes.
Q. And did Dave Richards tell you he needed to talk to the doctor?
A. No.
Q. I just want to back up a minute. You said you had a meeting with him on Monday?
A. On Monday.
Q. How did that happen?
A. He told me Friday, I left early Friday, because of my husband's accident, he couldn't take care of the kids, he had to do other stuff, and he wasn't feeling well, that he needed to talk to me. So, on Monday, that's when we had the meeting, that same day I told him that the kids were sick all weekend and the whole situation.
Q. And you said he talked about absenteeism or leaving,

about days off during that meeting?
A. That meeting --
Q. I'm sorry. The meeting you just described where you talked about your husband was in an accident, and you went to Dave, that was Friday?
A. That was Monday. He asked me to see him on Monday.
Q. Because you left early Friday?
A. Because I left early Friday.
Q. So, what was Dave Richards like, as you knew him, as a supervisor?
A. He was very nice.
Q. Was he a fairly compassionate guy?
A. I thought he was.
Q. Did you think he was generally concerned about your kids, and you being with them?
A. Yes.
Q. And I ask that because you say when you were terminated he made a comment to you that, now you can go home and be with your kids; right?
A. Um-hmm.
Q. How did you take that, did you think it related to your conversation on Monday?
A. I think he was just being sarcastic.
Q. He said it sarcastically?

Q. What did he say to Randy?
A. Nothing.
Q. How long did the meeting last?
A. Five, not even, like, two minutes.
Q. Why do you think you were terminated?
A. I think I was terminated because I kept asking him, after I gave my complaint about quitting my job and the racist comments, I was very, I said to him, I need to know that you are really working on this. And I kept asking him, because he had promised me the paper, telling me that he was working on it. And every time I would ask him for it, my computer's down, or I haven't had a chance to do it. He would always give me an excuse. So, I think because of me pushing it so much, like, I need you, I really need you to do this, nothing has changed, and can you please do something about it, that's the only way that you can prove it to me, and he never did.
Q. How many times after your meeting that you asked him to put something in writing did you follow up with him?
A. Many times. I don't know how many. I could say maybe every single day.
Q. But you never put your request in writing?
A. No.

takes into account ethnicity and racial makeup when making hiring or firing decisions?
A. Let me see if I understand. If they take -- if they base that ethnicity, they base that on --
Q. I'm sorry. Do you have any basis to believe that Electrolizing takes race or nationality into account when they make hiring or firing decisions?
A. No.
Q. What about gender, how is the workforce split along gender lines? Mostly men?
A. Mostly men.
Q. And is there anything that leads you to believe that Electrolizing makes hiring or firing decisions based on gender?
A. No.
Q. Do you have any sense of how the percentages break down in terms of fifty percent women, fifty percent men, or 60/40, 70/30?
A. I would say ten percent women, and the rest men.
Q. And what about Hispanic background versus non-Hispanic?
A. I would say ninety percent.
Q. Oh, is that right?
A. Um-hmm.

Q. Ninety percent --
A. Spanish.
Q. -- Hispanic, and ten percent non?
A. Um-hmm.
Q. Is there anything you know that leads you to believe that Electrolizing makes hiring or firing decisions with regard to any other ethnicity or race, not necessarily Spanish or not Spanish, but black, Asian, anything else?
A. No.
Q. Nothing you know suggests that's a factor in their employment decision-making?
A. No.
MR. MILLSOM: I'm going to go through a couple of documents, and just ask you a few questions. We're near the end.
(Defendants' Exhibit B Marked for Identification)
Q. Ms. Bonilla I've placed before you a document that's been marked for the purpose of this deposition as Exhibit B?
A. Um-hmm.
Q. Do you recognize it?
A. Yes.
Q. It's a document that has a court caption on it that reflects the caption of this case. Do you see that?

employee, to work after 3:30 in the -- in the morning in receiving, after 3:30 in the shipping department, and cover both. That was before they hired Anilsa. Cover both, whenever Alan went on vacation.
Q. On the second page, at paragraph fifteen, you talk about a meeting you had with Mr. Richards in October of 2005. Do you see that?
A. Yes.
Q. You called it the HR meeting?
A. Okay.
Q. And you say you requested a formal, you go on, and please, again, feel free to read the document?
A. I requested a formal meeting with Mr. Richards to discuss Mr. Godin's conduct.
Q. And you go on to say in paragraph 17 that that was the meeting where you requested a written report and investigation?
A. Yes.
Q. And correct me if I'm wrong, but today you suggested that that meeting was in December?
A. Yes. Because when I first, we first did this, I think it was just going roughly based on what I could remember. Right after we went over all this again, and going back and remembering more detailed

stuff, then I was able to remember that it, in fact, was in December, and not in October of 2005.

Q. Okay. Yeah. I'm not so concerned about the date, but it's the same meeting; right?

A. Yes.

Q. You state in paragraph 19 that to the best of your knowledge, Electrolizing never conducted an investigation. Do you see that?

A. Yes. I do see that.

Q. Why do you say that? What knowledge do you have, other than the fact that you never got a report?

A. The fact that Alan Godin didn't change any of his behavior or his actions or his derogatory comments, sexist comments and racial comments. Nothing was -- I didn't see him not stop doing that. He just kept doing the same thing.

Q. So, you assume that no investigation was conducted, because you never saw a report, and he never changed?

A. And because I kept complaining about the same things, and that I kept questioning David Richards about if he, in fact, did do it, then can I please have it in writing, so that I can, it will prove to me even more that you are doing an investigation on it. But I did question it whenever I would go up to

him to request for the thing in writing.

Q. Right. No. You testified very clearly that you never got anything, and you asked him about it, for it, several times. I guess to ask what I'm trying to get at a little clearer, did Dave Richards or anybody else ever tell you that they weren't going to do an investigation?

A. No.

Q. Or that they didn't do an investigation?

A. No.

Q. Next paragraph, early '06, personal time. You say your husband was involved in a serious car accident. That's the car accident you were testifying about earlier?

A. Yes.

Q. And paragraph twenty-three you say, the car accident occurred on February 3, 2006; right?

A. Yes.

Q. And you say the car was totaled?

A. Yes.

Q. That wasn't true, was it? That's not true?

A. Well, it was fixable, basically.

Q. So, it wasn't totaled?

A. Oh, I'm sorry.

Q. And it wasn't his car, was it?

A. No, it was not.

Q. So, that wasn't true?

A. No.

Q. It's not true?

MR. GAGLIARDI: Objection.

Q. Right?

A. That's right.

Q. And then, the next paragraph when you say you requested, received permission to leave work three hours early and pick him up at the emergency room, that's not true, either; right?

A. No.

Q. But you signed this document under penalties of perjury; right?

A. Right.

Q. Under the same oath you took here today?

A. Right.

Q. Paragraph thirty, you state that Mr. Richards allowed several of your male coworkers to be excused from work for longer periods of time than you, yet these workers were not terminated for excessive absences. Do you see that?

A. Yes.

Q. Do you remember the names of any of the male coworkers that he excused earlier?