UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| ENID BONILLA,<br><br>Plaintiff,<br><br>v.<br><br>ELECTROLIZING, INC., ALAN GODIN and DAVE RICHARDS,<br><br>Defendants. | C.A. No. 07-331S |

**DECLARATION OF DAVE RICHARDS**

DAVE RICHARDS, pursuant to 28 U.S.C. § 1746, declares as follows:

1. I am over eighteen years of age and a defendant in this case. I presently reside in Raleigh, North Carolina. I make this declaration on the basis of my personal knowledge.

2. Between April of 2004 and February of 2006, I worked for Electrolizing, Inc. in the position of Operations Manager. As the Operations Manager, I had overall responsibility for all production operations at Electrolizing. This responsibility included hiring, supervising, reviewing and terminating employees who worked on the plant floor as well as managing the operations themselves.

3. The essence of Electrolizing's operations was to apply a patented chrome coating to its customers' metal equipment and pieces – the customers would ship the pieces to Electrolizing's plant in Providence, Rhode Island, and Electrolizing would apply the coating and ship the pieces back to the customer.

4. In approximately March or April of 2004, I hired Enid Bonilla to work part-time (which is to say, less than 32 hours per week) at Electrolizing. Her responsibilities at this time included assisting in the shipping department and training to work in the receiving department.

5. At that time, the majority of the receiving responsibilities were handled by Norma Geranis, who retired in the beginning of 2005.

6. The decision to hire Enid Bonilla was made with the knowledge that she was an unskilled laborer who had no experience with the UPS shipping system that Electrolizing used. Electrolizing would need to train her and provide her with the skills necessary to do the job. During the period in which she received training on the UPS shipping system and the receiving systems and procedures used at Electrolizing, she was paid a reasonable hourly wage. After her training, she was expected to perform her job functions to Electrolizing's standards.

7. Shortly before Norma Geranis retired, I asked Enid Bonilla to replace Ms. Geranis and become a full-time employee.

8. As a full time employee, I assigned Enid Bonilla to work in "receiving," where she would open all the incoming shipments, process the work and direct it to the appropriate persons in Electrolizing's plant. Once all the shipments that arrived each day were processed, Enid Bonilla was to move over to "shipping" and work with another employee, Alan Godin, to process all the finished product for shipment back to the customer.

9. Alan Godin worked full-time in the shipping department, but his shift began at 7:00 a.m. and ended at 3:30 p.m. each day.

10. Accordingly, Enid Bonilla was expected to take over for Alan at 3:30 and handle the shipping responsibilities by herself from 3:30 until her shift ended at 5:00 p.m. each day. If

the volume of work was such that it could not all be processed for shipment by 5:00 p.m. (which was sometimes the case), Enid Bonilla was expected to work overtime.

11. Enid Bonilla was not particularly adept at her job, and often had trouble completing the work required. Consequently, I was forced to hire a woman named Anilsa Soriano as Enid Bonilla's "helper." Ms. Soriano's official position was "Receiving Clerk," but her basic responsibilities were to help Enid Bonilla first in receiving and, when receiving was completed, in shipping.

12. I observed Enid Bonilla performing her job and spoke to other management personnel about Enid's performance. Based on my observations and conversations with other employees, I reviewed Enid Bonilla annually. Her reviews were mediocre. A copy of a review of Enid Bonilla that I prepared is attached as Exhibit 1.

13. Among the criticisms of Ms. Bonilla's work performance that are reflected in this review is the fact that she tended to talk and socialize with other plant employees when she should be working which resulted in her failing to meet production goals. This is something I observed and at least one other worker commented upon. Also, as is indicated on the review, she would not stay late when necessary, and her absences were excessive. Enid Bonilla received a score of 45 out of a possible 60 for this review, which was well below average.

14. Enid Bonilla also frequently required time off, often on an emergency or unscheduled basis. I did my best to accommodate her and to allow her the flexibility she requested. For example, at one point she asked if she could leave the facility during her lunch break in order to drive her sister-in-law to work. I told her that I would permit her to do so as long as she was back within the 30 minutes that were allotted for lunch. However, Enid Bonilla

was regularly away from the job for 45 minutes to an hour to accomplish this task, and I was forced to tell her to stop driving her sister-in-law to work.

15. In February of 2006, there was a series of events that forced me to evaluate her inability to consistently make the time commitment that her job required. Enid Bonilla's time cards reflecting the series of events that led me to review her work attendance history are attached as Exhibit 2.

16. One day in early February 2006, Enid Bonilla approached me at work and informed me that her husband had been in a serious car accident and requested that she be permitted to leave work immediately in order to go meet him in the emergency room. Of course, I allowed her to leave.

17. Shortly after Enid Bonilla left, however, her husband called Electrolizing and asked to speak with her. I spoke with him and it was clear to me from his manner and tone that he was not seriously injured and not in a hospital emergency room. He did not appear to be in any great pain or discomfort and he seemed confused as to why his wife was gone for the day.

18. Based on this conversation, I became concerned that Enid Bonilla had fabricated the story of her husband's car accident in order to leave work early.

19. On February 6, 2006, I counseled her on the need to work a full day, every day. I informed her she was required to be at work when scheduled and to stay the full day, including any necessary overtime. I also instructed her that if she could not consistently work a full day (and overtime, when needed), I would be forced to terminate her. A note memorializing the warning Enid Bonilla was given on February 6, 2006 is found at page 2 of Exhibit 2.

20. Two days after I counseled Enid Bonilla regarding the need to work a full day, she came to me shortly after arriving at work and told me that she needed to leave early because her children were sick. Naturally, I allowed her to leave. *See* Exhibit 2 at 11.

21. Frustrated with her attendance problems and concerned that she was not always truthful regarding why she had to leave early or come in late, I reviewed Enid Bonilla's time records and discovered the full extent of her failure to meet the time commitment of her job. For at least one day in every two week pay period for the final four months of her employment, Enid Bonilla missed either part of a day or a full day of work for which she was scheduled. Not one of these unscheduled absences was allocated to her vacation time. A copy of Ms. Bonilla's time records for the period October 16, 2005 to February 10, 2006 is attached as Exhibit 3.

22. Based on these time records, I decided to terminate Enid Bonilla.

23. My decision to terminate Enid Bonilla also required me to terminate her "helper" Anilsa Soriano. Ms. Soriano was not capable of handling Enid Bonilla's responsibilities and I believed that I could find someone who was capable of doing Enid Bonilla's job without assistance. Accordingly, on Friday February 10, 2006, I terminated both Enid Bonilla and Ms. Soriano.

24. Shortly afterwards, I hired one person to replace both Enid Bonilla and Anilsa Soriano. At the time I decided to leave Electrolizing in November of 2006, that person was still employed by Electrolizing and was ably performing all of the responsibilities that had been performed by both Enid Bonilla and Ms. Soriano.

25. During my tenure at Electrolizing, Alan Godin worked exclusively in the shipping department and was responsible only for packaging finished products for shipment back to the customer and other shipping-related tasks. He did not supervise any employees. Nor did he

influence any employment decisions. He was not responsible for or consulted with regard to hiring, termination, promotion, pay rate, on any other matters relating to other employees.

26. After I terminated Enid Bonilla, I learned that she had filed a charge of discrimination with the Rhode Island Commission for Human Rights alleging that she was subjected to inappropriate comments at work from Alan Godin, that she complained to me about those comments and that I refused to take action. I categorically deny those allegations and deny that Enid Bonilla ever complained to me or otherwise made me aware that Alan Godin made any insensitive comments in her presence, much less that he had made comments that were critical or disparaging of women or people of Hispanic origin. I do not tolerate or condone such behavior and neither, to my knowledge, does Electrolizing. I believe that Ms. Bonilla is once again fabricating a story in order to get what she wants – in this case money.

I swear under penalty of perjury that the foregoing is true and correct.

[signature]
DAVE RICHARDS

Executed on June 30, 2008

457714_1.doc