**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| ENID BONILLA,<br>Plaintiff | : | |
| v. | : | C.A. No. 07-331S |
| ELECTROLIZING, INC.,<br>ALAN GODIN, *alias*,<br>DAVE RICHARDS, *alias*, and<br>any and all defendants,<br>Defendants | : | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Enid Bonilla submits this memorandum in opposition to Defendants Electrolizing, Inc.'s, Alan Godin's, and Dave Richards's Motion for Summary Judgment. For the reasons stated herein, the court should deny Defendants' Motion for Summary Judgment.

## INTRODUCTION

This is a case about an honest, hard-working, young mother who was fired unlawfully by her employer because she was a woman, because she complained repeatedly to her supervisor about being harassed by another employee, and because she left work early one day to bring her sick children to the hospital.

## Factual Background

Enid Bonilla is a female person and a native of Puerto Rico who immigrated to the United States when she was ten years old. (Aff. of Enid Bonilla at ¶5). On March 30, 2004, Ms. Bonilla began working for Electrolizing as a production worker where she worked as a receiver and a back up shipper. Ms. Bonilla did her job adequately, made few mistakes, and got along well with her co-workers. Unfortunately, Ms. Bonilla came to realize that Electrolizing is no place for women, particularly young Hispanic women with children. Sadly, Ms. Bonilla was fired abruptly because she was a woman, because she complained about being harassed by another employee, Alan Godin, and because she left work early one day to take her sick children to the hospital.

Ms. Bonilla complained to Electrolizing's Operations Manager David Richards about Mr. Godin's treatment of her on numerous occasions. (Aff. of Enid Bonilla at ¶20). Initially,

Ms. Bonilla's complaints about Mr. Godin pertained to his rude and demeaning behavior towards her. (Tr. of Deposition of Enid Bonilla at 44:17:21). For example, Mr. Godin would yell and scream at Ms. Bonilla regularly and throw things angrily around their work area. (*Id.*) Eventually, Ms. Bonilla complained to Mr. Richards that Mr. Godin was directing sexist and racist comments towards her and that these comments were adversely affecting her work performance to the point that she threatened unless something was done (Aff. of Enid Bonilla at ¶¶20-23). Ms. Bonilla requested Mr. Richards to speak to Mr. Godin about his offensive and unlawful conduct, but Mr. Richards never did because Alan Godin's behavior remained unchanged following her complaints. (*Id.* at ¶ 23). Ms. Bonilla also requested Mr. Richards to conduct a formal investigation into her complaints and to set forth in writing the results of the investigation. (*Id.*). Once again, Mr. Richards failed to take any corrective action whatsoever pursuant to Ms. Bonilla's complaints. (*Id.*).

While it is true that Ms. Bonilla did not document in writing any of her complaints about Mr. Godin, there is one witness who can corroborate that Ms. Bonilla did, in fact, complain to Mr. Richards verbally about Mr. Godin. Ms. Bonilla's co-worker, Diana Bonilla, witnessed a tearful Enid Bonilla telling Mr. Richards that she would quit her job unless something was done about Mr. Godin's behavior. (Aff. of Diana

Bonilla). However, in the end, it was Enid Bonilla who was terminated, for trumped-up attendance problems, and not Mr. Godin despite his boorish, outrageous, and unlawful conduct. Indeed, Electrolizing merely gave Mr. Godin a slap on the wrist via a written warning in his personnel file ("Final Warning for Derogatory Comments," attached as Ex. 1) and only in an effort to cover its backside after receiving a letter six days earlier from Ms. Bonilla's attorney threatening a lawsuit. ("June 29, 2006 Letter From Mark P. Gagliardi to Electrolizing, Inc. attached as Ex. X). To make matters worse, Messrs. Bejbl and Godin knew that Alan Godin had been issued a written warning as a result of Ms. Bonilla's allegations, yet each man lied under oath at their respective depositions when asked point blank whether or not Mr. Godin had been reprimanded. (Exc. of Tr. of Christopher Bejbl at 96:5:7) (Exc. of Tr. of Alan Godin at 40:14:17).

In addition to allowing Ms. Bonilla to fester in a hostile work environment, there is ample evidence that proves Electrolizing treated Ms. Bonilla differently than some of her similarly-situated, male co-workers. For example, Electrolizing allowed Erisson Carasco, a male worker, to take a three-week leave of absence to travel to the Dominican Republic for family reasons even though he exceeded his allowable vacations days. (Exc. of Tr. of Alan Godin at 59). Mr. Carrasco has also

admitted to being late to work, but claims he has never been reprimanded for attendance problems. (Exc. of Tr. of Erisson Carrasco at 26). Yet Ms. Bonilla was fired two days after she missed seven hours of work to bring her seriously ill children to the hospital even though she had forty hours (five days) of vacation time available to use for personal reasons. ("Vacation Log for Enid Bonilla, attached as Ex. 2) Aff. of Enid Bonilla) In fact, when Mr. Richards fired Ms. Bonilla he was so brazen about his disregard for her legal rights and company policy that he told her in the presence of at least one witness: "I'm letting you go, so you can go take care of your kids." (Exc. of Tr. of Enid Bonilla at 57; Aff. of Enid Bonilla)

Electrolizing also treated another male worker, Alan Godin, differently from Ms. Bonilla by disciplining him less-harshly despite his checkered employment history at Electrolizing. Indeed, Mr. Godin's personnel file is flooded with written warnings and performance reviews reflecting his poor attitude with co-workers and supervisors (Personnel File of Alan Godin, attached as Ex. 3), while Electrolizing never issued to Ms. Bonilla a written warning during her employment (Tr. Dep. of Enid Bonilla at 31-32). In fact, Ms. Bonilla was fired only two days after receiving a verbal warning (Aff. of Enid Bonilla at ¶ 31). And that verbal warning is suspect because Ms. Bonilla missed work due to her husband's car accident, which Mr.

Richards admits was not a violation of the company's attendance policy and allegedly not a factor in his decision to fire her. (Depo. Of Dave Richards at 98-99). During Mr. Godin's employment, he has been disciplined for having conflicts with co-workers, being disrespectful to supervisors, making disparaging remarks about immigrants, and most recently, for harassing Ms. Bonilla (Ex. 3). Yet miraculously and inexplicably, Mr. Godin has managed to retain his job for twenty-six years.

Conversely, Electrolizing alleges that Ms. Bonilla was substandard worker base on one employment performance evaluation that it describes as "well below average." However, within weeks of issuing this allegedly poor performance evaluation, Electrolizing gave Ms. Bonilla a raise and paid her a $1,000.00 bonus ("Electrolizing Pay Stub Vouchers for Enid Bonilla," attached as Ex. 4).

Sadly, Ms. Bonilla is not the only former Electrolizing employee who Alan Godin harassed. Anilsa Soriano also claims that Mr. Godin made disparaging remarks to her about women and Hispanics (Dep. of Anilsa Soriano at 54). Ms. Soriano even claims that Electrolizing fired her because the company knew it was inevitable that she would not be able to work with Mr. Godin and that he would harass her much in the same way that he harassed Ms. Bonilla (*Id.*) Indeed, it is not surprising that

Electrolizing eventually replaced both Ms. Bonilla and Ms. Soriano in the Shipping Department with a man, Kenneth B. Roark (Dep. of Alan Godin at 56)

There is also evidence on the record indicating that Electrolizing's proffered reason for terminating Ms. Bonilla – an inability to work forty hours per week – is a pretext for the true reasons – being a woman with children, retaliation for her complaints about Alan Godin, and retaliation for her exercising of her FMLA rights. Indeed, Electrolizing failed to allow Ms. Bonilla the opportunity to avail herself of the company's progressive discipline policy by issuing her a second verbal warning. As such, a reasonable jury could conclude that Mr. Richards's curious decision to skip this important step in the process and not allow Ms. Bonilla the opportunity to cure her alleged attendance problems is evidence of a discriminatory motive.

Moreover, Defendants have provided inconsistent reasons for why it terminated Ms. Bonilla and, therefore, they should not be believed. For example, Mr. Richards claimed, in a statement to the Rhode Island Department of Labor and Training pursuant to Ms. Bonilla's February 2006 claim for unemployment benefits, that he terminated Ms. Bonilla because she left work at 9:30 AM the day she was terminated. Later, Mr. Richards changed his story and told the same investigator that he fired Ms. Bonilla

for an inability to work a forty hour work week. ("Enid Bonilla's DET Claim," attached as Ex. 5).

Furthermore, Electrolizing's proffered reason for terminating Ms. Bonilla - her inability to work a forty hour work week over a period of time - is not credible. Mr. Richards claims that he became suspicious of the circumstances surrounding Ms. Bonilla's husband's car accident on February 3, 2006, so he reviewed her attendance for the previous two months and determined that she did not work a forty hour week once. This is not true. In fact, Ms. Bonilla worked overtime the week before. ("Enid Bonilla's Total Hours Worked," attached as Ex. 6; Aff. of Enid Bonilla at 16). If Mr. Richards really did examine Ms. Bonilla's attendance for the previous eight weeks, he would have discovered that she worked forty or more hours twice, thirty-nine or more hours twice, and thirty-seven hours once. (*Id.*) The other three weeks in which she did not work at least thirty-nine hours were due to legitimate excused absences for which she had available vacation time to apply.

Finally, when compiling a list of employee start and termination dates, there is sufficient evidence indicating that in 2005 Electrolizing was a covered employer under the FMLA because it employed fifty (50) or more workers in at least twenty (20) weeks of that year and, therefore, it was compelled

by federal law to offer FMLA leave to eligible employees in 2006, namely Ms. Bonilla.

**ARGUMENT**

Rule 56(c) of the Federal Rules of Civil Procedure states, in pertinent part: "[summary judgment] should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

In determining whether summary judgment is appropriate, the court must view the evidence in light most favorable to the non-moving party and give that party the benefit of any and all reasonable inferences. *Medina v. Adecco*, No. 06-2126 (GAG), 2008 WL 2428207, at * 1 (D.P.R. June 12, 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Moreover, in cases like the one at hand, which involve questions of motive and intent, the movant's burden is particularly rigorous. Unsettled issues regarding motive and intent will often preclude summary judgment. *Adecco*, 2008 WL 2428207, at * 1; see *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 895 (1st 1988). Moreover, the court should deny summary judgment when the non-moving party can point to specific facts detailed in affidavits and depositions -

that is, names, dates, incidents, and supporting testimony giving rise to an inference of discriminatory animus. *Id.*

In the present matter, when viewing the record before the court most favorable to the Plaintiff, it is clear the summary judgment is inappropriate for all of Plaintiff's claims.

## I SUMMARY JUDMENT IS INAPPROPRIATE FOR PLAINTIFF'S FMLA CLAIM BECAUSE THERE EXISTS A GENUINE DISPUTE REGARDING WHETHER THE DEFENDAMT ELECTROLIZING WAS A COVERED EMPLOYER UNDER THE ACT DURING PLAINTIFF'S EMPLOYMENT

In Defendants Motion for Summary Judgment, Defendants argue that Electrolizing was not subject to the FMLA during Ms. Bonilla's employment and that Plaintiff's FMLA claim fails as a matter of law. (Defs' Mot. Summ. J. at 9-10.) Specifically, Electrolizing claims that it only employed fifty or more employees for eighteen weeks in 2005 and, therefore, it was not required to provide FMLA benefits to any of its employee, including Ms. Bonilla, in 2006. (*Id.*).

Electrolizing bases it calculations using the payroll method supplemented with employees' start dates and termination dates to capture part-time workers who were omitted from some of the payroll check registers. (*Id.* at 10 n.5.) Electrolizing compiled a chart to illustrate that it only employed 50 or more employees for 18 weeks in 2005. (*Id.*)

## A. IN 2006, ELECTROLIZING WAS A COVERED EMPLOYER UNDER THE FMLA BECAUSE IT EMPLOYED FIFTY OR MORE EMPLOYEES IN AT LEAST TWENTY WEEKS IN 2005

When properly calculating the number of employees Electrolizing employed in 2005 using the evidence on the record thus far, Electrolizing employed fifty or more workers in exactly twenty weeks in 2005 and fifty or more workers in thirty-eight weeks when including Electrolizing's General Manager, Christopher Bejbl, as an employee. ("Total Number of Electrolizing's Employees," attached as Ex. 7). As such, Electrolizing was a covered employer in 2005, and it was required by law to provide FMLA benefits in 2006 to Ms. Bonilla and other eligible employees.[1]

Electrolizing's calculations are wrong due to a combination of sloppiness and misapplication of the relevant law and, therefore, their numbers must be adjusted by adding back some weeks of employment wrongfully excluded and subtracting other weeks of employment wrongfully included. First, Electrolizing's calculations erroneously omit fifty weeks of employment for employees who, based on their start dates and termination dates provided through discovery, were clearly employed by the company during these fifty weeks. Second,

---

[1] Defendants do not argue in their Motion for Summary Judgment that Ms. Bonilla was ineligible for FMLA benefits in 2006, only that it was not a covered employer and, therefore, in this memorandum, Plaintiff will only address the issue of whether Electrolizing was a covered employer in 2005.

Electrolizing's calculations erroneously include eight weeks of employment for employees who, based on their start dates and termination dates provided through discovery, were not employed by the company during these eight weeks. Third, Electrolizing's calculations erroneously include two weeks of employment for employees by wrongfully counting partial weeks of employment. Fourth, Electrolizing's calculations fail to account for the employment of Christopher Bejbl, who has been employed at Electrolizing since 1997 and whom is listed as the company's General Manager on its website(Electrolizing, Inc.'s website, at http://www.electrolizing.com/contact.htm (last visited July 18, 2008, attached as Ex. 8).

1. **Electrolizing's calculations erroneously omit fifty weeks of employment for employees who, based on the start dates and termination dates Electrolizing has provided through discovery, were clearly employed by the company during these fifty weeks.**

The following employees should be counted as employees for the corresponding time period and, therefore, these weeks must be added back to Electrolizing's calculations:

**Alassah, Richard**: Add: Week ending 8/5/05 [2]
**Cabral, Jisell**: Add: Twenty-three (23) weeks [3]

---

[2] Mr. Alassah's employment commenced on Monday 8/1/05 and, therefore, he must be counted as an employee for the entire week.

[3] It appears that Defendants only counted the weeks that Jisell Cabral received an actual paycheck (See Ex. 7). While Mr. Bejbl claims that Ms. Cabral is no longer employed by Electrolizing and that he cannot remember her termination date (Depo. of Chris Bejbl at 32.), Ms. Cabral received a

| | | |
|---|---|---|
| **Guertin, Richard**: | Add: | Week ending 12/2/05 [4] |
| **Hernandez, Raul**: | Add: | Week ending 9/9/05 [5] |
| **Hilliard, Al**: | Add: | Week ending 1/27/06 [6] |
| **Matos, Miguel A.**: | Add: | Week ending 4/8/05 [7] |
| **Joyce Plante**: | Add: | Week ending 2/18/05 [8] |
| **Aurelo Ramirez**: | Add: | Week ending 2/4/05 [9] |
| **Dario Ramirez**: | Add: | 18 weeks [10] |
| **Kenneth B. Roark**: | Add: | Week ending 2/17/06 [11] |
| **Michael P. Wheeler**: | Add: | Week ending 1/21/05 [12] |

2. **Electrolizing's calculations erroneously include eight weeks of employment for employees who, based on the start dates and termination dates Electrolizing has provided through discovery, were no longer employed by the company during these eight weeks.**

The following employees should not be counted as employees for the corresponding time periods and, therefore, these weeks must be subtracted from Electrolizing's calculations:

| | | |
|---|---|---|
| **Bonilla, Enid**: | Subtract: | Weeks ending 2/17/06; 2/24/06; and 3/3/06 [13] |
| **Gomez, Luis**: | Subtract: | Week ending 2/18/05 [14] |

paycheck as late as 2/17/06 and therefore, at a minimum, she must be counted as an employee from 5/25/05 to 2/17/06.

[4] Mr. Guertin's employment commenced on Sunday, 11/27/05 and, therefore, he must be counted as an employee for the entire week.

[5] Mr. Hernandez's employment commenced on Monday 9/5/05 and, therefore, he must be counted as an employee for the entire week.

[6] Mr. Hilliard's employment commenced on Monday 1/23/06 and, therefore, he must be counted as an employee or the entire week.

[7] Mr. Matos's employment commenced on Monday 4/4/05 and, therefore, he must be counted for the entire week.

[8] Ms. Plante's employment commenced on Monday 2/14/05 and, therefore, she must be counted for the entire week.

[9] Mr. Ramirez's employment commenced on Monday 1/31/05 and, therefore, he must be counted for the entire week

[10] It appears that Defendants only counted the weeks that Dario Ramirez received an actual paycheck (See Ex. 7).

[11] Mr. Roark's employment commenced on Monday 2/13/06 and, therefore, he must be counted for the entire week

[12] Mr. Wheeler's employment commenced on Monday 1/17/05 and, therefore, he must be counted for the entire week

[13] Ms. Bonilla was terminated on 2/10/06 and, therefore, she should not be counted as an employee for W/E 2/17/06; W/E 2/24/06 and W/E 3/3/06.

**Knott, James:** Subtract: Weeks ending 3/4/05 & 3/11/05 [15]
**Ortiz, Neisha:** Subtract: Week Ending 2/18/05 [16]
**Ramirez, Dario:** Subtract: Week Ending 9/2/05 [17]

**3. Electrolizing's calculations erroneously include two weeks of employment for employees by wrongfully counting partial weeks of employment[18]**

The following employees should not be counted as employees for the corresponding time periods and, therefore, these weeks must be subtracted from Electrolizing's calculations[19]:

**Hurtado, Sandra:** Subtract: Week ending 1/28/05 [20]
**Knott, James:** Subtract: Week Ending 3/18/05 [21]

**4. Electrolizing's calculations fail to account for the employment of its General Manager, Christopher Bejbl, who has been employed at Electrolizing since 1997.**

---

[14] Luis Gomez was terminated on 2/11/05 and, therefore, he should not be counted as an employee for the week ending 2/18/05.
[15] James Knott's employment commenced on 3/15/05 and, therefore, he should not be counted as an employee for the weeks ending 3/4/05 and 3/11/05.
[16] Neisha Ortiz was terminated on 2/11/05 and, therefore, she should not be counted as an employee for the week ending 2/18/05.
[17] Dario Ramirez was terminated on 8/31/05 and, therefore, he should not be counted as an employee for the week ending 9/2/05.
[18] 29 C.F.R. § 825.105(d) states: An employee who does not begin to work for an employer until after the first working day of a calendar week, or who terminates employment before the last working day of a calendar week, is not considered employed on each working day of that calendar week.

[19] Jorge Gomez's employment commenced on Tuesday, December 26, 2005, the day following a holiday (Christmas) and, therefore, he is counted properly as an employee for the week ending 12/30/05.
[20] Ms. Hurtado's employment commenced during a partial week, on Wednesday 1/26/05, and, therefore, she should not be counted as an employee for the week ending 1/28/05.
[21] James Knott's employment commenced during a partial week, on Tuesday 3/15/05, and, therefore, he should not be counted as an employee for the week ending 3/18/05.

It is curious that Christopher Babel's name is missing from Electrolizing's list of employees despite that fact that Mr. Bejbl: (1) is referred to as the company's General Manger on its website and elsewhere (Ex 8); (2) is paid a biweekly salary (Exc. Depo. Christopher Bejbl at 20-21); (3) is paid by the same payroll company that pays all of the company's employees (Id. at 21; (3) shows up daily to work at the company's main facility at 20 Houghton Street, Providence, RI (*Id.* at 90); (4) hires, fires, and disciplines the company's employees (*Id.* at 71); (5) occupies an office with the rest of the company's administrative staff (*Id.* at 90); and (6) is a natural person separate from Electrolizing, Inc., a corporate entity.

The definition of "employ" for purposes of FMLA is taken from the Fair Labor Standards Act, 29 U.S.C. § 203 (g) (2006).[22]

---

[22] Section 825.105(e) of the Code of Federal Regulations states:

> The courts have made it clear that the employment relationship under the FLSA is broader than the traditional common law concept of master and servant. The difference between the employment relationship under the FLSA and that under the common law arises from the fact that the term ``employ'' as defined in the Act includes ``to suffer or permit to work''. The courts have indicated that, while ``to permit'' requires a more positive action than ``to suffer,'' both terms imply much less positive action than required by the common law. Mere knowledge by an employer of work done for the employer by another is sufficient to create the employment relationship under the Act. The courts have said that there is no definition that solves all problems as to the limitations of the employer-employee relationship under the Act; and that determination of the relation cannot be based on ``isolated factors'' or upon a single characteristic or ``technical concepts'', but depends ``upon the circumstances of the whole activity'' including the underlying ``economic reality.'' In general an employee, as distinguished from an independent contractor who is engaged in a business of his/her own, is one who ``follows the usual path of an employee'' and is dependent on the business which he/she serves.

Put simply, Section 825.105(e) of the Code of Federal Regulations defines an employee, *inter alia*, as "one who follows the normal path of an employee." In Mr. Bejbl's case, Electrolizing will be hard-pressed to argue that Mr. Bejbl does not follow the normal path of an employee despite the fact that he may be a shareholder in Electrolizing and that he may receive a profit draw rather than a salary.[23] Moreover, "mere knowledge by an employer of work done for the employer by another is sufficient to create the employment relationship under the [FMLA]." Clearly, Mr. Bejbl is doing work for Electrolizing when he shows up at the facility every day and is not there for charity purposes.

Thus, when accounting for Mr. Bejbl' employment, Electrolizing employed 50 or more employees for 38 weeks in 2005.

## I. SUMMARY JUDMENT IS INAPPROPRIATE FOR PLAINTIFF'S TITLE VII CLAIMS BECAUSE THERE EXISTS A GENUINE DISPUTE REGARDING WHETHER THE DEFENDANTS DISCRIMINATED AGAINST THE PLAINTIFF BECAUSE OF HER SEX, BECAUSE OF HER RACE OR BECAUSE OF BOTH

---

29 C.F.R. § 825.105(e)(2007).

[23] To the extent that Defendants attempt to argue that Christopher Bejbl is not an employee of Electrolizing because he is a shareholder of the company, this argument will not hold water because Mr. Bejbl testified that he does not know whether he is a shareholder of Electrolizing or Armoloy, Inc. its licensor (Exc. Depo. Christopher Bejbl at 10-12).

"Because employment discrimination cases arise in a variety of contexts, the prima facie elements must be tailored to the given case." *Rodriguez-Torres v. Caribbean Forms Manufacturing*, Inc., 399 F.3d 52, 58 (1st Cir. 2005) (citing *Swierkiewicz v. Sorema*, N.A., 534 U.S. 506 (2002). In a wrongful termination case such as the one at hand, in order to establish a prima facie case of discrimination under Title VII, Ms. Bonilla must show that she: (1) was within a protected class; (2) possessed the necessary qualifications and adequately performed her job; (3) but was nevertheless dismissed; and (4) her employer sought someone of roughly equivalent qualifications to perform substantially the same work." *Rodriguez-Torres*, 399 F.3d at 58. In the present case, Plaintiff is able establish all of the above-reference elements.[24]

**A. PLAINTIFF IS ABLE TO ESTABLISH A PRIMA FACIE CASE OF DISCRIMINATION**

Defendants claim that Plaintiff is unable to satisfy the second element needed to establish a prime facie case of discrimination because she was a substandard employee and, thus, not qualified for the job she held (Def's Mot Summ. J. at 12). Specifically, Defendants' claim that Ms. Bonilla was "not

[24] In Defendants' Motion for Summary Judgment, Defendants concede that Plaintiff is able to satisfy the first and third elements of a prima facie case of discrimination - that she was in at least two protected classes (i.e., a female person and an Hispanic person) and that she suffered an adverse employment action (i.e., she was terminated). Therefore, Plaintiff will only address the second and fourth elements in this memorandum.

particularly adept at her job" (Decl. Dave Richards at 11) and, thus, "not able to fully perform her job functions," (Def's Mot Summ. J. at 12), which they then claim necessitated the hiring of an additional employee, Anilsa Soriano (*Id.* at 13) to make up for Ms. Bonilla's alleged shortcomings. However, the evidence produced through discovery does not support this argument in any way whatsoever. On the contrary, there is ample evidence showing just the opposite, that not only did Ms. Bonilla possess the necessary qualifications, but that she performed her job well.

### 1. Ms. Bonilla possessed the necessary qualifications and adequately performed her job.

Alan Godin, the man who worked side-by-side with Ms. Bonilla and whom was arguably in the best position to evaluate her work performance, claims Ms. Bonilla did "good work," he and Ms. Bonilla "worked well together," he "didn't have too many problems with her." (Dep. Alan Godin at 56). Indeed, Mr. Godin claims he was surprised when Electrolizing terminated Ms. Bonilla. (*Id.* at 56). Furthermore, the quality of Ms. Bonilla's work has never been questioned throughout this litigation, only her attendance. In fact, Ms. Bonilla's last performance evaluation rated her "Quality of Work" as an eight out of a possible ten. Moreover, Mr. Godin disagreed with the company's

decision to place Ms. Soriano in the Shipping Department, claiming that he did not need any help (Dep. Anilsa Soriano at 18). Indeed, if it were true that Ms. Bonilla was not particularly adept at her job and her job performance was substandard, one would think Alan Godin would welcome the additional help since the burden of dealing with Ms. Bonilla's shortcomings would likely fall on him.

Additionally, a review a Ms. Bonilla's employment history at Electrolizing indicates that she performed her job adequately. On March 30, 2004, Ms. Bonilla began as a part-time worker earning $9.00 per hour. ("Employee Change Notice for Enid Bonilla," attached as Ex. 9). In February 2006, the time of Ms. Bonilla's termination, a little less than two years into her employment, she was earning $12.25 per hour (Ex. 4), an increase of 136 percent. In fact, shortly after Ms. Bonilla's allegedly "well-below average" November 2005 employment evaluation,[25] she received a fifty cent increase in her hourly wage, from $11.75 per hour to $12.25 per hour and a well-earned $1,000 year-end bonus (*Id.*), which is evidence that she was performing her job adequately. *See Keisling v. SERS-Jobs For Progress, Inc.*, 19 F.3d 755, 760 (1st Cir. 1994) (holding that increased

---

[25] Ms. Bonilla's Employee Evaluation Sheet is undated. However, Electrolizing's practice was to give a review annually and to pay year-end bonuses after the end of the fiscal year ending October 31. Therefore, Ms. Bonilla's evaluation likely occurred between October 31, 2005 and before November 14, 2005, the date on pay check voucher.(Ex. 4)

responsibilities over time, pay increases, and positive feedback are sufficient to show employee was qualified for her position for the purposes of establishing a prima facie case of discrimination). And while Electrolizing may attempt to argue that its normal practice is to give a small raise annually to every employee regardless of their performance level, it will be hard-pressed to explain why it gave a $1,000 bonus to a substandard employee who was not qualified for the job she held.

a. **There is no evidence on the record indicating that Ms. Bonilla's work performance was below average compared to other similarly-situated workers.**

Defendants attempt to argue that Ms. Bonilla was a substandard worker compared to other similarly-situated workers at Electrolizing by pointing to an Employee Evaluation Sheet from November 2005 in which she received a rating of forty-five points out of a possible sixty points. However, Defendants offer no evidence other than Ms. Richards's bald assertion in a declaration that a rating of 45 out of 60 is "well below average." Certainly, Electrolizing has possession of some or all the company's Employee Evaluation Sheets and ratings from previous years.[26] Thus, Electrolizing could have easily computed the company's average rating and compared it to Ms. Bonilla's

[26] By way of example, Alan Godin's personnel file contains a performance evaluation from as far back as 1994 (Ex. 3).

score if Ms. Bonilla's score was, in fact, below average. The fact that Defendants failed to undertake this simple exercise leads to a reasonable inference that Ms. Bonilla's score was not below average. In this case, it is not Ms. Bonilla's burden to prove her work was substandard compared to other employees. Rather, if Defendants avers this to be the truth, and that there is no genuine dispute with regards to her poor work performance, then they must present admissible evidence and not simply rely on Dave Richards's self-serving opinion.

Mr. Richards also claims in Paragraph 12 of his Declaration that Ms. Bonilla received two annual performance reviews that were "mediocre," which is a troubling statement for two reasons. First, this statement contradicts another statement Mr. Richards makes in the very next paragraph of the same declaration in which he claims Ms. Bonilla's last performance evaluation was "well below average." Mr. Richards cannot have it both ways. Either Ms. Bonilla's last review was mediocre or it was well below average. There is a big difference. Webster's Revised Unabridged Dictionary defines "mediocre" as "[o]f a middle quality; of but a moderate or low degree of excellence; indifferent; ordinary." Webster's Revised Unabridged Dictionary, at http://dictionary.reference.com/browse/mediocre (last visited July 18, 2008). This is an important distinction because a reasonable jury could interpret a mediocre performance

evaluation to mean that Ms. Bonilla was meeting her employer's expectations. Second, Ms. Bonilla's first review, in which she claims she received a higher rating than her second review (Dep. Enid Bonilla at 40), is curiously missing from her personnel file that Electrolizing produced pursuant to her pre-litigation request.[27] As such, Defendants cannot sustain their summary judgment burden by referencing both reviews in support of their arguments, while conveniently only producing one review.

Finally, a review of Ms. Bonilla's personnel file indicates that she only received one verbal warning in twenty-two months of employment, and that warning is highly suspect because it occurred immediately following an excused absence.[28]

## 2. **Electrolizing sought someone of roughly equivalent qualifications to perform substantially the same work.**

To establish the fourth element of a prima facie case of discrimination, the Plaintiff need only demonstrate that her employer had a continuing need for the work she was performing

[27] Electrolizing also omitted from Ms. Bonilla's personnel file and in Defendants' Motion for Summary Judgment payroll data for six weeks from the week ending to 9/10/05 to 20/15/05) (Ex. 6. During this time period, Ms. Bonilla claims she worked forty hours continually in addition to many overtime hours.

[28] Page 10 of Electrolizing's Company Information Manual states that all corrective action will be recorded in the employee's work file. Therefore, it can be argued that the reason there is only one verbal warning in Ms. Bonilla's personnel file is because that is the only one she ever received.

prior to her termination. *Keisling v. SERS-Jobs For Progress, Inc.*, 19 F.3d 755, 760 (1st Cir. 1994). Here, Plaintiff easily meets this requirement as Electrolizing eventually replaced Ms. Bonilla in the shipping department with a man, Kenneth B. Roark, who performs her job as a back up shipper and works with Alan Godin.[29] (Depo. Alan Godin at 56).

**b. DEFENDANTS PROFFERED EXPLANATION FOR TERMINATING PLAINTIFF IS A PRETEXT FOR UNLAWFUL DICRIMINATION.**

In order to sustain the burden of persuasion on pretext, the Plaintiff must demonstrate either: (1) Defendants' proffered explanation for terminating Plaintiff is unworthy of credence; or (2) Defendants were more likely motivated by discrimination than by the explanation proffered. *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 168 (1st Cir. 1998) (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

One way a Plaintiff may demonstrate pretext is to show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder

[29] As of April 1, 2008, the date of Mr. Godin's deposition, Mr. Roark worked with Alan Godin.

could rationally find them unworthy of credence and" . . . "infer that the employer did not act for the asserted non-discriminatory reasons." *General Dynamics Corp.*, 144 F.3d at 168. In assessing discriminatory motive, a court may also consider other factors, including, *inter alia*, the historical background of the decision, the specific sequence of events leading up to the challenged decision, departures from the normal procedural sequence and any contemporary statements by members of the decisionmaking body. *Id.* at 168-69; *see also Straughn v. Delta Airlines, Inc.*, 250 F.3d 23, 35 (1st Cir. 2001) ("[t]he burden of persuasion on pretext may be met, *inter alia*, by showing 'that discriminatory comments were made by the key decisionmaker *or those in a position to influence the decisionmaker.*'" (quoting *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 55 (1st Cir. 2000)).

Pretext may also be established by showing evidence of "differential treatment in the workplace." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 824 (1st Cir. 1991).

Finally, "doubts about the fairness" of an employer's decision, while not necessarily dispositive, may be probative of whether the employer's reasons are pretexts for discrimination. *General Dynamics Corp.*, 144 F.3d at 169 (quoting *Burdine*, 450 U.S. at 259).

In the present matter, when viewing the totality of the circumstances surrounding Ms. Bonilla's termination, there exists a triable issue regarding whether her termination truly was for non-discriminatory reasons.

1. **Defendants' proffered explanation for terminating Plaintiff is unworthy of credence**

Put simply, Defendants' proffered explanation for terminating Ms. Bonilla, an inability to work a forty hour work week, is not believable. First, Electrolizing never required Ms. Bonilla to work a forty hour work week as a condition of her employment. Second, Dave Richards's explanation of the circumstances surrounding his decision to terminate Ms. Bonilla is implausible. Third, at the time of Ms. Bonilla's termination, she had forty hours of accrued, unused vacation time available to use for the personal time, which she was not allowed to use. Fourth, the Defendants have provided inconsistent reasons for terminating Ms. Bonilla. Fifth, Mr. Richards refused to allow Ms. Bonilla to avail herself of the company's progressive discipline policy. Sixth, the Defendants treated Ms. Bonilla differently than similarly-situated male workers.

a. **Electrolizing never required Ms. Bonilla to work a forty hour work week as a condition of her employment**

It is important to note that Ms. Bonilla did not have a fixed hourly work schedule, nor did her employer require her to have one (Aff. Enid Bonilla). Rather, due to the unique nature of one of Ms. Bonilla's positions as a back up shipper, her work schedule fluctuated in accordance with the company's daily work load (*Id.*). As such, Bonilla's work shift ended typically at 4:30 PM when all of the company's shipping was completed for the day (*Id.*). However, as in many manufacturing plants like Electrolizing, some days are busier than others. Therefore, on some days, Ms. Bonilla's work shift would end earlier, at 3:30 PM, which explains the fluctuations in her finish times (*Id.*). Electrolizing's one requirement for Ms. Bonilla's start time was to arrive at work no later than 10:00 AM when the first shipments arrived to the company via UPS (*Id.*). Moreover Mr. Richards would ask Ms. Bonilla frequently at the end of her shift whether she was interested in arriving earlier the following day to offer assistance in another department (*Id.*). Ms. Bonilla almost always accommodated Mr. Richard's request because she was a team player and because she needed the extra money, which explains the fluctuations in her start times (*Id.*)

In the Position Paper Defendants submitted to the Rhode Island Commission for Human Rights ("RICHR"), Defendants claim

that Ms. Bonilla was required to work from 8:30 AM to 4:30 PM (Defendants RICHR Position Paper at 3, attached as Ex. 11). However, this cannot be true because a review of Ms. Bonilla's time cards indicated that she would have been late for work fifteen days in a row - during the weeks ending October 21, 2005, October 29, 2005, and November 12, 2005 (Enid Bonilla's Start Times, attached as Ex. 11). Thus, it is inconceivable that if Ms. Bonilla' work shift truly was from 8:30 AM to 4:30 PM, that she would have been able to retain her job for so long based on the actual hours she worked, notwithstanding Mr. Richards's alleged "generosity."

Moreover, Electrolizing's Company Information manual, which outlines its policies, makes no reference to a forty hour work week requirement.

**b. <u>Dave Richards's explanation of the circumstances surrounding his decision to terminate Ms. Bonilla is implausible</u>**

Mr. Richards's story simply does not add up. Indeed, Mr. Richards has greatly exaggerated Ms. Bonilla's alleged attendance problems in order to mask his own unlawful conduct. First, Mr. Richards testified at his deposition that Ms. Bonilla had attendance problems throughout her career (Dep. Dave Richards at 242). This is simply not true. Ms. Bonilla's weekly work hours only began to drop beginning in early 2006

when her children became ill. A review of payroll data for 53 weeks from November 20, 2004 to December 31, 2005, indicates that Ms. Bonilla averaged 39.1 hours per week and was able to meet the forty hour per week requirement in thirty-one weeks, while meeting thirty-seven or more hours per week in an additional thirteen weeks (Ex. 6)[30]

Second, Mr. Richards claims that on February 3, 2006, he reviewed Ms. Bonilla's attendance over the previous two or three months after becoming suspicious when she left work early due to her husband's car accident. Mr. Richards then claims he based his decision to terminate Ms. Bonilla upon her poor attendance over this period of time. However, this is also a hard pill to swallow. Indeed, if Mr. Richards really did examine Ms. Bonilla's three months of attendance going back from February 3, 2006 - January 2006, December 2005, and November 2005 - he would have discovered that her attendance, while not perfect, was not egregious enough to merit termination under any set of circumstances. Indeed, during this time period Mr. Bonilla averaged 38.3 hours per week, and she met the forty hour per

[30] Mr. Richards has testified that the forty hour per week requirement includes allocated vacation days. For example, if an employee works thirty-two hours and takes eight hours of vacation, that employee has fulfilled the forty hour per week requirement for that week. (DR depo at 239).

week requirement five times; thirty-nine hours twice despite his sworn testimony to the contrary.[31]

### c. **At the time of Ms. Bonilla's termination, she had five days or forty hours of accrued, unused vacation time available to use for personal time, which she was not allowed to use**

To the extent that Ms. Bonilla violated Electrolizing's attendance policy, it was only because the company, at its discretion, did not allow her to allocate any of her available vacation time for personal time off based on her circumstances. As of November 1, 2005, Ms. Bonilla had accrued two weeks of vacation or ten days (Ex. 2) Ms. Bonilla used a single vacation on each of the following days: November 18, 2005, December 20, 2005, December 21, 2005, December 22, 2005, and December 23, 2005, leaving a balance of five (*Id.*). Therefore, it is indisputable that on February 10, 2006, the date of Ms. Bonilla's termination, she had five vacation days available to allocate for personal time off.

Furthermore, virtually all of the reasons why Ms. Bonilla's hours dipped below the forty hour per week threshold were as a result of excused absences, which Dave Richards concedes did not violate the company's attendance policy: her own minor

[31] ("Because driven from the previous week and the other incidents that had occurred, I had looked at her overall time for the last few months. And it was far below standard. She had exceeded - she couldn't finish 40 hours any of those weeks, regardless of the last two (Dep. Dave Richards at 292).

illnesses, her sick children, and her husband's car accident[32] (Ex. 6). Indeed, during a fourteen week period, from the week ending November 12, 2005 (the first full work week of fiscal year 2006) to the week ending February 10, 2006 (Ms. Bonilla's termination), Ms. Bonilla missed a total of approximately 31.25 hours of work for the aforementioned personal reasons over eight separate days (Ex. 6).[33] However, Mr. Richards did not allow Ms. Bonilla to allocate any of the forty hours of vacation she had available at the time (i.e., five days) to the 31.25 hours of work she missed (Dep. Dave Richards at 264). Instead, Mr. Richards blindly applied the company's policy of not permitting vacation time to be used for partially missed days, and in a self-fulfilling prophecy, terminated Ms. Bonilla for not being able to meet the company's attendance requirements. Indeed, Mr. Richards could have advised Ms. Bonilla to take full days off from work in the future and use a vacation day, which in this situation would have cured her alleged attendance problems. In fact, had Ms. Bonilla taken full days off, she would have been in full compliance with the company's attendance policy.

---

[32] Mr. Richards has testified that the forty hour per week requirement includes allocated vacation days. For example, if an employee works thirty-two hours and takes eight hours of vacation, that employee has fulfilled the forty hour per week requirement for that week (Dep Dave Richards at 239).

[33] On November 22, Ms. Bonilla called Mr. Richards to inform him that she would be late for work.

In truth, Ms. Bonilla was actually victimized for being a team player and showing up to work for partial days rather than staying home and using some of her five available vacation days.

For example:

- On January 9, 2006, Ms. Bonilla had to take her daughter to the doctor in the morning, so she came to work at 1:30 PM in order to work a few hours.
- On January 18, 2006, Ms. Bonilla had to take her son to the ear doctor, so she came to work at 11:30 AM in order to work a few hours.
- On February 8, 2006, Ms. Bonilla missed seven hours of work to take her children to the hospital emergency room. Ms. Bonilla knew several days earlier that her children were ill, but she tried to stick it out hoping that her children's medical conditions would improve and that she would not have to miss any work.

The above-cited examples show that the way Mr. Richards applied the attendance policy to Ms. Bonilla's situations was not only incomprehensible, but also inherently unfair. Indeed, staying home and using vacations days would have resulted in compliance, while coming to work for partial days in an effort to accommodate her employer resulted in non-compliance and termination. Unfortunately, an old saying holds true for Ms. Bonilla: "No good deed goes unpunished."

Moreover, it is troubling that Mr. Richards stated in his deposition that using a vacation day for the seven hours Ms. Bonilla missed to take her children to the hospital "could have

been an option." (Dep. Dave Richard at 257-258) and that he did not know whether Ms. Bonilla had any available vacation days at the time of her termination. (Dep. Dave Richard at 264). Indeed, had Mr. Richards bothered to check Ms. Bonilla's personnel file, he would have seen the vacation log indicating that she had five days of vacation available in February 2006.

**d. Defendants have provided inconsistent reasons for terminating Ms. Bonilla**

**(1) Electrolizing's Statement to the Rhode Island Department of Employment and Training ("DET")**

Ms. Bonilla filed for unemployment benefits DET immediately following her termination. On February 17, 2006, a DET investigator contacted Electrolizing to obtain an "Employer Statement, for the purpose of determining whether Ms. Bonilla should be allowed unemployment benefits or whether she was she was discharged for disqualifying circumstances such as misconduct under R.I. Gen. Laws § 28-44-18.[34] Mr. Richards gave

[34] **§ 28-44-18 Discharge for misconduct.** – An individual who has been discharged for proved misconduct connected with his or her work shall become ineligible for waiting period credit or benefits for the week in which that discharge occurred and until he or she establishes to the satisfaction of the director that he or she has, subsequent to that discharge, had at least eight (8) weeks of work, and in each of that eight (8) weeks has had earnings of at least twenty (20) times the minimum hourly wage as defined in chapter 12 of this title for performing services in employment for one or more employers subject to chapters 42 - 44 of this title. Any individual who is required to leave his or her work pursuant to a plan, system, or program, public or private, providing for retirement, and who is otherwise eligible, shall under no circumstances be deemed to have been discharged for misconduct. If an individual is discharged and a complaint is issued by the regional office of

a statement on behalf of Electrolizing (the "DET Statement") that not only contained untrue statements, but also contradicted his own sworn deposition testimony. For example, the DET statement contains the following statements:

- **"[Ms. Bonilla] had used up all of her sick time."** This is not true because, as previously discussed, Ms. Bonilla vacation log indicates she had five vacation days remaining when she was terminated.

- **"She left for lunch and came back late because she had said she had to take her sister to work."** This is not true because Ms. Bonilla's time records indicate that she did not punch out during any day of the week she was terminated (Ex. 5).

- **"On Friday, 2/10/06, she left at 9:30 AM and I told her I had to let her go."** This is also untrue because Ms. Bonilla's time records indicate that she did not punch out

the National Labor Relations board or the state labor relations board that an unfair labor practice has occurred in relation to the discharge, the individual shall be entitled to benefits if otherwise eligible. For the purposes of this section, "misconduct" is defined as deliberate conduct in willful disregard of the employer's interest, or a knowing violation of a reasonable and uniformly enforced rule or policy of the employer, provided that such violation is not shown to be as a result of the employee's incompetence. Notwithstanding any other provisions of chapters 42 - 44 of this title, this section shall be construed in a manner that is fair and reasonable to both the employer and the employed worker.

at any time during this day. This statement also contradicts Mr. Richards's sworn deposition testimony in which he claims he fired Ms. Bonilla at the end of the day, not at 9:30 AM, allegedly to save her the embarrassment of being terminated in front of the entire company (Id.).

**(2) <u>The reason Mr. Richards's gave to Ms. Bonilla for why she was being terminated</u>**

When Mr. Richards terminated Ms. Bonilla, he did not tell her that she was being terminated for not being able to work a forty hour work week. Rather, Mr. Richards told Ms. Bonilla that he was firing her so she could take care of her children.[35]

**e. <u>Mr. Richards refused to allow Ms. Bonilla to avail herself of the company's progressive discipline policy.</u>**

Mr. Richards claims that when he was the General Manager at Electrolizing, he practiced progressive discipline that consisted of two verbal warnings prior to termination. The following excerpt from Ms. Richards's deposition explains Electrolizing's progressive discipline policy:

**Q. Let's get back to this progressive discipline policy. You said there was** a **verbal warning.**

---

[35] During the meeting in which Mr. Richards terminated Ms. Bonilla, Ms. Soriano makes reference to Ms. Richards's comments about Ms. Bonilla showing up late and leaving early, but this

A. Correct.

**Q. Sometimes there was a second verbal warning, depending on whether they had a good excuse or not.**

A. Exactly.

**Q. If they didn't have a good excuse, then your practice was to give a verbal warning. Correct?**

A. Yes.

**Q. What if they committed the infraction a third time?**

A. If it met company policy, where they -- if they had exceeded -- violated company policy, then they'd be terminated.

On February 6, 2006, Mr. Richards issued Ms. Bonilla a verbal warning regarding her attendance. Four days later, on February 10, 2006, Mr. Richards terminated Ms. Bonilla for excessive absenteeism without given her a second verbal warning pursuant to the company's progressive discipline policy. The fact that Mr. Richards skipped this important step in the process is evidence of pretext.

**2. <u>Ms. Bonilla was treated differently and disciplined more harshly than similarly-situated employees</u>**

There is ample evidence that proves Electrolizing treated Ms. Bonilla differently than some of her similarly-situated, male co-workers. For example, Electrolizing allowed Erisson

Carasco, a male worker, to take a three-week leave of absence to travel to the Dominican Republic for family reasons even though he exceeded his allowable vacations days (Dep. Erisson Carasco at 19-20). Indeed, Mr. Carasco's three-week leave of absence occurred at a time when he had been working for the company for less than the five years required under company policy to accrue three weeks of vacation (*Id.*). Therefore, it was not possible for Mr. Carasco to accrue three weeks of vacation based on his tenure at the time. Yet Ms. Bonilla was fired two days after she missed seven hours of work to bring her seriously ill children to the hospital even though she had vacation time available to use for personal reasons.

Electrolizing also disciplined Ms. Bonilla more harshly than some of her male co-workers. For example, Mr. Carrasco has admitted to being late to work several times, but claims he has never been reprimanded for attendance problems (Dep. Carasco at 26-27). At the very least, Mr. Carasco should have been subject to the company's progressive discipline policy and issued a verbal warning.

Electrolizing also failed to apply its progressive discipline policy evenly with regards to another male worker, Alan Godin. Over a five-year period, Mr. Godin has been issued

two written warnings for harassment, yet he has not been terminated (Ex. 3). Electrolizing's failure to terminate Mr. Godin is problematic for two reasons. First, Mr. Richards claims that harassment is a terminable offense without the need for a verbal warning. In both instances, there was ample evidence that Mr. Godin violated the company's harassment policy. In 2001, Mr. Godin received a written warning for making a comment about "boat people" that offended another worker (*Id.*) The offended worker was not named in the written warning, but it is obvious from Mr. Godin's deposition testimony that it was Erisson Carasco. Mr. Godin admits to making a comment about illegal immigrants that offended Erisson Carasco and resulted in Mr. Carasco walking off the job and filing a complaint against Mr. Godin (Dep. Alan Godin at 40-42). Mr. Godin also testified that Mr. Carasco accused Mr. Godin of disliking Spanish people (*Id.* at 44). Mr. Godin further testified that Randy Clifton held a meeting in which he told Mr. Carasco that he should not have such a hard shell and that he should not take things to heart (*Id.* at 40-45). Five years later, Ms. Bonilla accused Mr. Godin of harassment, and Mr. Bejbl counseled Mr. Godin and threatened to fire him if he did it again (Ex. 1). Thus, it is obvious from the substance of these two written warnings that Mr. Godin committed these offenses. Yet Mr. Godin has not been fired for violating the

company's harassment policy twice, while Ms. Bonilla was fired for violating the company's attendance policy after receiving only one verbal warning. Moreover, several of Mr. Godin's performance evaluations - one that dates back fourteen years - reference the need for Mr. Godin to improve his attitude. Apparently, Mr. Godin's poor attitude continues to this day, yet it has not affected his good standing at Electrolizing according to Christopher Bejbl, the company's General Manager, who claims Mr. Godin "meets the standard" and acknowledges that he is a valuable employee.

**2. Defendants were more likely motivated by discrimination than by the explanation proffered**

When examining the evidence on the record thus far and when considering the totality of the circumstances surrounding Ms. Bonilla's termination, a reasonable jury could determine that the Defendants were more likely motivated by discrimination than by the reasons they have provided. First, Messrs. Godin and Richards both made sexist comments to Ms. Bonilla. Second, Dave Richards only fired two people for excessive absenteeism during his three years of employment, exclusive of Ms. Bonilla, and one person was fired for a no call-no show as a result of his incarceration. Third, Messrs. Bejbl and Godin lied at their respective depositions when asked point blank whether Mr. Godin

had ever been disciplined pursuant to Ms. Bonilla's allegations, while Mr. Richards's testimony regarding this matter is not believable.

### a. <u>Messrs. Godin and Richards both made sexist comments to Ms. Bonilla</u>

The record thus far shows that both Mr. Richards, Ms. Bonilla's direct supervisor, and Alan Godin, a person in position to influence Mr. Richards, made sexist comments to Ms. Bonilla during her employment. Ms. Bonilla is not the only witness who has testified that Mr. Godin questioned Electrolizing's policy of hiring women. Anilsa Soriano testified to the same effect ("I don't know why they send you there, and why they have ladies here, because that job is for men). (Dep. Anilsa Soriano at 32). Moreover, when Mr. Richards terminated Ms. Bonilla, he told her the reason he was letting her go was so she could take care of her kids. Indeed, a reasonable jury could find that Messrs. Godin's and Richards's comments to be gender stereotyping, implying that women belong at home with their children and not at a high-pressured, fast-paced manufacturing facility like Electrolizing. Moreover, it is not surprising in light of these comments that Mr. Richards eventually replaced Ms. Bonilla with a man, Ken O'Roark.

**b. <u>During Dave Richards's three and one half years of employment at Electrolizing, he only fired two people for excessive absenteeism, exclusive of Ms. Bonilla</u>.**

Defendants have argued that Electrolizing has a strict attendance policy and that it regularly terminated employees for poor attendance, which implies that they treated Ms. Bonilla no differently than anyone else. Based in the evidence produced, Plaintiff cannot rebut Electrolizing's claim that it terminated nine employees for excessive absenteeism, including Ms. Bonilla, over a four year period from January 1, 2003 to December 31, 2007.[36] However, what Defendants fail to mention in its argument is that Mr. Richards only fired three of those employee, and one was Ms. Bonilla. The evidence indicates that Mr. Richards only fired Erick Acevedo and Santo Suero (and Ms. Bonilla), while Mr. Bejbl fired the remaining employees. Moreover, Mr. Richards claims that excessive absenteeism fell into one of three categories: (1) a no-call-no show; (2) exceeding one's allotted vacation time; and an (3) inability to work a forty hour work week. Mr. Richards further testified that while he does not remember the names of the employees he fired - which is hard to believe since he only fired three people in three and one-half years - he does remember firing one employee for a no-call, no-

---

[36] (1) Erick Acevedo; (2) Judy Arsenault; (3) (4) Jaime Barros; (5) Santo Suero; (6) Glenna Rudin; (7) Stacy Perpall; and (8) Juan Olivio.

show as a result of that employee's incarceration. Therefore, it logically follows, based on Mr. Richards's own testimony, that he could have only fired two people for either exceeding one's allotted vacation time or inability to work a forty hour work week. Moreover, since Mr. Richards is unable to remember the names of the employees he terminated for excessive absenteeism, nor the circumstances surrounding their attendance, Defendants cannot sustain their argument on summary judgment that they applied the attendance policy uniformly to all their employees.

Moreover, Defendants stated in their Position Paper submitted to the Rhode Island Commission for Human Rights in response to Ms. Bonilla's Charge of Discrimination that Mr. Richards fired sixteen employees during his tenure, including thirteen men. However, this is a flat out lie for the reasons already stated.

**c. Messrs. Bejbl and Godin lied at their respective depositions when asked point blank whether Mr. Godin had ever been disciplined pursuant to Ms. Bonilla's allegations.**

At their respective depositions, each man was asked whether Mr. whether Mr. Godin had ever been disciplined pursuant to Ms. Bonilla's allegations. Sadly, but not surprisingly, each man lied.

On July 5, 2006, six days after Ms. Bonilla's attorney sent Electrolizing a letter informing them of Ms. Bonilla's potential claims, Mr. Bejbl issued to Mr. Godin a written warning (Ex. 1). Mr. Godin's Final Warning is self-explanatory. Indeed, it is not beyond debate that Mr. Bejbl spoke with Mr. Godin about Ms. Bonilla's potential claims against the company and that this letter is s form of discipline. Yet, at his deposition, Mr. Bejbl testified that he merely informed Mr. Godin that he was being sued, that he did not speak with Mr. Godin about Ms. Bonilla's allegations, and that he did not discipline Mr. Godin pursuant to Ms. Bonilla's allegations. Likewise, Mr. Godin testified that he had not been disciplined in connection with Ms. Bonilla's allegations.

Finally, while Mr. Richards's testimony regarding this manner may not constitute an outright lie, his testimony, nonetheless, strains credibility. Mr. Richards claims that he never reprimanded Mr. Godin pursuant to Ms. Bonilla's allegations and that he does not know whether Mr. Godin was reprimanded. However, Mr. Richards admits that he must have read Mr. Godin's Final Warning because his initials are on it. How Mr. Richards could have been oblivious to the fact that he was initialing a written warning to Mr. Godin regarding Ms. Bonilla's allegation is simply not credible.

**PLAINTIFF IS ABLE TO ESTABLISH THE ELEMENTS OF A HOSTILE WORK CLAIM ON THE BASIS OF HER RACE AND GENDER**

To the extent that Plaintiff's other Title VII claims fail, she is, nonetheless, able to establish a hostile work environment claim. In order to succeed on a hostile work environment claim, a plaintiff must show:

> (1) that she is a member of a protected class; (2) that she was subjected to unwelcome harassment; (3) that her membership was based on her membership in the protected class; (4) that the harassment was so severe or pervasive that it altered the conditions of her employment; (5) that the objectionable conduct was subjectively offensive, such that a reasonable person would find it hostile or abusive and plaintiff did in fact perceive it to be so, and; (6) some basis for employer liability has been established.

*Torres-Negron v. Merck & Company*, Inc., 488 F.3d 34, 39 (1st Cir. 2007) (citing *O'Rourke c. City of Providence*, 235 F.3d 713, 728 (1st Cir. 2001).

In the present matter, Plaintiff is able to establish all of the above-referenced elements. First, Defendants concede that Ms. Bonilla is an Hispanic woman and, therefore, a member of at least two protected classes. Second, Ms. Bonilla did not welcome the harassment as evidenced by her numerous complaints to Mr. Richards about Mr. Godin. Third, Mr. Godin's sexist and

racist comments were directed to Ms. Bonilla because she is a woman and because she is Hispanic. Fourth, the harassment was so severe or pervasive that it altered the conditions of Ms. Bonilla's employment because Ms. Bonilla threatened to quit unless Mr. Richards rectified the situation. (EB's depo at 46). Fifth, the objectionable conduct was subjectively offensive because Ms. Bonilla complained to Mr. Richards about it. Also, a reasonable woman would find it hostile or abusive to be told that women do not belong at Electrolizing. Similarly, a reasonable Hispanic person would find it hostile or abusive to be told that all Hispanics should go back to their native countries. Sixth, some basis for employer liability has been established. If Mr. Godin acted in a supervisory capacity over Ms. Bonilla, then Electrolizing is vicariously liable for the harassment. *Merck & Company*, Inc., 488 F.3d at 40. If, on the other hand, Mr. Godin acted as Ms. Bonilla's co-worker, then Electrolizing is still liable for the harassment because Mr. Richards was negligent in remedying the harassment. *Id.* To the extent Defendants argue that Mr. Richards was unaware of the harassment, that argument will fail because Diana Bonilla witnessed Ms. Bonilla complain to Mr. Richards about Alan Godin.

**c. PLAINTIFF IS ABLE TO ESTABLISH A PRIMA FACIE CASE OF RETALIATION BECAUSE HER TERMINATION OCCURRED WITHIN TEMPRAL PROXIMITY OF HER PROTECTED ACTIVITY**

Defendants have argued that Plaintiff's retaliation claim fails because there is no temporal or causal connection between her allegedly protected conduct and her termination. Specifically, Defendants claim that too much time had passed from the time of Ms. Bonilla's first complaints in December 2005 to her termination in February 2006, approximately two months. First, the burden of establishing a retaliation claim is "relatively light." *Mariani-Colon v. Dep't of Homeland Sec. ex. Rel. Chertoff*, 511 F.3d 216, 224 (1st 2007). Second, there is case law in the First Circuit which supports that a two month gap between the protected activity and the adverse employment action is sufficient to establish temporal proximity. *See Id.* (holding that "'temporal proximity" between appellant's allegation of discrimination in June 2002 and his termination in August 2002 is sufficient to meet the relatively light burden of establishing a prima facie case of retaliation). Third, whether

or not two months is sufficient to establish temporal proximity is question of fact not suitable for summary judgment.

## II. UNDER TITLE VII, THE INDIVIDUAL DEFENDNATS CAN BE HELD PERSONALLY LIABLE TO PLAINTIFF

Several cases in the U.S District Court for Rhode Island, Judge Lagueux, held that supervisors were subject to individual liability under Title VII (*See Wyss* and *Iacampo*). The First Circuit has not ruled on this issue. Therefore, Plaintiff sees no reasons why Defendants Richards and Godin should not be held liable for their unlawful conduct.

## CONCLUSION

For the foregoing reason, Plaintiff prays that this Honorable Court deny Defendants Motion for Summary Judgment in its entirety and allow this matter to proceed to a jury trial on its merits.

Enid Bonilla

By Her Attorneys,

/s/Mark P. Gagliardi (#6819)
111 Wayland Avenue
Providence, RI 02906
(401) 277-2030
(401) 277-2021 (fax)
e-mail: mark@gagliardilaw.net

/s/Brandon S. Bell (#5871)
120 Wayland Avenue
Providence, RI 02906
(401) 272-6303
(401) 277-4163 (fax)
e-mail: bbellesq@aol.com

**REQUEST FOR ORAL ARGUMENT**

Plaintiff hereby requests an oral argument on the above matter.

/s/Mark P. Gagliardi

**CERTIFICATION**

I hereby certify that on this **21st** day of **July**, 20**08**, I filed electronically this Objection with the Clerk of the U.S. District Court for the District of Rhode Island. The following counsels of record have received notice electronically:

Geoffrey W. Millsom, Esq.
ADLER POLLOCK & SHEEHAN, P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345
gmillsom@apslaw.com

Adam M. Ramos, Esq.
ADLER POLLOCK & SHEEHAN, P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345
aramos@apslaw.com

Richard R. Beretta, Esq.
ADLER POLLOCK & SHEEHAN, P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345
rberetta@apslaw.com

/s/Mark P. Gagliardi