# Exhibit 10

COPY

ADLER POLLOCK & SHEEHAN P.C.

One Citizens Plaza, 8th floor
Providence, RI 02903-1345
Telephone 401-274-7200
Fax 401-751-0604 / 351-4607

175 Federal Street
Boston, MA 02110-2210
Telephone 617-482-0600
Fax 617-482-0604

www.apslaw.com

February 15, 2007

***VIA HAND DELIVERY***

Ms. Marlene Colon Toribio
EEOC Project Director
Rhode Island Commission For Human Rights
180 Westminster Street
Providence, RI 02903

***Re:*** ***Enid Bonilla v. Electrolizing, Inc., Alan Godin, and Dave Richards***
***RICHR # 07EA0131***
***EEOC # 16J-2007-00093***

Dear Ms. Toribio:

This office represents Electrolizing, Inc. ("Electrolizing"), Alan Godin and David Richards (collectively "Respondents"). We write on behalf of Respondents in response to the Charge of Discrimination ("Charge") filed by Enid Bonilla. In her Charge, Ms. Bonilla makes three allegations. First, Ms. Bonilla alleges that she was terminated from Electrolizing on the basis of her sex in violation of the Rhode Island Fair Employment Practices Act ("RIFEPA") and Title VII of the Civil Rights Act of 1964 ("Title VII"). Second, Ms. Bonilla alleges that she was subjected to a hostile work environment and that Electrolizing did not take proper remedial action in violation of the RIFEPA and Title VII. Third, Ms. Bonilla alleges that she was terminated in retaliation for filing a harassment complaint. As set forth in greater detail below, Ms. Bonilla was not terminated because of her sex, nor was she terminated in retaliation for filing a harassment complaint. Ms. Bonilla was terminated because of her inability to meet Electrolizing's attendance requirements. Moreover, Ms. Bonilla was not subjected to a hostile work environment, nor did she file any complaints of unlawful harassment.

Electrolizing is small manufacturing company located in Providence, Rhode Island that employs fewer than fifty people. Ms. Bonilla was hired on March 20, 2004 to work in Electrolizing's shipping and receiving department. Ms. Bonilla was hired to work from 8:30 a.m. until 4:30 p.m. and was expected to work overtime when necessary. Because the amount of work in the Electrolizing's shipping and receiving departments fluctuates from day to day and is dependant upon factors beyond Electrolizing's control, some times are busier than others. During these times, overtime is expected. During the time that Ms. Bonilla was employed by Electrolizing, there were only three people in the shipping and receiving department. Ms. Bonilla was Electrolizing's main receiver and back-up shipper and Mr. Godin was Electrolizing's main shipper. Ms. Bonilla also had an assistant who worked as the backup shipper and backup receiver. Ms. Bonilla and her assistant worked in the receiving department from 8:30 a.m. until

all the shipments received by Electrolizing had been appropriately processed, which generally took until at least 2:00 p.m. and often took longer. After all the shipments received each day had been processed, either Ms. Bonilla or her assistant would go to the shipping department to assist Mr. Godin. Mr. Godin's scheduled work hours were 8:00 to 4:00. Accordingly, Ms. Bonilla was responsible for completing all shipping projects between 4:00 and 4:30 after Mr. Godin left for the day. Based on their staggered work schedules and different departments, Ms. Bonilla worked with Mr. Godin for at most 2 hours per day and often less than that.

During the first year of her employment with Electrolizing, Ms. Bonilla had satisfactory job performance and generally met her 40-hour per week requirement – although she rarely, if ever, worked overtime. Unfortunately, Ms. Bonilla's attendance (and productivity) steadily declined over time. Starting in the summer of 2005, Ms. Bonilla rarely worked a full 40-hour week. She took extended lunch breaks and would habitually leave work early or come in late. In the summer of 2005, for example, Ms. Bonilla was in an automobile accident. Ms. Bonilla left early on a regular basis to receive treatment of her alleged injuries and to meet with her attorney who was prosecuting Ms. Bonilla's case against the other driver. Ms. Bonilla's supervisor, David Richards ("Mr. Richards"), was very flexible with Ms. Bonilla and allowed her to take off whatever time she needed.

Although Mr. Richards tried to accommodate Ms. Bonilla's other responsibilities, Ms. Bonilla started to take advantage of Mr. Richards' kindness. In the fall of 2005, Ms. Bonilla started taking 60 to 70 minute lunch breaks even though she was only allowed 30 minutes for lunch. When she was confronted by Mr. Richards, Ms. Bonilla stated that she was leaving to take her sister to work during that time. Mr. Richards informed Ms. Bonilla that her lunch break was only 30 minutes and that she could not continue leaving for extended periods of time. Following this incident, Ms. Bonilla still consistently failed to meet Electrolizing's attendance requirements. Between October 16, 2005 and February 10, 2006, Ms. Bonilla only worked five full weeks. Ms. Bonilla also called in sick the day before her scheduled vacation in December, which is always considered a questionable absence by employers. A copy of Ms. Bonilla's attendance records are attached as **Exhibit A**.

Ms. Bonilla was counseled on several occasions regarding her failure to meet Electrolizing's attendance policy. Ms. Bonilla was also warned about her excessive absenteeism in her performance evaluation. A copy of Ms. Bonilla's performance evaluation is attached as **Exhibit B**. In her performance evaluation, Ms. Bonilla received an overall rating of 45 out of 60 points. Ms. Bonilla received reduced scores in every category, but a notation was specifically made regarding her ability to comply with Electrolizing's attendance policy. Ms. Bonilla also received a reduced score based on comments from her coworkers that she talked too much.

ADLER POLLOCK & SHEEHAN P.C.



Unfortunately, Ms. Bonilla's attendance did not improve in 2006. In January 2006, Ms. Bonilla left early on at least three occasions without any advance notice. On or about February 3, 2006, Ms. Bonilla told Mr. Richards that she had to leave early. According to Ms. Bonilla she had to leave early because her husband was in an automobile accident. Mr. Richards allowed Ms. Bonilla to leave early, but was suspicious of Ms. Bonilla's excuse because Ms. Bonilla's husband had called Mr. Richards minutes before and asked to speak with Ms. Bonilla who was unavailable. Ms. Bonilla's husband did not leave a message for his wife, nor did he state that there was an emergency.

Based on Mr. Richard's suspicions regarding Ms. Bonilla's excuse for leaving early on February 3, 2006 and her past history of absenteeism, Mr. Richards met with Ms. Bonilla on February 6, 2006 and told her that she needed to work her full scheduled work day and that Electrolizing was depending on her to meet its production needs. Several days later, however, Ms. Bonilla's children became ill and Ms. Bonilla left work more than six hours early. Although Mr. Richards and Electrolizing were sympathetic to the fact that Ms. Bonilla's children were ill, Ms. Bonilla had made such a habit of leaving work early over the preceding six month period that Electrolizing realized that it could not depend on Ms. Bonilla to meet her job responsibilities. Ms. Bonilla's consistent requests to leave work early without notice left Electrolizing scrambling to cover Ms. Bonilla's shift and complete her work. On certain occasions, Mr. Richards was forced to do the work himself or ask sales associates to help complete time sensitive projects. Otherwise, Mr. Richards would ask Mr. Godin to stay past his scheduled work hours to complete the shipping work.

Were it not for the efforts of its other employees, Electrolizing would not have been able to meet its receiving and shipping needs. The shipping and receiving department was composed on only three people (one of whom was an assistant that could not handle the operations without Ms. Bonilla or Mr. Godin) and Ms. Bonilla's continued absences, without notice, significantly impacted Electrolizing's operations. Based on her history of continued unreliability, Mr. Richards decided to terminate Ms. Bonilla. Although he tried to be flexible, Mr. Richards only allowed each of his employees, regardless of sex or race, a certain amount of leeway before he let them go. During the three and one half year period that Mr. Richards was at Electrolzing, he terminated approximately 16 employees for excessive absences (approximately, 13 of whom were men).

In her Charge, Ms. Bonilla alleges that she had five unused vacation days to apply towards personal time off, and therefore, she should not have been terminated. Ms. Bonilla's allegation that she should have been allowed to use unearned vacation time to accommodate her reduced work schedule is without merit. Electrolizing's employee handbook specifically provides that individual vacation days can only be taken if "three (3) days advance notice is … given to the

ADLER POLLOCK & SHEEHAN P.C.



Operations Manager." A copy of Electrolizing's Company Information ("Employee Handbook") is attached as **Exhibit C**. The EmployeeHandbook also provides that "[n]o ½ day or partial vacation days may be taken." Moreover, although Ms. Bonilla was eligible for 10 days of vacation as of November 1, 2005, she had not accrued all ten days at the time she was terminated. In fact, according to the calculation provided for in the employee handbook, as of February 10, 2006 when Ms. Bonilla was terminated, she had only earned 18.45 hours of vacation. Ms. Bonilla, however, had already taken 40 hours of vacation time between November 1, 2005 and February 10, 2006.

It is also important to note that Electrolizing's Employee Handbook allows for unpaid vacation time. Unpaid vacation time, however, must be requested thirty (30) days in advance and must be approved by the Operations Manager depending on the department's production needs and prior scheduled vacations. In her Charge, Ms. Bonilla alleges that Electrolizing allowed her male co-workers to take time out of work. In the past, Electrolizing has allowed both male and female employees to take paid and unpaid vacation time. Those employees, however, have requested vacation time in advance under the guidelines set forth in the employee handbook. Ms. Bonilla, on the other hand, did not request to use her vacation time nor did she give any advance notice.

In her Charge, Ms. Bonilla also alleges that she was harassed by Mr. Godin (although it is unclear whether she is alleging harassment based on race or sex or both). Mr. Richards knew that Mr. Godin and Ms. Bonilla did not get along; however, it was Mr. Godin that complained about Ms. Bonilla's poor work ethic and unreliability. Mr. Godin had grown frustrated with Ms. Bonilla's absences because it forced Mr. Godin to take on additional responsibilities and work hours to cover for Ms. Bonilla. Ms. Bonilla also complained about Mr. Godin, but her complaints were always that Mr. Godin was on her case for not getting her work done and for talking too much. Ms. Bonilla never complained to Mr. Richards, or anyone else, that she was being mistreated based on her race or sex, nor did she complain about any conduct that would have led Mr. Richards to think that Mr. Godin was harassing Ms. Bonilla because of her race or sex. Ms. Bonilla's complaints about Mr. Godin were always job-related, not personal. The only comment Ms. Bonilla ever made to Mr. Richards that was remotely related to race was that Mr. Godin made one statement on one occasion that someone was playing Spanish music too loud. When Mr. Richards was informed of Mr. Godin's comment, he went to the work area and concluded that Mr. Godin's comment had nothing to do with the content the music, but that the music was in fact too loud. Electrolizing has a policy that music can be played, but it must be kept at a level that does not intrude on other people's work areas. Accordingly, Mr. Richards instructed the male employee playing the music to turn his radio down.

As the facts set forth above demonstrate, Electrolzing terminated Ms. Bonilla for her inability to meet Electrolizing's attendance requirements, not because of her race or her sex or the

ADLER POLLOCK & SHEEHAN P.C.



allegations of harassment that were not made until after her termination. Moreover, the facts establish that Ms. Bonilla cannot establish her claims for harassment, disparate treatment or retaliation, as a matter of law. Ms. Bonilla cannot establish a hostile work environment claim because she was not harassed (based on sex or any other unlawful reason), she failed file a complaint with Electrolzing as required and the Electrolizing employee handbook, and her claim is barred by the statute of limitations. In addition, Ms. Bonilla cannot establish the requisite elements of her disparate treatment and retaliation claims. Accordingly, the Commission should dismiss Ms. Bonilla's claims with a finding of no probable cause.

I. Hostile Work Environment

Ms. Bonilla's claim that she was subjected to a hostile work environment in violation of Title VII and the RIFEPA must fail for several reasons. First, Ms. Bonilla's hostile work environment claim is barred by the statute of limitations. Under Title VII, an employee that is subjected to a hostile work environment must file his or her claim with the Equal Employment Opportunity Commission ("EEOC") within 300 days "after the allegedly unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). Under the RIFEPA, an employee must file a charge of discrimination with the Commission within one year of the alleged discriminatory conduct. *See* R.I. Gen. Laws § 28-5-17(a). Even if the claimant has alleged continuing discriminatory conduct, it is well established under Title VII and the RIFEPA that at least one act must occur within the limitations period. *See Croce v. State of Rhode Island*, 881 A.2d 75, 78, n.5 (R.I. 2005) citing *Muniz-Cabrero v. Ruiz*, 23 F.3d 607, 610 (1st Cir. 1994).

Here, Ms. Bonilla alleges that she requested a meeting with Mr. Richards in October 2005 to discuss Mr. Godin's conduct. Ms. Bonilla does not, however, allege any unlawful conduct by Mr. Godin contributing to the alleged hostile work environment after October 2005. Accordingly, even if Ms. Bonilla was harassed, which she was not, in order to pursue a Title VII hostile work environment claim, Ms. Bonilla was required to file a charge of discrimination with the EEOC by August 2006, at the latest. Similarly, a hostile work environment claim under the RIFEPA was due on or before October 2006. It is undisputed, however, that Ms. Bonilla did not file her Charge with the Commission or the EEOC until December 6, 2006, well beyond the 300-day and 1-year limitations periods. Accordingly, Ms. Bonilla's claim that she was subjected to a hostile work environment in violation of Title VII and the RIFEPA must fail because her claim is barred by the statute of limitations.

Second, even if Ms. Bonilla's hostile work environment claim was not barred by the statute of limitations, Ms. Bonilla cannot establish that Mr. Godin's alleged conduct was sex or race based or that his conduct sufficiently severe and pervasive that it altered the conditions of her work environment. In order to establish a hostile work environment claim, a claimant must establish

the following: (1) that she "is a member of a protected class; (2) [she] was subjected to unwanted harassment; (3) that harassment was based upon [her] sex [or race]; (4) 'that the harassment was sufficiently severe and pervasive so as to alter the conditions of [her] employment and create an abusive work environment'; (5) that harassment 'was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so'; and (6) 'that some basis for employer liability has been established.'" *DeCamp v. Dollar Tree Stores, Inc.*, 875 a.2d 13, 22-23 (R.I. 2005) (quoting *O'Rourke v. City of Providence*, 235 F.3d 713, 728 (1st Cir. 2001)) (emphasis added). In order to determine whether the alleged conduct is "so severe or pervasive that, in essence, it altered the terms or conditions of her employment," consideration is given to "the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Fontanez-Nunez v. Janssen Ortho*, LLC, 447 F.3d 50, 56 (1st Cir. 2006) (internal citations omitted).

The conduct in question must also be based on a protected characteristic such as sex or race to constitute actionable harassment. *See Morrison v. Carleton Woolen Mills, Inc.*, 108 F.3d 429, 441 (1st Cir. 1997). "Merely because a supervisor is overbearing or fellow employees unsociable and hard to get along with, does not suffice unless underlying motives of a sexual or gender [or racial] discriminatory nature are implicated." *Id.* Moreover, if the alleged harassment is committed by a co-worker, an employer cannot be held liable unless "that the employer knew or should have known of the charged ... harassment and failed to implement prompt and appropriate action." *Fontanez-Nunez*, 447 F.3d at 56.

Here, Ms. Bonilla cannot establish that Mr. Godin harassed her because of her race or sex or that Mr. Godin's conduct was sufficiently severe and pervasive that it altered the conditions of her work environment. In her complaint, Ms. Bonilla alleges that Mr. Godin made four comments that offended her. According to Ms. Bonilla, Mr. Godin stated: (1) that Electrolizing should not to hire women; (2) that individuals like Ms. Bonilla come to the United States and get all the benefits; (3) that he was sick of salsa music; and (4) that she talked too much during work hours, but only when she spoke Spanish. Mr. Godin adamantly denies that he ever made the above-referenced comments or any racially insensitive or sexist comments to Ms. Bonilla. However, even if the Commission assumes for purposes of this argument only, that Mr. Godin did make the statements, the four statements alleged are not sufficiently severe or pervasive to constitute an actionable hostile work environment claim.

The comments allegedly made by Mr. Godin are not severe, nor are they physically threatening. If anything, the alleged comments were isolated offensive utterances. In addition, Ms. Bonilla does not allege that the alleged comments unreasonably interfered with her work performance. As stated in *Fontanez-Nunez*, "[w]hile vulgar language [is] inappropriate in the workplace and

ADLER POLLOCK & SHEEHAN P.C.



completely unprofessional, mere offensive utterances that [do] not reasonably interfere with the employee's work performance do not amount to harassment that in essence alter[s] the terms and conditions of … employment." *Id.* at 57. Thus, absent any proof that the comments interfered with her work performance, Ms. Bonilla's hostile work environment claim must fail.

Ms. Bonilla's hostile environment claim also fails because she failed to complain about the alleged harassment. In order to establish a hostile environment claim, a claimant must establish that "the employer knew or should have known about the charged … harassment and failed to implement prompt and appropriate action." *Id.* at 56. Failure to utilize an established complaint procedure should also be considered. *Id.* at 57. Here, Ms. Bonilla failed to follow the complaint procedure set forth in Electrolizing's Employee Handbook. The Employee Handbook specifically provides that any offensive or unwelcome conduct should be reported to the Human Resources Manager. Ms. Bonilla admittedly did not follow that procedure. Moreover, Ms. Bonilla never complained to Mr. Richards about any conduct or harassment based on sex or race (other than a comment about loud Spanish music referenced above that was addressed). Ms. Bonilla only complained that Mr. Godin was on her case to work harder and to get her work done. Just because a supervisor may be overbearing is not sufficient to establish a hostile work environment claim. The law does not protect individuals who do get along with their supervisors unless there is evidence of racial or sexist animus. Here, there is absolutely no evidence that Mr. Godin mistreated Ms. Bonilla based on her sex or her race or that his comments altered the conditions of her work environment. In addition, Ms. Bonilla never complained about any unlawful harassment. Accordingly, Ms. Bonilla's hostile work environment claim must fail.

## II. Disparate Treatment

Ms. Bonilla's claim that her termination for excessive absences constitutes disparate treatment based on sex in violation of Title VII and the RIFEPA also fails. A gender based disparate treatment claim under Title VII or the RIFEPA follows the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, (1973). *See DeCamp*, 875 A.2d at 21. Thus, a plaintiff must first prove, by a preponderance of the evidence, a *prima facie* case of discrimination. *Id.* at 802. In order to establish a prima facie case of disparate treatment, a plaintiff must establish that: "(1) she is a member of a protected class; (2) she was performing her job at a level that rules out the possibility that she was fired for inadequate job performance; (3) she suffered an adverse job action by her employer; and (4) her employer sought a replacement for her with roughly equivalent qualifications." *DeCamp*, 875 A.2d at 21 (quoting *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 15 (1st Cir. 1994)).

If the plaintiff successfully establishes a prima facie case of discrimination, the burden shifts to the defendant to "articulate a legitimate, non-discriminatory reason" for the adverse employment

ADLER POLLOCK & SHEEHAN P.C.



action. *Id.* at 802. Once the defendant has met its burden of production, the burden shifts back to the plaintiff, who must then show that the reason(s) articulated for the adverse employment decision are pretextual and that intentional discrimination was the real reason for the decision. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 508, 510-11, 515-17 (1993); *Udo,* 54 F.3d at 13. To satisfy this third and final prong of the *McDonnell Douglas* burden-shifting framework, "a plaintiff must do more than simply cast doubt on an employer's justification." *Nicolae v. Miriam Hospital*, 847 A.2d 856, 860 (R.I. 2004) (quoting *Resare v. Raytheon Co.*, 981 F.2d 32, 42 (1st Cir. 1992). Rather, a plaintiff must introduce sufficient evidence to support two findings: (1) that the employer's articulated reason for laying her off is a pretext, and (2) that the true reason is discriminatory. *See Udo*, 54 F.3d at 12; *see also Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 16 (1st Cir. 1994) (stating that "Title VII does not grant relief to a plaintiff who has been discharged unfairly, even by the most irrational of managers, unless the facts and circumstances indicate that discriminatory animus was the reason for the decision.").

Ms. Bonilla cannot establish a prima facie case that she was discriminated on the basis of her sex, as alleged. Ms. Bonilla cannot establish a prima facie case of sex discrimination because she was not performing her job at a level that rules out that she was fired for inadequate job performance. Ms. Bonilla's attendance records provide clear and unbiased evidence that Ms. Bonilla was not working her scheduled work hours. Ms. Bonilla's attendance started to suffer in the summer of 2005 and consistently worsened as the year went on. Ms. Bonilla took time off for matters such as meeting with her lawyer to pursue her automobile accident claims and to drive her sister to work. Unfortunately, Ms. Bonilla's children got sick in February 2006 and she asked to take more time off. Considered in isolation, Ms. Bonilla's request would have been reasonable. Unfortunately, however, Ms. Bonilla had established a pattern of leaving work early and coming in late without prior notice and Electrolizing could not depend on Ms. Bonilla to meet the needs of the small shipping and receiving department.

In support of her disparate treatment claim, Ms. Bonilla alleges that her male co-workers were excused from work for longer periods of time and were not disciplined. Ms. Bonilla fails to recognize, however, that some of her co-workers, both male and female, would request time off in advance, as required under the employee handbook. Other employees that abused the system or failed to request time off in advance like Ms. Bonilla were terminated. As set forth above, Mr. Richards terminated approximately 16 people during his tenure at Electrolizing for attendance problems. Of the 16 people, approximately 13 were men. Thus, Ms. Bonilla's claim that she was treated differently because she is a woman is completely without merit.

Moreover, even if Ms. Bonilla could establish a prima facie case of disparate treatment, she cannot overcome Electrolizing's legitimate nondiscriminatory reason for her termination.

ADLER POLLOCK & SHEEHAN P.C.



Ms. Bonilla was terminated because of her poor job performance and her failure to meet Electrolizing's attendance requirements. Ms. Bonilla was not held to a higher standard than her co-workers, male or female. Ms. Bonilla was asked to work a full 40-hour work week, which she failed to do. Accordingly, Ms. Bonilla's disparate impact claim must fail.

III. Retaliation

Ms. Bonilla's claim that she was terminated in retaliation for filing a harassment complaint with Mr. Richards also fails. In order to establish a claim for retaliation, a claimant must establish that "(1) she engaged in protected conduct under Title VII [or the RIFEPA]; (2) she suffered an adverse employment action; and (3) the adverse action is causally connected to the protected activity." *Dressler v. Daniel*, 315 F.3d 75, 78 (1st Cir. 2003); *see also Douglas v. J.C. Penny Co., Inc.*, No. 06-1606, 2007 U.S. App. Lexis 1019 (1st Cir. Jan. 18, 2007). Reporting a claim of harassment based on a protected characteristic is considered protected conduct. *See Dressler*. 315 F.3d at 78.

Here, Ms. Bonilla cannot establish that she engaged in the requisite protected conduct or that her termination was casually connected to her alleged claim of harassment. First, Ms. Bonilla never filed a harassment or discrimination claim with Mr. Richards. As set forth above, Ms. Bonilla complained that Mr. Godin was on her case about her job performance, but she never complained that she was being harassed because of her race or her sex. Accordingly, Ms. Bonilla cannot establish that she engaged in protected conduct. Moreover, even if Ms. Bonilla did complain, Ms. Bonilla cannot establish that her termination was casually connected with her alleged complaint. According to Ms. Bonilla her last complaint was made in October 2005. Even if Ms. Bonilla did file a complaint in October 2005, which Mr. Richards states never occurred, Ms. Bonilla's termination four months later for well-documented absences cannot casually connected to her alleged complaint. Ms. Bonilla was counseled verbally and in writing for excessive absences starting as early as the summer of 2005. Ms. Bonilla, however, did not respond to the corrective action and continued to take time out of work without prior notice. For example, between November 2005 and February 2006, Ms. Bonilla left early or came in late 10 times and she called out sick the day before her vacation was scheduled to begin. Ms. Bonilla was reminded in early February 2006 that she needed to work a full day, but she was unable to meet her obligations. Accordingly, she was terminated for failure to meet Electrolizing's attendance policy, not for any other reason.

Based on the foregoing, Ms. Bonilla has not and cannot establish a hostile work environment claim, a claim of disparate treatment based on sex or a claim for retaliation. Accordingly, the Respondents respectfully request that the Commission for Human Rights dismiss Ms. Bonilla's Charge with a finding of no probable cause.