# Excerpted Tr. of Deposition of Enid Bonilla

I could be trained.
Q. But when you started at 9:00, you were fully trained and you were, that was just your responsibility?
A. Yes.
Q. Did anybody else work in receiving?
A. Norma, I believe her name was.
Q. And that was when you started; right?
A. Yes.
Q. Was she there the whole time?
THE WITNESS: Until my termination.
MR. MILLSOM: Yes.
A. No. She retired.
Q. Were you sort of supposed to be her replacement?
A. Yes.
Q. Did she have any assistants, anybody else working with her in receiving?
A. No.
Q. While you were there, did you have anybody helping you in receiving?
A. At the beginning, no. Then they hired Anilsa Soriano.
Q. And what did Anilsa do?
A. She was to learn receiving, but mainly to work with Alan in shipping.
Q. Did you ever receive any warning or any kind of

discipline while you were at Electrolizing, prior to your termination?

A. No.

Q. Did you ever --

THE WITNESS: I'm sorry.

MR. MILLSOM: I'm sorry. Please continue. I shouldn't have interrupted.

A. On the Monday of February 6, he did ask me to see him, and he spoke to me about my attendance that one time.

Q. Who's he?

A. Dave Richards.

Q. So, Dave Richards called you in on the morning?

A. On the Monday, February 6.

Q. Was that the day of your termination?

A. No. On Friday. On the 10th.

Q. Before that, had he ever discussed your attendance with you?

A. No.

Q. Did anybody ever speak to you, anybody in a supervisor advisory role at Electrolizing, ever speak to you about talking too much on the job?

A. He mentioned it when they did the review. He said there was one particular coworker that was giving this complaint about me talking too much.

Q. So, you've never seen this before?
A. The exceeded allowable days, no.
Q. Going down to section two, do you see the handwritten notation to the right?
A. Um-hmm.
Q. Can you read that?
A. Stays late.
Q. And the number next to it?
A. Eight.
Q. Do you see an S on the end of the word stay?
A. Yes. Not clearly, no.
Q. So, you think that says stays late?
A. Stay late. It would make sense to say stays late.
Q. Did you talk to Dave Richards at all about this subject during the course of your review?
A. What he focused on the most was the talking too much.
Q. You don't recall, and I'll tell you, my question is, it's not clear from the document whether or not this related to the fact that you do stay late, and it was a point in your favor, or the fact that he wanted you to stay late. Do you remember that subject coming up at all in the review, so that you could shed any light on it?

A. No.
Q. Can you read what it says next to three, quantity of work?
A. Talks, and I don't know what the word next to it says. I don't know what it says.
Q. And can you read the number?
A. Seven.
Q. And that's seven out of ten points; right?
A. Yes.
Q. And was talks a positive, as you recall it being presented to you in your review?
A. No.
Q. And under five, or across from five, can you read what it says?
A. Talking too much noted by coworkers or coworker.
Q. Do you remember Dave Richards specifically discussing this with you, this aspect, talking too much, during the review?
A. Yes.
Q. And seeing this document, I know you've testified about it, you've testified clearly, is there anything else that you recall talking to him about during this review about the talking too much?
THE WITNESS: I'm sorry, say that again.

meaning for you?
A. Well, I know I did better on the first review. That was the only meaning.
Q. You did better?
A. Yes. On my first review.
Q. And is that something you and Dave talked about?
A. No.
Q. You just, you remember seeing a higher number on the first review?
A. Yes.
Q. Did you ask him any questions about why the number was going down, and whether or not there was any problem, in his mind, with your performance?
A. Well, I asked him how many people were giving these complaints, because it's not very clear on what he wrote, whether coworker or coworkers. So, I did ask him if it was more than one coworker, and his answer was yes.
Q. It was yes?
A. Yes.
Q. Were you ever counseled or spoken to by anybody at Electrolizing about taking too much time at lunch?
A. No.
Q. Was there ever a period of time when you were taking your sister-in-law to work at lunch?

Alan Godin?

A. It was many times. I don't know exactly how many times.

Q. Do you remember what exactly you complained about?

A. Yes.

Q. What was it? What did you complain about?

THE WITNESS: Do you want to know about at the beginning of my complaints or at the end of my complaints?

MR. MILLSOM: Yeah. And --

THE WITNESS: Summarize.

Q. I don't want to know a whole lot about it. I just want to know the subject areas, you know, when you first went to him, what was it, and how did you complaints evolve over time? What were you talking to him about?

A. At first I was complaining about the hostility in the area, how everything I did bothered him, how he would throw things around and swear and yell, and how that it made me feel very uncomfortable and threatened by his actions.

Q. And what do you remember Dave Richards' response to those complaints?

A. That he would talk to Alan about it.

Q. Did you ever see him talk to Alan about that?

Word Index

45

A. I believe in December, sometime in December.
Q. Why do you think it was December?
A. Because it was right after Carmen Bonilla had quit her job.
Q. And tell me about your conversation at that time; what do you remember about it?
A. I was very upset, because I didn't see any change in Alan's actions, and so, I decided to have, like, a meeting with David. And I said to him, I was very honest with him, and I said, I don't think you have even talked to him, because nothing has changed. I really want to quit this job because of this. I have given you many, many complaints. When I confronted you about the racial and sexist comments, you said that, you haven't been here long enough to know what you're talking about. These are very serious accusations. And he just left it that way when I first tried to confront him or let him know what was going on. So.
So, on this meeting I said, I need you to give me something in writing that shows me that you're really working with this person, trying to change the whole -- I didn't want to keep working in a hostile environment, I wanted to be able to go into work without having to worry about having to listen

about days off during that meeting?
A. That meeting --
Q. I'm sorry. The meeting you just described where you talked about your husband was in an accident, and you went to Dave, that was Friday?
A. That was Monday. He asked me to see him on Monday.
Q. Because you left early Friday?
A. Because I left early Friday.
Q. So, what was Dave Richards like, as you knew him, as a supervisor?
A. He was very nice.
Q. Was he a fairly compassionate guy?
A. I thought he was.
Q. Did you think he was generally concerned about your kids, and you being with them?
A. Yes.
Q. And I ask that because you say when you were terminated he made a comment to you that, now you can go home and be with your kids; right?
A. Um-hmm.
Q. How did you take that, did you think it related to your conversation on Monday?
A. I think he was just being sarcastic.
Q. He said it sarcastically?

A. Well, actually, he was. I mean, he was very -- okay, how should I say this. He was very upset with the fact that I had to leave on Wednesday to take the kids to the emergency room. So, when he did say, now you can go and take care of your kids, he said it very sarcastically. Well, that's the way I took it.

Q. Okay. Is that sort of the way he is, sort of a sarcastic guy? Or I mean, was that consistent with the way you and he related during your time there?

A. No.

Q. So, would it have been out of character for him to be sarcastic and say something relatively callous? You know what I mean when I say that?

A. Well, like I said, he was very upset with me with the fact of me leaving on that day. And he had someone else in there, also. And he didn't look at me and say, well, this is why I'm letting you go. He was looking more towards Anilsa, and then he just turned around. Because I was sitting on his right. And he said, oh, and now you can go and take care of your kids. There was no real explanation of the reason why he was letting me go. I thought that was definitely out of character, and definitely out of line. That's the reason why I took it like he was

of any significance, I'm not talking about leaving five minutes early, what significant time did you miss for family reasons or other reasons?

THE WITNESS: Two weeks prior to my termination?

MR. MILLSOM: Or leading up, thereabouts.

A. The only one that I recall was the one on the Friday, February 3rd, leaving early.

Q. And why did you do that?

A. Because my husband had gotten into a car accident, and he couldn't go pick up the kids or take care of them, because he wasn't feeling good, and he had other things to do related to that.

Q. So, did you miss any other time related to your children's medical issues?

A. Two weeks, or summarized?

Q. No. I know you said you missed some time in the afternoon on February 3rd because of your husband's car accident?

A. Yes.

Q. You missed a whole day the week you were terminated; right?

A. A whole day, no. No. On Wednesday I left around 10:30, I believe. I came into work, I believe at 8:30, and I left shortly after I spoke to