# Excerpted Tr. Depo. Dave Richards

A. I had a copy of this document.
Q. Okay. Does this look like the same one that was given to you when you were hired at Electrolizing?
A. (Witness examines document) As far as I can tell, yes.
Q. Okay. Did Chris Bejbl give you either this -- a copy of this document or something very similar to it?
A. I don't remember who gave it to me, but I had a copy of it.
Q. Okay. So if it wasn't Chris Bejbl, it would have been somebody in the administrative office?
A. Most likely.
Q. Did you read it --
A. Yes.
Q. -- when you were --
A. Yes.
Q. Okay. So when you hired people when you worked for Electrolizing, you're not sure if they were given a copy of one of these documents?
A. Correct.
Q. And you don't know if they -- if

each employee was -- all the company's benefits and rules and regulations were explained to each employee at the time of their hiring?

A. I believe, in the indoctrination process, they read this and got that briefing, but I did not do that briefing myself.

Q. But you don't know for sure if that was done. Correct?

A. I don't know. Correct.

Q. Did the topic of benefits ever come up at an interview with someone?

A. Yes.

Q. What would be some of the questions that people would ask regarding benefits?

A. Well, I would use this as their calculated -- how vacation worked because it was an accrual process. The absenteeism policy, distribution of paychecks. If they did ask about benefits, then they -- you know, what is the healthcare, what is that -- the administration folks would handle those specifics because you could sign up or

A. Yes.
Q. Okay. What about -- and who would you have next? Judy Arsenault?
A. No.
Q. That was -- Chris Bejbl fired her?
A. I don't know who fired her.
Q. Well, who had the authority to fire people --
A. She worked --
Q. -- other than --
A. -- she worked in the --
Q. Okay. Let me --
A. -- administration department.
Q. -- let me finish the question. Who at Electrolizing had the authority to fire people other than you and Chris Bejbl, to your knowledge?
A. To my knowledge, no one.
Q. Okay. So if you didn't fire Judy Arsenault, then it logically follows that Chris Bejbl fired her. Correct?
A. Logically.
Q. Okay. So you didn't fire Judy Arsenault.
A. No.

Q. Okay. The next one?
A. The next one I see is Santo Suero.
Q. Okay.
A. That's all I see on here. Except for -- that's all I see.
Q. Erick Acevedo and Santo Suero?
A. That's all that I see on this list.
Q. Okay. What about Glenna Rudin? Oh, she was secretarial.
A. I don't remember who she was.
Q. She was secretarial. Okay. And Stacy Perpall was also secretarial. All right. So you fired Erick Acevedo and Santo Suero for excessive absenteeism.
A. Correct.
Q. And you say one of those fellows was incarcerated.
A. No. I said I don't remember the name of the person that was incarcerated.
Q. But of the people that you fired during your tenure, you said one of them was fired for excessive absenteeism which involved being incarcerated.
A. Correct.

That's the choice she had to make, and that's fine.

Q. And you counseled her that Monday about her attendance.

A. Yeah, that's what the -- yeah, the note said on there. Yeah.

Q. And you had previously testified that leaving work or missing work to care for sick kids is a legitimate reason --

A. Of course.

Q. -- to miss work? Okay. But you fired her two days after she had to leave work to be with her sick kids, right?

A. Yes.

Q. Where did you fire her? Where were you?

A. There was a conference room in the front of the building.

Q. And whom was present?

A. Enid Bonilla, myself -- what was her name -- Soriano. And Randy Clifton was there.

Q. What is -- you said -- you testified that when you fired people, your procedure is to do it at the end of the day

a verbal warning on that Monday, the 6th.
Correct?
A. At least on that Monday, yeah.
Q. And then Wednesday she left to
take care of her sick kids.
A. Yeah. It says to take them to
the emergency room -- was my note says.
Q. And then sometime after that, you
made the decision to fire her.
A. Correct.
Q. Is it fair to say that that
incident on February 8th was kind of a last
straw?
A. No.
Q. I mean, you fired her two days
after that incident. It would -- a
reasonable person would assume -- would make
the connection that that one incident caused
her termination.
MR. MILLSOM: Objection.
A. No. I would have looked at all
the history of it.
BY MR. GAGLIARDI:
Q. So the timing of her termination
was -- in regards to that February 8th