UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ENID BONILLA
Plaintiff,

v. C.A. NO.: 07-331S

ELECTROLIZING, INC., ALAN GODIN,
and DAVID RICHARDS
Defendants.

DEPOSITION OF ENID BONILLA,

in the above-entitled cause, taken on behalf of the Defendants, pursuant to notice, before Jane F. Cormier, CSR, a Notary Public in and for the State of Rhode Island, at the offices of Adler Pollock & Sheehan, P.C., One Citizens Plaza, Providence, Rhode Island, on Friday, March 14, 2008, convening at 9:30 a.m.

PRESENT:

FOR THE PLAINTIFF...... LAW OFFICE OF MARK P. GAGLIARDI
BY: MARK P. GAGLIARDI, ESQUIRE

FOR THE DEFENDANTS..... ADLER POLLOCK & SHEEHAN P.C.
BY: GEOFFREY MILLSOM, ESQUIRE

ALSO PRESENT: MATTHEW BEJBL

say?

A. Yes.

Q. But nobody ever said that you need to go to him to request days off or sick time or with problems?

A. No.

Q. Electrolizing never told you that he was the guy that was going to review your performance, did he?

A. No.

Q. At a certain point in time, did you stop being part time?

A. Yes.

Q. And do you remember when that was?

A. No.

Q. Was it days, weeks, months?

A. Months after.

Q. After you started. And when you switched from part time to full time, did you have a set schedule, a set hours you had to work?

A. No.

Q. How did you know you were full time?

A. After thirty-two hours, I believe, you're considered full time. Basically because if I was to come in, let's say at 9:00, mainly at 9:00, before receiving would start, I didn't have an end time. I could have left one day at 5:00. Like, I could have

left one day at 3:30. If there was anything -- because shipping, sometimes it had a lot of stuff that needed to go out that day, and everything was rush, rush, rush, and it could take up until 5:00 o'clock. Or sometimes if it was slow that day, everything was done by 3:30, and everyone got to go home in the shipping department.

Q. At a certain point in time, did somebody ask you to start coming in earlier than 11:00?

A. Yes.

Q. And is that what you think of in your mind as when you switched from part time to full time?

A. Yes.

Q. And who asked you to start coming in before 11:00.

A. Dave Richards.

Q. And did your job change at all when you -- and -- let me restate that question. Did what you were doing change at all when you started on a full-time basis?

A. In the mornings I was in the receiving department.

Q. And before you came in at 9:00, you didn't do receiving?

A. Well, if there was nothing in shipping, they would ask me to go into the receiving department so

I could be trained.
Q. But when you started at 9:00, you were fully trained and you were, that was just your responsibility?
A. Yes.
Q. Did anybody else work in receiving?
A. Norma, I believe her name was.
Q. And that was when you started; right?
A. Yes.
Q. Was she there the whole time?
THE WITNESS: Until my termination.
MR. MILLSOM: Yes.
A. No. She retired.
Q. Were you sort of supposed to be her replacement?
A. Yes.
Q. Did she have any assistants, anybody else working with her in receiving?
A. No.
Q. While you were there, did you have anybody helping you in receiving?
A. At the beginning, no. Then they hired Anilsa Soriano.
Q. And what did Anilsa do?
A. She was to learn receiving, but mainly to work with Alan in shipping.
Q. Did you ever receive any warning or any kind of

meaning for you?
A. Well, I know I did better on the first review. That was the only meaning.
Q. You did better?
A. Yes. On my first review.
Q. And is that something you and Dave talked about?
A. No.
Q. You just, you remember seeing a higher number on the first review?
A. Yes.
Q. Did you ask him any questions about why the number was going down, and whether or not there was any problem, in his mind, with your performance?
A. Well, I asked him how many people were giving these complaints, because it's not very clear on what he wrote, whether coworker or coworkers. So, I did ask him if it was more than one coworker, and his answer was yes.
Q. It was yes?
A. Yes.
Q. Were you ever counseled or spoken to by anybody at Electrolizing about taking too much time at lunch?
A. No.
Q. Was there ever a period of time when you were taking your sister-in-law to work at lunch?

THE WITNESS: My sister.
MR. MILLSOM: Your sister.
A. Yes.
Q. What happened?
A. She had just come down from -- you want the whole story?
Q. No. I just want to know --
A. With Dave Richards. I came to speak with Dave Richards one day, and I said, my sister Rena, doesn't have a ride, can I get permission to drive her to work, and he said yes.
Q. So, did you drive her from then on?
A. And then he asked me to stop.
Q. Why did he ask you to stop; did he say?
A. Because it was just taking too long, and he wanted it to stop.
Q. So, did he talk about, at that point, taking too much time at lunch?
A. No.
Q. No?
A. No. It had nothing to do with the lunch. It was just, it was taking me too much time to drive her to her job, and he wanted it to stop. And when he asked for it to stop, it stopped.
Q. When would you typically drive her? What was the

time of the day?
A. Noontime.
Q. Okay. I think we're probably saying the same thing with different words. How long would it take you to leave and come back when you were taking her to work?
A. About forty-five minutes, from what I recall.
Q. And how long did you get for a break, at or about noon?
A. Thirty minutes, I think.
Q. The car accident you talked briefly about before, did that happen while you were at Electrolizing?
A. Yes.
Q. And do you remember about when?
A. It was shortly after I became a full-time employee.
Q. Did you take time out of work in connection with that?
A. Once.
Q. Well, how much time did you take? Did you just take a day?
A. No. I left early.
Q. And that was to see a doctor?
A. Yes.
Q. Did you ever take time off to meet with your lawyer

medication. On that meeting, because I also had that meeting with David, where he was telling me about how I wasn't meeting the attendance, or whatever it was. And I said to him, well, my kids are sick, and my husband took them to the doctor, but I'm not really sure what's going to happen. And I requested that I might, I said to him, I might be able to take some time off, because it's pretty serious what they have. And he said it was fine.

I still went to work on Tuesday and Wednesday. On Wednesday the condition just got worse. I went in to work, because one, the office opened at 10:00, and I didn't want to just run off to the emergency room without them knowing, without my job knowing what was going on. So, I decided to just drop them off at my mother-in-law, and I called into work, and I explained the situation to David Richards. I said to him, can I please call the doctor from here, because we weren't allowed to use the phones, we had to ask for permission. And he said that it was okay. So, I called the doctor, and I explained to her all the symptoms that my kids were having. And she said, you're going to have to take them to the emergency room, because with the strep throat and the scarlet fever, it can affect the long-term

kidney and the heart, so we want to make sure to do certain tests. And I said to her, well, you're going to have to talk to my supervisor, because I didn't think he understands the seriousness of the situation. So, she did. And he said it was fine for me to go, and to try to come back, but I left the hospital almost at 5:00, so it was already too late.

Q. That doctor was Dr. Geraldo?

A. Yes.

Q. And did Dave Richards tell you he needed to talk to the doctor?

A. No.

Q. I just want to back up a minute. You said you had a meeting with him on Monday?

A. On Monday.

Q. How did that happen?

A. He told me Friday, I left early Friday, because of my husband's accident, he couldn't take care of the kids, he had to do other stuff, and he wasn't feeling well, that he needed to talk to me. So, on Monday, that's when we had the meeting, that same day I told him that the kids were sick all weekend and the whole situation.

Q. And you said he talked about absenteeism or leaving,

about days off during that meeting?
A. That meeting --
Q. I'm sorry. The meeting you just described where you talked about your husband was in an accident, and you went to Dave, that was Friday?
A. That was Monday. He asked me to see him on Monday.
Q. Because you left early Friday?
A. Because I left early Friday.
Q. So, what was Dave Richards like, as you knew him, as a supervisor?
A. He was very nice.
Q. Was he a fairly compassionate guy?
A. I thought he was.
Q. Did you think he was generally concerned about your kids, and you being with them?
A. Yes.
Q. And I ask that because you say when you were terminated he made a comment to you that, now you can go home and be with your kids; right?
A. Um-hmm.
Q. How did you take that, did you think it related to your conversation on Monday?
A. I think he was just being sarcastic.
Q. He said it sarcastically?