UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ENID BONILLA,
Plaintiff,
v. C.A. NO. 07-331S
ELECTROLIZING, INC., ALAN GODIN
and DAVE RICHARDS,
Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF

DAVID RICHARDS

June 26, 2008
9:36 a.m.
Law Offices of Poyner & Spruill LLP
3600 Glenwood Avenue, Suite 200
Raleigh, North Carolina
Donna R. Cuddy, Court Reporter
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

A. I had a copy of this document.
Q. Okay. Does this look like the same one that was given to you when you were hired at Electrolizing?
A. (Witness examines document) As far as I can tell, yes.
Q. Okay. Did Chris Bejbl give you either this -- a copy of this document or something very similar to it?
A. I don't remember who gave it to me, but I had a copy of it.
Q. Okay. So if it wasn't Chris Bejbl, it would have been somebody in the administrative office?
A. Most likely.
Q. Did you read it --
A. Yes.
Q. -- when you were --
A. Yes.
Q. Okay. So when you hired people when you worked for Electrolizing, you're not sure if they were given a copy of one of these documents?
A. Correct.
Q. And you don't know if they -- if

each employee was -- all the company's benefits and rules and regulations were explained to each employee at the time of their hiring?

A. I believe, in the indoctrination process, they read this and got that briefing, but I did not do that briefing myself.

Q. But you don't know for sure if that was done. Correct?

A. I don't know. Correct.

Q. Did the topic of benefits ever come up at an interview with someone?

A. Yes.

Q. What would be some of the questions that people would ask regarding benefits?

A. Well, I would use this as their calculated -- how vacation worked because it was an accrual process. The absenteeism policy, distribution of paychecks. If they did ask about benefits, then they -- you know, what is the healthcare, what is that -- the administration folks would handle those specifics because you could sign up or

WITNESS: Okay.
MR. MILLSOM: -- we'll be done with this.
BY MR. GAGLIARDI:
Q. If an employee --
MR. MILLSOM: Well, that's a different question.
MR. GAGLIARDI: I don't want to mention Enid Bonilla.
MR. MILLSOM: Go ahead. Just -- just -- that's what you want. He'll answer it. I'll object. Ask it.
MR. GAGLIARDI: There's no need to get agitated, Geoff, okay? This is just -- these are just questions, okay? This is not an easy process.
MR. MILLSOM: No, it is an easy process.
MR. GAGLIARDI: Well --
MR. MILLSOM: You're not making it easy.
BY MR. GAGLIARDI:
Q. If any employee came to you and accused another employee of making sexist and racist comments regarding her gender, her

Hispanic origin, her national origin, would that rise to the level of termination if you could prove it to be true?

MR. MILLSOM: Objection.

A. If a person came to me, and I performed the investigation and it was validated and it was true in accordance with company policy, the person would be terminated.

BY MR. GAGLIARDI:

Q. Thank you. Now, did you ever fire anybody when you were the operations manager at Electrolizing?

A. Yes.

Q. Do you know how many people you fired?

A. I don't know how many people.

Q. Let me just back up. When you said that the example that I gave you -- the hypothetical that you testified that that person would be terminated if you could corroborate their claims. Correct?

A. I believe that's what I said.

Q. Is that Dave Richards' policy or was that the company's policy or both?

excessive absenteeism.
BY MR. GAGLIARDI:
Q. Do you have the power to fire? Did you have the power to fire her?
A. Yes, I did. That's what I did.
Q. Then why couldn't you stop her from leaving work? When you say you can't stop -- you can't stop someone, do you mean --
A. How would I physically stop her from leaving?
Q. Oh, of course you can't physically stop her.
A. So what could I do?
Q. How about, "If you leave, you're fired."
A. And I said, "Be advised" -- and I told her numerous times -- "you are in excessive absenteeism. You risk the chance of being fired." And if you go back and look at what I've talked about before, I counseled her before that. And she continued to leave.
Q. Let's get back to this she came to you on several occasions and asked to leave

early. Do you remember when this happened?
A. No. I don't have the timecards in front of me. It was weeks. I gave -- I mean, it was weeks.
Q. What was her reason for wanting to leave early?
A. I don't remember the specific instances. It could be anything from driving someone to somewhere, going to get her car fixed, going to a lawyer's appointment she told me once. There was a myriad of excuses. And --
Q. Is it --
A. -- and most of them were not given pre. They were came in that day and told me.
Q. So if she had told you a few days earlier, "I have to go to see my lawyer," then what?
A. I don't know. It depends how much time she had, what had she accrued, what the work schedule was. I don't remember. You know, you have to pre-plan things the best you can. If you have a meeting or a doctor's appointment on a Friday, you usually

playing semantics here. His first answer was, "I said no."

MR. GAGLIARDI: No. His answer was, "I need you here." That's different.

A. Numerous times I told her she's needed here; she shouldn't leave. Okay?

BY MR. GAGLIARDI:

Q. And did you say it was --

A. And it was clear that she was not to leave.

Q. Did you say, "This will count as an unexcused absence?"

A. Yes.

Q. When?

A. I told her numerous times, and said, "You are already -- you are at risk of losing your job because of excessive absenteeism."

Q. Did you give her a verbal warning?

A. Numerous times.

Q. Did you give her a written warning?

A. I don't believe I wrote one down, no.

Q. Why not?

to this witness they can work when the plant --

MR. GAGLIARDI: No.

MR. MILLSOM: -- is shut down?

MR. GAGLIARDI: No.

BY MR. GAGLIARDI:

Q. I'm suggesting that, for example, Erison Carrasco too three weeks off, and the company was able to function properly. Correct?

A. Because of the large amount of time notice beforehand, yes.

Q. But he was able to give you notice in that scenario.

A. He also needed a large block of time. It's not the same as someone saying, "I need to leave four hours today." He had a block of time and let me know months in advance of three weeks. That's easy to schedule around. He also --

Q. It's also easy to give notice when you're able to give notice, too.

MR. MILLSOM: Don't badger the witness.

MR. GAGLIARDI: I'm not.

them in terms of --
A. Of course not.
Q. -- their attendance?
A. Of course not.
Q. Okay. What about -- do you remember ever talking to Miss Bonilla about taking too long of a lunch? Taking too long of a lunch break?
A. Yes.
Q. What was the policy for lunch breaks? How long were employees allowed?
A. Thirty minutes.
Q. Thirty minutes? And what was she doing that was a problem for you with regard to that?
A. She was transporting somebody to work. I don't know if it was a sister or a -- or an aunt or somebody. But she was providing them transportation to work. So she would leave during her lunch period and then return after she dropped the person off, I guess.
Q. Did she ask you in advance if she could take a longer lunch?
A. No. She asked if -- the company

didn't like you -- if you left the premises for that, you were required to punch out for your lunch. For, I guess it was in case you had a car accident. But she didn't ask -- she said, "I'm going to go take my cousin, and I might be a little late." She said that one time.

Q. What did you say to that?

A. "Well, try to be back as, you know, see if you can be back in 30 minutes." And then after, you know, the first or the second time, I believe we were still in the old card system, and she was in excess of 45 minutes. And I said, "You really can't -- you can't really do that. Because they're giving you 30, and now it's into" -- I don't remember specifically. The card would tell you. But it was in excess of 45 minutes.

Q. And so did you give her a written -- a verbal warning?

A. I told her, "If it's going to take you that long, then she'll have to find alternate transportation."

Q. And did Miss Bonilla comply with your request to make sure she took the

appropriate amount of time for lunch? After you talked to her about it?

A. I don't believe she was driving her after that, so -- I'd have to look at the timecard, but I'm pretty sure it was -- she corrected that.

Q. All right. So was that one of the reasons that she was terminated?

A. Specifically for that?

Q. Well, you said she was terminated for excessive absenteeism. And you said there was a pattern of conduct.

A. Right. In that --

Q. Is that one of the things that --

A. -- in that case, if I looked at the timecards I could tell you, and I'm sure her time didn't add up to 40 hours that week. And if it went into two weeks -- I don't remember specifically -- that would be the problem. Since she started at 8:30 and we're usually done by 5:00, if she took 45 minutes for lunch during those days, obviously, on the Friday she would be under the 40 hours.

Q. Okay. Do you remember the week

take my children to the emergency room."
Q. Were you busy that day?
A. Every day was relatively busy.
Q. Were you angry that she had to leave?
MR. MILLSOM: Objection.
A. I don't know what you mean by "angry." Disappointed that I would have to have someone work overtime and probably have to go out there myself or find other assistance to help package the material.
BY MR. GAGLIARDI:
Q. Right.
A. I think disappointed is better. I wouldn't say angry.
Q. Were you disappointed in her or just in the circumstances of the fact that she had to leave? That it put the company in a bind, let's say.
A. Just disappointed in the circumstances, that now someone else has to do the work.
Q. I mean, you couldn't really blame her for wanting to leave. Correct?
A. No. She needed to do that.