UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| ENID BONILLA,<br>        Plaintiff<br><br>        v.<br><br>ELECTROLIZING, INC., ALAN GODIN<br>and DAVE RICHARDS,<br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 07-331 S |

## DECISION AND ORDER

WILLIAM E. SMITH, United States District Judge.

Before the Court is Defendants' motion for summary judgment on all counts. Enid Bonilla ("Plaintiff"), a former employee of Defendant Electrolizing, Inc., claims a violation of rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C § 2000e et seq. ("Title VII") and the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq. ("FMLA"). Plaintiff maintains that she was fired because she is a woman, subjected to a hostile work environment from harassment based on sex and ancestral origin, and retaliated against for complaining about harassment and for taking time off to care for her ill children. Having conducted a thorough review of the record in this highly fact-intensive case, the Court concludes that Defendants are entitled to judgment on Plaintiff's Title VII claims but not the FMLA claim.

I.    Factual Background

The Court reviews the record in the light most favorable to the non-moving party, making all reasonable inferences in her favor.  Mellen v. Trs. of Boston Univ., 504 F.3d 21, 24 (1st Cir. 2007).  Plaintiff is a Hispanic female who moved to the United States from Puerto Rico at age ten.[1]  Electrolizing is a Rhode Island corporation that applies a unique chrome plating to metal pieces and equipment.  Customers send pieces to Electrolizing's Providence plant for coating and, once complete, items are returned via Electrolizing's shipping system.

In March of 2004, Plaintiff was hired as a part-time plant employee.  In early 2005, she replaced an outgoing (female) employee in the receiving department and began to work full-time.  Plaintiff opened and processed incoming packages each morning, and in the afternoon worked as a "back up shipper" preparing items for return to customers.  It is in the shipping department where she worked with Defendant Alan Godin ("Godin"), a Caucasian male employed by Electrolizing for approximately twenty-six years.  Godin's daily shift ran Monday through Friday from 7:00 a.m. to 3:30 p.m.  Plaintiff usually worked with him in shipping during the afternoon and, once Godin left, Plaintiff finished all remaining shipping projects.  In April of 2005, Electrolizing hired Anilsa

_____

[1] The Court treats Plaintiff's status as a "national origin" under Title VII.  Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 4 n.1 (1st Cir. 2000).

Soriano as a receiving clerk.  Ms. Soriano assisted Plaintiff with receiving packages in the morning and usually moved with her to shipping in the afternoon around 3:00 p.m. to provide additional help.  Ms. Soriano, Plaintiff and Godin were supervised by Defendant Dave Richards ("Richards"), a Caucasian male and Electrolizing's former Operations Manager.[2]  The vast majority of employees at Electrolizing's plant are of Hispanic origin (Plaintiff herself estimates 90 percent).

According to Plaintiff, Godin made derogatory remarks about women and Hispanics.  Plaintiff claims that when Godin believed she worked too slowly, he said "I told Dave [Richards] not to hire women . . . you shouldn't be working here . . . all you women do is talk . . . I don't know why they keep sending me women."  She also claims Godin swore and made remarks such as "you people come to this country and get all the benefits . . . If I had my way, none of you people would be here . . . you should all go back to your country" and disparaged Salsa music in front of her.

Plaintiff claims she verbally complained to Richards about Godin on many occasions, "maybe every single day."  At first, she

---

[2] Plaintiff urges the Court to categorize Godin as Plaintiff's supervisor.  The record indicates that Godin had many years of experience at the plant and at times gave direction to Plaintiff when they worked in shipping.  It is undisputed that Godin could not fire Plaintiff, had no say over compensation, was not the person to whom she spoke about taking time off, gave no performance reviews and made no management decisions.  In short, there is no basis for describing Godin as Plaintiff's supervisor.

complained about "the hostility in the area, how everything I did bothered him, how he would throw things around and swear and yell, and how it made me feel very uncomfortable and threatened by his actions." Plaintiff identifies one specific complaint to Richards during a meeting with him in December 2005. At this meeting, Plaintiff claims to have requested written assurance that Electrolizing would respond to Godin's behavior because she thought Richards was ignoring her. Plaintiff made no written complaints and no oral complaints to anyone else. Richards denies Plaintiff ever complained to him of harassment by Godin, much less harassment based on sex or national origin, or that she requested any investigation and written report. Plaintiff submitted an affidavit of co-worker Diana Bonilla (no relation), who says on some unspecified date she overheard Plaintiff tell Richards that Godin made sexist and racist comments. Diana Bonilla claims Plaintiff cried and told Richards she wanted to quit because of Godin, and that Richards said he did not want her to quit and would talk to Godin.

Relevant sections of Electrolizing's written company policy, entitled "Company Information," state as follows:

> All complaints of possible discrimination should be submitted, in written form, to the Human Resources Manager within 20 days of the alleged discriminatory act. The complainant must sign the complaint. All employees have a right to utilize the complaint procedure without jeopardizing their current or prospective employment status. All complaints of discrimination will be fully investigated.

> The company shall strive to provide equal opportunity to all applicants and employees without regard to race, color, sex, religion or national origin, disability, or age.
>
> Electrolizing . . . shall prohibit sexual and other harassment of any employees, whether it is by a co-worker, a manager, a customer, or a vendor. Because [it] believes that all employees should treat one another with respect for the individual's dignity, all forms of sexual harassment are prohibited, including sexual advances, requests for sexual favors and gender-specific remarks. In addition, any harassing behavior that is considered offensive or threatening (though not sexually explicit) and/or interferes with an individual's work performance should be reported to management for investigation.

Additionally, the "Harassment Prohibited" section provides that reports should be directed to the Human Resources Manager (though Plaintiff's counsel stated in response to the Court's inquiry during argument that no HR department existed at the relevant time). Another section directs employees to discuss concerns with supervisors but if that is not "satisfactory," to take concerns to the Operations Manager, HR Manager or other manager "openly and without fear of reprisal." At her deposition, Plaintiff said she was not aware of any policies or procedures at Electrolizing pertaining to complaints about harassment or other conduct in the workplace. According to Electrolizing's co-owner Chris Bejbl, the Company Information document is provided to all employees and was provided to Plaintiff.

Plaintiff's attendance and job performance are in play in this case. Plaintiff describes her's as a flexible work schedule with fluctuating start and finish times depending on the company's

production.  She says she needed to be at the plant by 10:00 a.m.
unless Richards asked her to arrive early to help and earn extra
hours (which she often did), and that she was never required to
work a 40 hour week.[3]  The picture Electrolizing paints, however,
is of a 40 hour work week requirement with daily hours from
approximately 8:30 a.m. to 4:30 p.m. and possible overtime.  The
company manual states that the first shift is from 7:00 a.m. to
3:30 p.m., Monday through Friday, with a 30 minute lunch break and
occasional overtime required "due to the nature of this business."
Ms. Soriano testified that she worked from 8:00 a.m. to about 4:30
p.m.

From Electrolizing's viewpoint, Plaintiff was not a
particularly good employee.  It claims through the second half of
2005 and early 2006 she consistently left the plant or missed parts
of the day on an unscheduled or emergency basis with, according to
Richards, "a myriad of excuses."  Electrolizing submitted a chart
reflecting Plaintiff's time records, which (argues Electrolizing)
show that from October 16, 2005 through February 10, 2006 she

---

[3] Under the "sham affidavit" doctrine, <u>Colantuoni v. Alfred
Calcagni & Sons, Inc.</u>, 44 F.3d 1, 4-5 (1st Cir. 1994), Defendants
ask the Court to disregard Plaintiff's affidavit statement that she
did not have to work 40 hours and only needed to arrive by 10:00
a.m.  Defendants say this is conveniently inconsistent with her
prior deposition testimony about her 9:00 a.m. arrival, and with
the time records showing she usually arrived before 10:00 a.m.
While the discrepancy may be enough to raise an eyebrow, the Court
need not go so far as to strike the evidence.  This is largely
because there is ample other evidence of Plaintiff's attendance
problems, regardless of her precise start and end times.

missed at least one unscheduled partial or full day during each pay period and regularly fell short of the 40 hour mark.  Plaintiff denies this.  An "Employee Evaluation Sheet" reflects that she received (from Richards) a score of 45 out of a possible 60 on a review.[4]  Richards noted with respect to a "in on time/work full days" category on the evaluation that Plaintiff "exceeded allowable days," and was "talking too much, noted by co-workers."

Richards claims Plaintiff requested time off for various things "throughout her career" and would not regularly stay late when needed.  He claims he did his best to be flexible, such as allowing her to leave the plant during lunch to drive her sister-in-law to work, but that eventually he told her to stop once the extended breaks became constant.  Richards says he often advised Plaintiff that she was "in excessive absenteeism" and risked being fired.  Godin recalled her missing "a lot of work" but said she was a "pretty good" employee.  Electrolizing apparently hired Ms. Soriano as a receiving clerk "helper" to assist Plaintiff because, it claims, she often left projects incomplete.  Plaintiff does not dispute that Ms. Soriano assisted her with projects for most of the day and helped her in shipping in the late afternoon.

---

[4] There seems to be agreement that consistent with the company's review and bonus process this undated evaluation was likely provided to Plaintiff in early November 2005.  Richards says the score was "mediocre" and/or well below average, a characterization Plaintiff disputes.

Plaintiff denies being counseled about what she describes as "trumped-up" attendance issues before a February 6, 2006 meeting with Richards (see below), but acknowledged Richards spoke to her in 2005 about complaints that she talked too much on the job. She says she missed work or took extended breaks in accordance with company policy and/or when approved by Richards.[5] Payroll documents show she received a fifty cent per hour raise and a $1,000 bonus in December 2005.

The events surrounding Plaintiff's termination occurred in February 2006. On Friday, February 3, Plaintiff received a phone call at the plant and claims she learned her husband was in a car accident. She asked for and received permission from Richards to leave work. Plaintiff claims Richards was angry and said he wished to speak with her about her attendance the following Monday. Richards' says he was concerned Plaintiff fabricated the story about the car accident to leave work early before the weekend. Apparently, he became suspicious when Plaintiff's husband called shortly after she left work, was not in the hospital and was confused as to why his wife was not at the plant. This, says Richards, caused him to review her time records and attendance history because it had been an ongoing issue. In any event,

---

[5] The parties squabble about whether Plaintiff could have applied vacation days to some absences. Apparently, vacation days at Electrolizing are commensurate with time of service and cannot be used for partially missed days. The Court finds this issue largely irrelevant.

Plaintiff admits that on Monday, February 6 Richards spoke with her about "an issue he had with my attendance." Richards' electronic note memorializing the meeting states: "discussed for last time about needing to be here to cover the workday. depending on her to meet prod needs." Richards said if she could not consistently work a full day and overtime (when needed), he would be forced to fire her.

Around this same time Plaintiff's two children -- then ages two and six -- became ill and their condition (extreme fever, sore throat, ear infection, rash, and swelling akin to Scarlet Fever) worsened over the weekend of February 4th and 5th. On Monday, February 6 when Plaintiff met with Richards about her attendance she said she "might need some time off during the upcoming week to tend to my children." On Wednesday, February 8 Plaintiff received permission from Richards to leave early to take them to the emergency room. Before she left at around 10:30 a.m., Plaintiff received permission to call the pediatrician so Richards could speak with him and understand "the seriousness of the situation." Plaintiff testified that Richards "said it was fine for me to go, and to try to come back, but I left the hospital almost at 5:00 p.m., so it was already too late."

Plaintiff returned to work full days on Thursday, February 9 and Friday, February 10. During that time, however, Richards says he decided to fire her because of her consistent inability to meet

attendance requirements and because he was concerned that she was not always truthful about why she left early or arrived late. Around the close of business on February 10, Richards met with Plaintiff and Ms. Soriano (the receiving clerk) in a conference room and fired both women. A company salesman Randy Clifton was also present, and the meeting lasted less than five minutes. Plaintiff provided the following deposition testimony:

> Well, like I said, he [Richards] was very upset with me
> with the fact of me leaving on that day. And he had
> someone else in there, also. And he didn't look at me
> and say, well, this is why I'm letting you go. He was
> looking more towards Anilisa [Soriano], and then he just
> turned around. Because I was sitting on his right. And
> he said, oh, and now you can go and take care of your
> kids. There was no real explanation of the reason why he
> was letting me go. I thought that was definitely out of
> character, and definitely out of line.

Plaintiff testified that she believed Richards' comment about her kids was "sarcastic," but also that she believed he was, at least in the past, concerned about the children and "very nice." Electrolizing replaced Plaintiff and Ms. Soriano with one male employee who performs all of the same receiving and shipping functions.

## II.  Standard of Review

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "Once the moving party avers the absence of genuine issues of material fact, the nonmovant must show that a factual dispute does exist." Velázquez-Fernández

v. NCE Foods, Inc., 476 F.3d 6, 10 (1st Cir. 2007) (citation omitted). An issue of fact is "genuine" if it "may reasonably be resolved in favor of either party," Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997), and it is "material" "only when it possesses the capacity, if determined as the nonmovant wishes, to alter the outcome of the lawsuit under the applicable legal tenets." Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 253 (1st Cir. 1996). The Court views the record in the light most favorable to the Plaintiff, and must draw all reasonable inferences in her favor. See Flowers v. Fiore, 359 F.3d 24, 29 (1st Cir. 2004).

"Even in employment discrimination cases where elusive concepts such as motive or intent are at issue," judgment as a matter of law for Defendants is appropriate if Plaintiff rests "merely upon conclusory allegations, improbable inferences, and unsupported speculation." Feliciano, 218 F.3d at 5 (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (internal quotations omitted)). Plaintiff bears the burden of proof at this stage, and the "evidence adduced on each of the elements of [her] asserted cause of action must be significantly probative in order to forestall summary judgment." Bennett v. Saint-Gobain Corp., 507 F.3d 23, 30 (1st Cir. 2007).

11

III. Discussion

Plaintiff's Amended Complaint alleges three Counts: I (Title VII discrimination), II (Title VII retaliation), and III (FMLA retaliation).   In written opposition to Defendants' motion, Plaintiff argued under Count I that she was discriminated against because of sex and national origin.   During argument, however, counsel limited the argument to sex-based discrimination only. Counsel also said Plaintiff intended to bring a hostile work environment claim under Count I based on sex _and_ national origin. The Court performs its analysis under that framework.

A.   Title VII Claims (Counts I and II)

1.   Termination based on Sex

Plaintiff argues that she was fired because she is a woman and not, as Electrolizing says, because of attendance problems.   Title VII prohibits an employer from discriminating with respect to compensation, terms, conditions, or privileges of employment because of a person's "race, color, religion, sex, or national origin."   42 U.S.C. § 2000e-2(a)(1).

Absent direct evidence, the Court turns to the familiar McDonnell Douglas burden-shifting framework to determine whether Plaintiff raises an inference of sex discrimination.[6]   McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).   To establish a prima

---

[6] Plaintiff does not argue that she has direct evidence of discrimination, and the Court sees none.

facie case, Plaintiff must show that (1) she belonged to a protected class; (2) she was adequately performing her job; (3) she suffered an adverse employment action; and (4) her employer replaced her with an employee of comparable qualifications. Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000) (burden for prima facie case "not onerous"). The parties dispute whether Plaintiff adequately performed her job. Given the minimal burden and evidence that Plaintiff was at least an average employee, the Court assumes a prima facie showing "in order to move on to the real issues in the case." García v. Bristol-Myers Squibb Co., 535 F.3d 23, 31 (1st Cir. 2008); Dichner v. Liberty Travel, 141 F.3d 24, 30 (1st Cir. 1998) ("the task of proving discrimination remains the plaintiff's at all times"). Plaintiff concedes that Defendants have a non-discriminatory reason for her firing: inconsistent attendance and lack of a reliable full schedule. Thus, the Court addresses the all-important issue: whether there is sufficient evidence to show the stated reason for termination was a mere pretext for sex discrimination. McDonnell Douglas, 411 U.S. at 802. It is here Plaintiff's theory collapses.

Plaintiff advances a host of reasons to support her theory as to why Electrolizing is engaged in a cover-up. Her primary claim is that Godin disliked working with women at the plant and thought they talked too much. As evidence, Plaintiff points out that he said to her, "I told Dave [Richards] not to hire women;" and

13

Richards subsequently fired her and said "now you can go and take care of your kids." Together, in Plaintiff's view, this is enough to create a material factual dispute as to whether her termination was based on sex.

This chain of proof is far too speculative to survive summary judgment. For starters, Plaintiff provided no time frame for Godin's comments. The record indicates he must have made them before December 2005, when Plaintiff purportedly complained. The more fundamental (and fatal) flaw is that even giving Plaintiff the benefit of the doubt, there is no link between Godin (and his sexist comments) and Richards' termination decision. Plaintiff merely describes Godin (without any record support) as "a person in position to influence Mr. Richards." The record is devoid of any proof that Godin was involved in any way with personnel decisions.[7] Moreover, there is no evidence Godin actually told Richards not to hire or "send him" women -- Godin simply said he did. Regardless, even making that stretch, it amounts to nothing more than an irrelevant stray co-worker remark (months before the challenged decision) that cannot be attributed or linked to the decisionmaker. See Bennett, 507 F.3d at 29 (disregarding comments by those having no part in decision); Santiago v. Canon U.S.A., Inc., 138 F.3d 1,

---

[7] Godin's uncontroverted deposition testimony is that he was surprised Plaintiff was fired and did not ask Richards about the decision, nor was he ever told of the reason(s). He has never asked nor recommended that someone be fired.

5 n.8 (1st Cir. 1998) (stray remarks by nondecisionmaker usually insufficient to prove discriminatory animus); <u>Medina-Munoz</u>, 896 F.2d at 10 ("The biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case.").

Still, Plaintiff says, a jury could find that Godin's animus somehow infected Richards as evidenced by his (Richards') comment "now you can go and take care of your kids." She characterizes this as an explicit sexist statement showing she was fired because Godin and Richards had it out for women at the plant. Based on the evidence Plaintiff has put forth, this is an impossible inference. However, the comment may have some probative value on Plaintiff's FMLA claim, as will be discussed near the end of this decision.

First, as discussed above, Godin's prior remarks, without some connection to Richards or the termination decision (for example, evidence that the two exchanged emails about women or women taking care of children or joked at the plant about women employees) amount to little more than irrelevant "background noise." <u>Ruiz Rivera v. Pfizer Pharm., LLC</u>, 521 F.3d 76, 87 (1st Cir. 2008) (quoting <u>Patten v. Wal-Mart Stores E., Inc.</u>, 300 F.3d 21, 25 (1st Cir. 2002)). This critical link in Plaintiff's "conspiracy" theory connecting Godin to Richards is absent, and no jury could reasonably assume that Godin's alleged comments reveal a window of any kind into Richards' mind.

Second, the First Circuit has recently made clear that statements suggesting sex-based stereotypes and assumptions about women and presumed family obligations may, in some circumstances, give rise to a valid discrimination claim. See Chadwick v. Wellpoint, Inc., -- F.3d -- , 2009 WL 782822, *2-4 (1st Cir. Mar. 26, 2009) (reversing entry of summary judgment for employer due to circumstantial evidence of discrimination where explanation for denial of woman's promotion included comments such as "you have the kids and you just have a lot on your plate right now"). But the facts of Chadwick, which the Court of Appeals found could support an inference of sex-stereotyping discrimination, are a far cry from Richards' statement here and, importantly, the context in which it was allegedly made. There is no evidence that Richards made any assumption or generalization about Plaintiff's inability to handle competing work and family demands -- rather, the reference to her caring for the children was directly linked to their illness at that time, and a reference to Plaintiff's specifically stated reason for her absences. By contrast, in Chadwick the comments reflected a general view that the plaintiff could not perform the applied for job because of her obligations as a mother of young triplets. The distinction here is subtle, but real. A statement such as Richards' alleged comment could (as the Court will discuss with respect to the FMLA retaliation count) reflect an impermissible and unlawful reaction to taking family leave, but as

16

it stands alone it cannot support the higher burden a Plaintiff must bear to prevail in a claim of gender discrimination based on sex-stereotyping in the termination decision. Cf. Santiago-Ramos, 217 F.3d at 51, 55-56 (jury could find discrimination against working mothers where female executive was terminated shortly after employer learned she planned to have a second child, and where decision maker and others in a position of influence had made specific comments about her ability to balance work and family responsibilities, as well as general comments reflecting employer animus such as preferring "unmarried, childless women because they would give 150% to the job"). The bottom line is that no jury could reasonably find that a sex-based stereotype about women being unable to balance childcare responsibilities while working at Electrolizing was behind Richards' termination decision. Much to Plaintiff's chagrin, his comment (if made) is no smoking gun.

Next, Plaintiff piles on a patchwork of common pretext themes that do not fit the facts of this case. First, evidence "that others similarly situated to [her] in all relevant respects were treated differently by the employer" may be probative of pretext. Kosereis v. Rhode Island, 331 F.3d 207, 214 (1st Cir. 2003) (quoting Conward v. Cambridge Sch. Comm., 171 F.3d 12, 20 (1st Cir. 1999)). Plaintiff points to Erisson Carrasco, a male employee whom Electrolizing allowed to go to Costa Rica for a few weeks (planned well in advance) for family reasons, and Godin, who was warned at

17

times about his attitude and comments at the plant as reflected in his personnel file but not fired. Plaintiff argues that the treatment of these men reveals hostility to her as a woman. But these so-called instances of disparate treatment are "distinguishable in important respects from the facts and circumstances that [Plaintiff] faced." Kosereis, 331 F.3d at 216; Conward, 171 F.3d at 20 (comparators "need not be perfect replicas" but must "closely resemble one another in respect to relevant facts and circumstances"). There is no evidence that either Carrasco or Godin had spotty attendance and/or extended breaks and did not consistently work 40 hours. Rathbun v. Autozone, Inc., 361 F.3d 62, 76 (1st Cir. 2004) (plaintiff must prove she is "comparing apples to apples"). There is no trialworthy question over whether Electrolizing disciplined women more harshly than it did men.[8]

Plaintiff claims Richards provided "different" reasons to an unemployment benefits investigator (which, in any event, appear in the record as second-hand hearsay). Evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" can support finding

---

[8] To the contrary, Plaintiff acknowledges that she cannot rebut Electrolizing's claim that it fired at least nine employees for reasons related to absenteeism over a recent four year period. Indeed, former employee Pedro Roman testified that Richards was "real strict" and warned him about attendance and "if you missed one day out of work, that's it, your job was on the line, no matter what excuse you had . . . if you don't give them the overtime, and if you take one day or two days or whatever days, they're quick to replace you in a minute."

pretext.  <u>Santiago-Ramos</u>, 217 F.3d at 56.  But put in context, the reasons actually reinforce Defendants' position.  These comments -- "inability to meet attendance requirements"; "terminated for excessive attendance problems"; "she had used up all of her sick time and had been warned about her attendance"; "she was making doctor's appointments during working hours and I told her I needed her here 40 hours"; "she left for lunch and came back late because she said she had to take her sister to work"; "I called her in and told her that I needed someone here 40 hours a week and I had to let her go for excessive attendance problems" -- give reasons that may vary in the details, but are 100% consistent in the overall theme.

Plaintiff's final argument is that Richards skipped an important step by not giving her an attendance warning following their February 6 meeting.  Plaintiff depicts a formal "progressive discipline policy" mandating two verbal warnings prior to termination.  This so-called departure from standard procedure is derived from scattered snippets of Richards' testimony and is not at all backed up by the record.  At any rate, no reasonable jury could find that Plaintiff was unaware her attendance was an issue before February 2006.  This is most evident from her 2005 review ("exceeded allowable days") and Richards' February 6 note ("discussed <u>for last time</u> about needing to be here to cover the workday") (emphasis added).

At best, this evidence would leave a jury to "guess at the reasons behind the pretext." Medina-Munoz, 896 F.2d at 10. At most Plaintiff questions whether her attendance problems should have led to termination. But even if the decision was hasty or unfair, there is nothing here to suggest it was based on gender. See Arroyo-Audifred v. Verizon Wireless, Inc., 527 F.3d 215, 219-20 (1st Cir. 2008) (plaintiff "may not meet [her] burden by citing an inequity and tacking on the self-serving conclusion that the defendant was motivated by a discriminatory animus"); Thomas v. Eastman Kodak Co., 183 F.3d 38, 64 (1st Cir. 1999) (courts cannot "grant relief to a plaintiff who has been discharged unfairly, even by the most irrational of managers" unless the facts indicate that "discriminatory animus was the reason for the decision"); Mesnick v. Gen. Elec. Co., 950 F.2d 816, 835 (1st Cir. 1991) (courts "may not sit as super personnel departments, assessing the merits - or even the rationality - of employers' nondiscriminatory business decisions).

### 2.   Hostile Work Environment

Plaintiff's second Title VII claim is that Electrolizing required her "to work in a discriminatorily hostile or abusive environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). Here, Plaintiff says she was harassed based not only on her sex but also her Hispanic origin.

To prevail, a jury must be able to conclude that (1) Plaintiff is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) harassment was based upon her sex and/or national origin; (4) Electrolizing is "permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions'" of her employment; (5) the conduct was objectively and subjectively offensive; and (6) some basis for employer liability exists. O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001) (quoting Harris, 510 U.S. at 21). "This is not, and by its nature cannot be, a mathematically precise test." Harris, 510 U.S. at 22. The Court scrutinizes the facts, including the frequency of the conduct, its severity, whether there were physical actions or threats, whether comments were mere stray remarks and whether harassment unreasonably interfered with Plaintiff's employment. Pomales v. Celulares Telefónica, Inc., 447 F.3d 79, 83 (1st Cir. 2006) (citing O'Rourke, 235 F.3d at 729). The parties agree Plaintiff is a member of two protected classes; the remaining elements are fair game and hotly disputed.

This is a case of alleged co-worker harassment. Examined most favorably to the Plaintiff, the evidence is that Godin told Plaintiff she bothered him; he threw things, swore and yelled; he said he told Richards not to send him women in shipping, and that women should not be hired because all they do is talk. Godin also

made comments such as "you people come to this country and get all the benefits . . . . If I had my way, none of you people would be here . . . you should all go back to your country." He said in front of Plaintiff that he was sick of Salsa music. A reasonable Hispanic woman, Plaintiff says, would find it abusive to be told that women do not belong and to "go back to her country." She was subjectively offended (as evidenced by her complaints to Richards) and Godin clearly altered her employment because she threatened to quit.[9]

At the outset, Plaintiff makes no effort to separate her sex-based harassment claim from harassment based on national origin; she simply claims the environment was hostile. It is unclear whether she believes each type of harassment alone is sufficient, or whether in combination the facts are sufficient to survive summary judgment. Either way, these facts fall too short of the mark to create a triable issue.

Even when the Court credits, as it must, Plaintiff's threat to quit as evidence of an unreasonable impediment to her work, there is still no triable dispute. For starters, nothing suggests Godin's swearing, throwing or yelling had anything to do with sex or national origin or was personally directed at Plaintiff. See

---

[9] During argument, Plaintiff's counsel said Godin's conduct affected Plaintiff's marriage because she cried and did not want to play with her kids or go out to dinner. These facts appear nowhere in the record and do not affect the analysis in any event. They will not be considered. See Local Rule Cv. 56.

<u>Morrison v. Carleton Woolen Mills, Inc.</u>, 108 F.3d 429, 441 (1st Cir. 1997) (conduct by overbearing or "unsociable and hard to get along with" employee not actionable unless "underlying motives of a . . . discriminatory nature are implicated"). There was no touching or intimidation directed at Plaintiff or any other woman or Hispanic. While by no means dispositive, Godin and Plaintiff worked together at most for a few hours each day. There is no suggestion Godin (or anyone) increased Plaintiff's responsibilities or assigned difficult or degrading tasks. Nor is there any indication women or Hispanics were segregated to certain areas at the plant or subjected to an atmosphere where harassment was tolerated.

This leaves Godin's comments. Though Plaintiff specifies only a few, the Court takes as true her assertion that Godin made similar remarks with some consistency. The Court first tackles the sex-based comments. Plaintiff does not allege sexual harassment in the traditional sense; i.e., sexual advances or <u>quid pro quo</u> propositions. Nevertheless, her claim may survive if a jury could find she endured sufficiently offensive or humiliating gender-based conduct. <u>O'Rourke</u>, 235 F.3d at 729. Here, no jury could so find. Godin's unattractive and boorish banter about women talking too much and his dislike of sharing the workplace with them, while juvenile and imbecilic, was not severe ridicule and insult. Compare <u>Slayton v. Ohio Dept. of Youth Serv.</u>, 206 F.3d 669, 679

23

(6th Cir. 2000) (reasonable woman could find hostile being continuously told she was a "bi\*\*h" who would be fired soon, told her menstrual cycle was the cause of her problems, and made to listen to sexually explicit music and videos). Without a hint of sexist name-calling or sexually charged innuendo, Godin's comments are a far cry from the vulgar "gender-specific epithets" that usually support sex-based claims of hostile work environment. See Forrest v. Brinker Int'l Payroll Co., 511 F.3d 225, 229-30 (1st Cir. 2007) (collecting cases). Title VII does not guarantee a workplace free from the type of opinions Godin expressed about women.

Plaintiff's argument about harassment based on offensive statements regarding Hispanic origin fares no better. Telling "you people" (assuming, that is, Godin was referring to Hispanics) to leave the country, while coarse and stupid, is not sufficiently humiliating or intolerable. When these facts are compared to other cases involving national origin, it is clear that Plaintiff's claim must fail.[10] See de Jesus v. Potter, 211 Fed. Appx. 5, \*11 (1st

---

[10] In examining the totality of "hostile" circumstances the Court does not apply a lower standard given what some might deem the "blue collar" environment at Electrolizing's plant. This is not the law in this Circuit. Compare O'Rourke, 235 F.3d at 735 ("[T]here is no merit to the City's argument at the first trial that it was entitled to a jury instruction that the firefighters' conduct should be evaluated in the context of a blue collar environment.") with Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1538 (10th Cir. 1995) ("[W]e must evaluate [the] claim . . . in the context of a blue collar environment . . . . Speech that might be offensive or unacceptable in a prep school faculty meeting, or on

Cir. 2006) (comments possibly alluding to plaintiff's Hispanic origin such as calling Caribbean employees "you people" and saying mail from Puerto Rico came "off of the banana boat" insufficient); Vasquez v. County of Los Angeles, 349 F.3d 634, 643 (9th Cir. 2003) (no hostile environment where plaintiff was told to consider transferring because "Hispanics do good in the field," and he had "a typical Hispanic macho attitude"); Valdez v. Mercy Hosp., 961 F.2d 1401, 1402-03 (8th Cir. 1992) (supervisor's "ethnic humor" telling ethnic jokes and showing a "Mexican Sex Manual" not sufficiently severe or pervasive, where employee had ongoing personality conflict with supervisor); Hansford v. Norton, 414 F. Supp. 2d 918, 923, 925 (D.S.D. 2006) (comments to Native American employee that members of certain tribes should not hold certain positions and that he "doesn't fit in up here" not abusive).

The bottom line is that Godin may not have been a "man of refinement" at Electrolizing (to say the least). Baskerville v. Culligan Int'l Co., 50 F.3d 428, 431 (7th Cir. 1995); see Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996) ("work places are rarely idyllic retreats"). Indeed one could reasonably call him boorish, crass, unsophisticated, rude and more. His personality and attitude clearly clashed with Plaintiff. Yet, while drawing the line between this conduct and harassment is not always easy, through a Title VII lens no jury could describe the plant as

_____

the floor of Congress, is tolerated in other work environments.").

permeated with severe ridicule based on sex or national origin. See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (courts must maintain a standard "sufficiently demanding to ensure that Title VII does not become a general civility code"); Pomales, 447 F.3d at 83 (summary judgment is appropriate for "polic[ing] the baseline for hostile environment claims") (quoting Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999) (en banc)).[11]

### 3.    Retaliation for Complaints

The Court now turns to Plaintiff's final Title VII theory and the first of her two retaliation claims.  In this claim, Plaintiff switches gears from sex discrimination and maintains that she was fired for complaining about, or opposing, Godin's conduct.  This "opposition clause" notion of retaliation is another recognized

---

[11] Even assuming Plaintiff presented sufficient evidence of harassment by Godin, Electrolizing may nonetheless have a defense to the hostile work environment claim: a lack of evidence from which a jury could find any basis for employer liability.  See Crowley v. L.L. Bean, Inc., 303 F.3d 387, 401 (1st Cir. 2002); O'Rourke, 235 F.3d at 728 (final element to hostile work environment claim is basis for employer liability).  When harassment is by a co-worker, as is claimed here, an employer is liable only if it was negligent either in discovering or remedying the harassment.  Crowley, 303 F.3d at 401; see White v. New Hampshire Dep't of Corrections, 221 F.3d 254, 261 (1st Cir. 2000) (employer is liable for co-worker harassment only if it "knew or should have known" of harassment and "failed to implement prompt and appropriate corrective action").  Though the Court need not reach this step given its resolution, some evidence suggests Plaintiff did not follow the appropriate reporting channels per Electrolizing's "Company Information" document, and that the company moved Plaintiff and/or reduced the number of hours she and Godin worked together in shipping after learning of the problems between the two.

variety of Title VII liability. Crawford v. Metropolitan Gov't of Nashville & Davidson County, Tennessee, 129 S. Ct. 846, 2009 WL 160424, *2-3 (Jan. 26, 2009) (Title VII makes it "unlawful . . . for an employer to discriminate against any of his employees . . . because he has opposed any practice made . . . unlawful . . . by this subchapter.") (quoting 42 U.S.C. § 2000e-3(a)); see also Fantini v. Salem State College, 557 F.3d 22, 31-32 (1st Cir. 2009).

The Court analyzes the Title VII retaliation claim under the McDonnell Douglas framework. Ramirez Rodriguez v. Boehringer Ingelheim Pharm., Inc., 425 F.3d 67, 84 (1st Cir. 2005) (describing modified analysis for retaliation claims drawn from McDonnell Douglas). The prima facie elements are that (1) Plaintiff engaged in protected conduct; (2) she suffered an adverse employment action; and (3) the action is causally connected to the protected conduct. Id.[12] On top of this, Plaintiff must create a genuine factual dispute over whether Defendants' proffered reason for termination was pretextual, and whether Richards in fact acted in retaliation. Calero-Cerezo v. United States Dep't of Justice, 355 F.3d 6, 26 (1st Cir. 2004).

---

[12] Plaintiff's retaliation claim does not necessarily fail simply because her underlying claims fall short. See Mesnick v. Gen. Elec. Co., 950 F.2d 816, 827 (1st Cir. 1991) (plaintiff's inability to establish ADEA violation not fatal to retaliation case); Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 261-62 (1st Cir. 1999) (reported activity need not have been illegal as long as employee reasonably believed it was).

Accepting for purposes of this analysis that Plaintiff complained to Richards about Godin's harassment based on sex or national origin (though Richards denies this), she engaged in protected activity during the fall of 2005 and in the December 2005 meeting. See Benoit v. Technical Mfg. Corp., 331 F.3d 166, 175 (1st Cir. 2003) (protected conduct includes complaints to supervisors).[13] She was fired in February 2006. The key question, then, is could a reasonable jury find an adequate causal connection between her complaint in December and termination in February? Plaintiff insists a jury could connect the dots between these two events using Richards' remark upon firing her about taking care of her kids.

The closer in time an adverse action is to a protected complaint, the greater the inference of causation: two months may be but is not always close enough. Compare Mariani-Colon v. Dep't of Homeland Sec. ex rel. Chertoff, 511 F.3d 216, 224 (1st Cir. 2007) (two months sufficient for prima facie case) with Kipp v. Missouri Highway & Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002) (two-month interval too long to allow inference of causal

---

[13] Defendants make much of the fact that Plaintiff stated in an affidavit attached to her administrative charge that she complained during an October 2005 meeting, not December as she later asserted at deposition. At this stage, given that the discrepancy in recollection presents a credibility question, the Court accepts Plaintiff's recent version. More important is the fact that the difference between October and December complaints makes no difference to the Court's analysis and ultimate outcome.

connection); see also Calero-Cerezo, 355 F.3d at 25 ("[t]hree and four month periods have been held insufficient to establish a causal connection based on temporal proximity").

Assuming arguendo that a two-month gap is enough to satisfy Plaintiff's relatively light prima facie burden, her claim falters at the next step because temporal proximity alone cannot prove Electrolizing's proffered reason was pretextual. Here, there is no evidence upon which a jury could rely to infer that Richards' decision had something to do with Plaintiff's complaints about Godin and not her documented attendance issues that came to the forefront in February 2006. As discussed, no jury could find Richards supported Godin's harassment or favored him so as to punish Plaintiff for complaining. There is no evidence to suggest that Godin was involved in the February 2006 decision to terminate. Indeed, there is no evidence whatsoever about the relationship between Godin and Richards beyond that of plant employee/supervisor.

Accordingly, it would be unreasonable for a jury to string together Richards' February 2006 comment with Plaintiff's complaints about Godin in late 2005. On this record, the two events simply have nothing to do with one another. And, if doubt remained and more were needed, Plaintiff's raise and bonus in December 2005 after, as she claims, she complained to Richards daily "cut[s] against any plausible inference of retaliation."

Bennett, 507 F.3d at 32-33.   All in all, Plaintiff's rank speculation cannot overcome Electrolizing's proffered legitimate reason for termination.   Id. at 31 ("conjecture cannot take the place of proof in the summary judgment calculus").

    4.   Title VII Individual Liability

The question of whether individual defendants can be personally liable for a Title VII violation is, of course, now moot because Plaintiff's three claims fail as a matter of law.   In any event, a recent First Circuit decision issued after this case was briefed and argued snuffs-out what little life there ever was to Plaintiff's argument that Godin and Richards should be kept in the case under Title VII.   See Fantini, 557 F.3d at 28 (agreeing with majority of Circuit Courts that there is no individual employee liability under Title VII).

B.    FMLA (Count III)

Plaintiff's final theory is retaliation under the FMLA, 29 U.S.C. § 2601 et seq.   The gravamen of her argument is that she was fired because she took time off from work on February 8, 2006 to care for her ill children.

The FMLA has two main components.   First, it establishes substantive rights that entitle eligible employees to a total of 12 workweeks of leave, which they may take intermittently in some circumstances including those applicable here (serious health condition of a child).   See 29 U.S.C. § 2612(b)(1).   Second, "[i]n

addition to creating the above entitlements, the FMLA provides protection in the event an employee is discriminated against for exercising those rights." Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 159-160 (1st Cir. 1998). The FMLA claim here falls under this second type of provision.[14] See Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 331-33 (1st Cir. 2005) (discussing independent cause of action for retaliation under FMLA and attendant regulations).

Once again, the Court's assessment tracks McDonnell Douglas. See Hodgens, 144 F.3d at 160-61. To make a case for retaliation, Plaintiff must show (1) she engaged in protected conduct (here, requesting and taking leave);[15] (2) she suffered an adverse employment action (undisputed); and (3) the protected conduct and adverse action are causally connected. See Orta-Castro v. Merck, Sharp & Dohme Quimica P.R., Inc., 447 F.3d 105, 113-14 (1st Cir. 2006). If Plaintiff makes this showing, then (given Defendants'

---

[14] The FMLA states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter," 29 U.S.C. § 2615(a)(1), and that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter," 29 U.S.C. § 2615(a)(2).

[15] The fact that Richards allowed Plaintiff to leave work on Wednesday February 8 to care for her children (i.e., her substantive rights were not violated) does not mean she is precluded from pursuing a FMLA retaliation claim. See Hodgens, 144 F.3d at 159-60; Hunt v. Rapides Healthcare Sys., LLC, 277 F.3d 757, 769 (5th Cir. 2001).

proffered legitimate reason) the Court must ask whether Plaintiff has created a triable issue on the question of whether the proffered reason is but a pretext.

Defendants attack the third prong of Plaintiff's prima facie retaliation case (the causal connection).  They also challenge her pretext evidence as insufficient to overcome the rock solid evidence of chronic absenteeism.[16]  Plaintiff must be able to demonstrate that there is evidence from which a reasonable jury could find Richards' decision was motivated by a desire to retaliate against her for taking time off to care for her children. In contrast to her Title VII retaliation case, here Plaintiff offers some corroborating evidence that could allow a jury to connect these dots.  See Kosereis, 331 F.3d at 217.

The two days between Plaintiff's exercise of FMLA rights (Wednesday) and her termination (Friday) make the events "very close" and the timing highly probative of causality.  Calero-Cerezo, 355 F.3d at 25.  Moreover, under her FMLA theory, the "now you can go and take care of your kids" statement by Richards

---

[16] In its moving papers, Electrolizing also argued that the FMLA did not apply because the company did not employ the requisite number of employees (50) during the relevant time.  29 C.F.R. § 825.104(a).  At oral argument, however, Defendants' counsel volunteered that material issues of fact still existed on the question so as to take it "off the table" for purposes of the instant motion.  In addition, Defendants have hinted that Plaintiff's children may not have had a FMLA-qualifying "serious health condition," 29 U.S.C. § 2611(11), but this issue was neither briefed nor argued and the Court will not reach it.

finally has some relevance. The Court must credit the record evidence that Richards made this statement directly to Plaintiff upon firing her.[17] At minimum, she has made out a prima facie case.

Moving on to pretext, the Court cannot conclude that a fair-minded jury could not infer from the timing and statement that Richards acted with retaliatory animus. Defendants argue that when viewed in context, the comment is innocuous and does not reflect retaliatory sentiment of any sort. Richards denies that Plaintiff's leave to care for her children was the last straw. That may well be true, especially given her background and absenteeism warning just a few days prior. Defendants will have their chance to convince a jury. But at this stage Plaintiff is entitled to all reasonable inferences, and the possible meaning of Richards' statement in this context is one of them. The evidence of record suggesting Richards said he was letting her go so she could care for her children (and appeared angry and sarcastic) is probative and could be viewed as a reference to her protected leave. See Hodgens, 144 F.3d at 171 ("Statements by supervisors

---

[17] It is worth noting Plaintiff's description of Richards' statement in an affidavit ("I'm letting you go . . . so you can take care of your kids") differs slightly from her deposition ("oh, and now you can go and take care of your kids."). While the two accounts are not so inconsistent as to be viewed as manufacturing a dispute of fact, the additional preface of "I'm letting you go so . . ." could be critical at trial if Plaintiff testified as such. The nebulousness of the record on this point contributes to the Court's belief that summary judgment would be premature. Evidentiary details on the question of Richards' intent should be flushed out before a jury.

carrying the inference that the supervisor harbored animus against protected classes of people or conduct are clearly probative of pretext").

It is undisputed Richards decided to fire Plaintiff <u>after</u> she left on February 8. Whether or to what extent he considered that leave (even if it was intermittent and brief) in making that decision is a question best left for trial. <u>Peter v. Lincoln Technical Inst.</u>, 255 F. Supp. 2d 417, 445 (E.D. Pa. 2002) ("FMLA-protected absences may not lawfully be considered in deciding whether to terminate an employee for excessive absenteeism"); <u>Hodgens</u>, 144 F.3d at 168 (citing <u>Monica v. Nalco Chem. Co.</u>, No. CIV.A. 96-1286, 1996 WL 736946, *2 (E.D. La. Dec. 26, 1996) (fact that one of six absences used as basis for termination due to absenteeism was an FMLA-covered absence creates issue of fact as to retaliation)).

To sum up, the pertinent question is not whether Richards retaliated against Plaintiff for taking FMLA-protected leave, but whether a jury could reasonably so conclude. Admittedly, this is a close call on summary judgment. While the circumstantial proof of retaliatory animus is hardly overwhelming, there is just enough of a factual dispute to warrant a trial.[18]

--------

[18] Defendants did not raise the issue of individual liability under the FMLA, an open question in this Circuit. Most courts have held that individual liability is appropriate in some circumstances for officers and supervisors under the FMLA definition of "employer" and parallel Federal Labor Standards Act definition.

III. Conclusion

   For the reasons presented above, Defendants' motion for summary judgment is GRANTED as to Counts I and II and DENIED as to Count III.   Count III will proceed against Electrolizing and Richards only.

ENTER:


_William E. Smith_
William E. Smith
United States District Judge
Date:   4/15/09

---

See Brunelle v. Cytec Plastics, Inc., 225 F. Supp. 2d 67, 82 (D.
Me. 2002) (summarizing principles).   Although at this time the
Court will pass on the question with respect to Richards, it will
dismiss Count III as against Godin individually because no
formulation of the current case law could support deeming him a
FMLA "employer."   29 U.S.C. § 2611(4)(A)(ii)(I).